UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA
for the use and benefit of
DIAMOND SERVICES CORPORATION

VERSUS

RLB CONTRACTING, INC.,
HARBOR DREDGING, INC., and
TRAVLERS CASUALTY AND SURETY
COMPANY OF AMERICA

CIVIL ACTION NO: 3:21-cv-00253

DISTRICT JUDGE
HON. JEFFERY V. BROWN

MAGISTRATE JUDGE
HON.  ANDREW M. EDISON

**Opposition to RLB's Motion to Dismiss**

Diamond performed work for the benefit of, at the direction of, RLB, in a job in the Houston Ship Channel. Specifically, RLB had a dredging contract, and Diamond did all the dredging on the contract. During that job, there were certain significant difficulties resulting to an unforeseeable site condition, with excessive detritus where the dredging should take place. RLB told Diamond not to worry – RLB would submit a request for equitable adjustment to the Corps to make sure Diamond was taken care of. And in fact, RLB submitted its equitable request to the Corps, in which it sought $8,867,212. Not all of that nearly nine million dollars was for RLB's work, though. RLB included $2,362,344 of Diamond's work in its equitable request. And RLB was paid: it received six million equitable dollars from the Corps for this differing site condition. (The payment from the Corps is attached as Exhibit A.) Now RLB takes the position that the money the Corps paid to RLB for Diamond's work actually belongs to RLB, and neither law nor equity demands otherwise.

When RLB equitably submits Diamond's time and materials to the Corps, and then the Corps equitably pays RLB for Diamond's excess time and materials, RLB cannot equitably keep the money that was paid for Diamond's work. RLB attached about one hundred pages of exhibits

1

to its motion to dismiss. RLB's motion to dismiss should be converted to a summary judgment motion and denied. Furthermore, Diamond asks this Court to enter judgment on behalf of Diamond for $2,362,344 under Fed. R. Civ. P. 54(f), because the material facts are not in dispute: RLB cannot keep money that the Corps paid RLB for Diamond's work.

Diamond's claim against RLB sounds in quasi-contract because the equitable adjustment is beyond the scope of Diamond's written agreement. This follows, as definitionally, RLB's own equitable request to the Corps is beyond the scope of RLB's contract with the Corps. And Diamond's claim against Travelers is a valid Miller Act claim because, under the Miller Act, Diamond is a subcontractor of RLB, not of Harbor, following more than fifty years of Supreme Court precedent on the Miller Act that holds a subcontractor is determined not on the contracts but on the significance of the work performed. This Court should enter judgment for Diamond against Travelers for $2,167,288: the total of Diamond's damages less Diamond's profits, which are not recoverable under the Miller Act.

## I.      Background

The factual allegations are laid-out in Diamond's Complaint. Diamond worked for RLB on a dredging job in the Houston Ship Channel.  Pursuant to the agreement between Diamond and RLB, Diamond would be paid 54.16% per cubic yard dredged. As Diamond explains, and as RLB's submittal to the Corps makes clear, there were multiple problems with the job, mostly focusing on excessive debris. The Complaint speaks for itself. There is, from RLB's exhibits, new information that Diamond will address.

1. Diamond's contract with Harbor; Harbor's contract with RLB.

Diamond's contract with Harbor is attached as Exhibit A to Diamond's Complaint, rec. doc. 1-2. RLB's contract with Harbor is attached as Rec. Doc. 22-1. Obvious from the face of it,

the two contracts are, effectively, identical, except Harbor changed some of the names and figures around before sending its contract with RLB to Diamond for Diamond's signature.

The contract executed by Harbor and RLB provides that RLB is Contractor and Harbor is Sub-Contractor. It further provides, in Articles 1 and 2, that Harbor is owed $2,745,700 upon completion. The contract between Harbor and Diamond is a little more confused with regard to who is the contractor. In the first sentence, it provides that Harbor is Contractor and that Diamond is Subcontractor. But then, immediately below, it provides that RLB Contracting is "General Contractor" and that both Diamond and Harbor are "Sub-Contractor." In Article 1, it references Contractor receiving funds from the U.S. Army Corps of Engineers, which means that Contractor is RLB: Harbor, after all, received its funds from RLB, not from the Corps. The total payment owed to Diamond under the contract is $2,428,150: about 88% of the funds owed to Harbor. The remainder of the two contracts is effectively identical.

Explained in more depth below, there are aspects of the contract with significant legal consequences – both what is in the contract and what is omitted. The contract does not include a merger clause, and in Article 4, the contract contemplates either oral or written modifications ("Contractor, [presumably RLB] without nullifying this Agreement, **may** direct Subcontractor in writing to make changes to Subcontractor's work.") (emphasis added.) It further references change orders.

RLB takes the position that Diamond is a stranger to RLB's contract with the Corps, but the contract incorporates RLB's contract with the Corps into the subcontract in full. Rec. Doc. 1-2, Paragraph 1. RLB also takes the position that Diamond cannot claim damages for delay or additional work, but nowhere does the contract place the burden of delay or extra expense on Diamond, which is required under Texas law.

Finally, there are some confusing and evidently mislaid portions of both contracts. The contract lists "Article?" (presumably Article 7, as it sits between Articles 6 and 8) calls for subcontractor to indemnify Owner, Architect, and Architect's consultants. Though these terms are capitalized, they are undefined, and Diamond cannot intuit who Architect is.

2. RLB's submittals to the Corps show that Diamond did the dredging, and Harbor passed along Diamond's invoices.

RLB helpfully attached its submittal to the Corps to its motion. Helpfully too, RLB leads with Diamond's certified costs and pricing data – Rec. Doc. 22-2. And, laid out there, Diamond's portion of the request for equitable adjustment comes to $2,362,344. The support too is laid out, with a spreadsheet showing all Diamond's costs for the equitable adjustment. Harbor Dredging's expenses are attached. Rec. Doc. 22-3, and RLB's. RLB passed these along to the Corps without comment, accepting them in full.

The bulk of Harbor Dredging's claim is its 20.19% overhead on Diamond's actual costs. Harbor's actual costs are $64,371 for labor. Adding 20.19% overhead and 9% profit to Harbor's labor expenses, Harbor's requested equitable adjustment for Harbor's actual work is $84,330.58. But by adding 20.19% overhead and 9% profit to Diamond's costs, Harbor's overhead and profit for the work of passing along Diamond's requested equitable adjustment, Harbor increases its equitable adjustment by $739,458. Put another way, 90.7% of Harbor's submittal to RLB, which RLB passed along to the Corps, is literally just Harbor's markup of Diamond's work.

|  | Plus Harbor's claimed overhead (20.19%) | Plus Harbor's claimed profit (9%) | % of REA to Harbor, less Diamond |
|---|---|---|---|
| Harbor's direct costs: $64,371 | $77,367.50 | $84,330.58 | 10.3% |
| Diamond's costs: $2,362,344 | $517,353.33 | $563,915.13 | 90.7% |

RLB forwarded Diamond's and Harbor's information to the Corps. For RLB's own time, though, it used a different measure: instead of time and materials, it used the measured mile. Rec. Doc. 22-4, p. 4. The measured mile formula quantifies how effectively RLB (really Diamond, because Diamond, not RLB, provided the dredge and the dredging for this dredging contract) dredged from August 1, 2020 to August 10, 2020. RLB then compared this faster dredging rate to the remainder of the dredging efficacy, extrapolated that whenever the dredging was slower than this ten-day period, it was because of differing site conditions, and told the Corps that the Corps owed that difference, along with Harbor's and Diamond's costs. The sum sought was $8,867,212.

In its spreadsheet, Rec. Doc. 22-4, p. 6, RLB calculated that RLB is owed $2,707,634 for its production cost loss, on a measured mile analysis. RLB then included Diamond's and Harbor's numbers at $3,179,170; then it marked up both numbers for overhead by 33.7% to get a sum of $8,014,834. RLB adds 9% profit and its bond cost to get it's nearly nine million dollar equitable request.

|  | Plus RLB claimed overhead (33.7%) | Plus RLB's claimed profit (9%) | % of REA to RLB's work vs. Diamond's |
|---|---|---|---|
| RLB's direct costs: $2,815,471 | $3,764,284.73 | $4,063,458.58 | 47.41% |
| Diamond/Harbor costs: $3,179,170 | $4,250,550.29 | $4,663,099.82 | 52.59% |

Fully 90.7% of the money owed to Harbor was for the (doubtless arduous) task of passing along Diamond's invoices. RLB then passed along the combined Diamond and Harbor invoice with an additional 33.7% markup for overhead, and another 9% for profit. RLB's own claim on the measured mile analysis was $2,707,634 – with overhead and profit, $4,063,458.58.

However, the more significant portion of RLB's claim is its passing along Diamond's invoices: this adds $4,663.099.82. If RLB took the position that it owes Harbor for Harbor's

submittal, and it owes Diamond for Diamond's submittal, then this analysis would be unfair: Diamond's money would go to Diamond, and Harbor's to Harbor. In that universe, RLB would only be seeking to profit $1,453,929.82 off Diamond's work.[1] Here though, RLB takes the position that it does not owe Diamond for Diamond's submittal. In fact, it owes Diamond nothing, even though Diamond's work, plus Harbor's markup, plus RLB's markup on Harbor's markup, makes up more than half what RLB sought from the Corps.

3.   <u>RLB received $6,000,000 from the Corps for its equitable request.</u>

Attached to this opposition is what RLB received from the Corps: $6,000,000. On page 2, Paragraph A, the Modification of Contract provides that the contract is equitably adjusted "due to excessive amount of debris in the channel." And then, in Paragraph B, it provides "Total contract price is increased by $6,000,000.00. In Paragraph D, it provides "It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the Contractor **and its Subcontractors** and Suppliers for all costs and markups directly or indirectly attributable for the change ordered [. . .]" (emphasis added).

In sum: RLB submitted an equitable request for $8,867,212 to the Corps. Of that, 52.59% was the combination of (a) Diamond's work, and (b) Harbor and RLB's markup on Diamond's work. RLB accepted $6,000,000 from the Corps, and that $6,000,000 expressly includes RLB's subcontractors. RLB would now have this Court dismiss Diamond's claim.

## II.   Standard of Review

1.   <u>RLB's Motion to dismiss</u>

When a district court reviews a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), it must construe the complaint in favor of the plaintiff and take all well-pleaded facts as true. *Randall*

---

[1] The math is as follows: $4,663,099.82, which is Diamond's submittal with RLB's profit and overhead, minus RLB's/Harbor's submittal of $3,179,170

*D. Wolcott, MD, PA v. Sebelius,* 635 F.3d 757, 763 (5th Cir. 2011) (*citing Gonzalez v. Kay,* 577 F.3d 600, 603 (5th Cir. 2009)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of its entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 545 (2007) (cleaned up). "Factual allegations must be enough to raise a right to relief above the speculative level, stating a claim that is plausible on its face." *Id.* at 545, 547 (citations omitted).

"A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Montoya v. FedEx Ground Package System, Inc.,* 614 F.3d 145, 148 (5th Cir. 2010) (*quoting Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). The plausibility standard is not akin to a "probability requirement," but asks for more than a "possibility that a defendant has acted unlawfully." *Twombly,* 550 U.S. at 556.

2. Diamond's summary judgment

The Fifth Circuit has "often noted the appropriateness of summary judgments in Miller Act cases." *United States ex rel. J.R. Canion v. Randall & Blake*, 817 F.2d 1188, 1193 (5th Cir. 1987) (Wisdom, J.) ("When a movant makes out a convincing showing that genuine issues of fact are lacking, we require that the adversary adequately demonstrate by receivable facts that a real, not formal, controversy exists, and, of course, he does not do that by mere denial or holding back evidence.") (internal citations omitted.)

A motion for summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that no genuine issue as to any material fact exists and that the moving party is entitled to a judgment as a matter

of law. Fed. R. Civ. P. 56(c). Pursuant Federal Rule of Civil Procedure 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions which it believes demonstrates the absence of genuine issues of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871 (1990).

The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the non-movant's case. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2002). In so demonstrating, the movant may rely on the absence of evidence to support essential elements of the opposing party's claim. *Int'l Assoc. of Machinists and Aerospace Workers AFL-CIO, Lodge No. 2504 v. Intercontinental Mfg. Co., Inc.*, 812 F.2d 219, 222 (5th Cir. 1987) citing *Fontenot v. UpJohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986). If the record taken as a whole cannot lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1286 (5th Cir. 1990). The moving party need not submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. *Saunders v. Michelin Tire Corp.*, 942 F.2d 299, 301 (5th Cir. 1991). Once a proper motion for summary judgment has been made, the non-moving party must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

Fed. R. Civ. P. 56(f) allows this Court grant summary judgment for Diamond on RLB's motion. See e.g. *Atkins v. Salazar,* 677 F.3d 667, 681 (5th Cir. 2011) (affirming district court's grant of summary judgment *sua sponte* without formal notice to the litigants because the party against whom summary judgment was granted "was aware [the legal issue] was at play and had a full opportunity to argue against it and present whatever evidence he had").

8

### III.    Law and Argument

Diamond's complaint includes multiple claims pled in the alternative. RLB argues to this Court that none of them provides Diamond a cause of action. Diamond will address each.

1. <u>This Court should enter judgment for Diamond on its quasi-contract claim against RLB.</u>

Diamond will address its quasi-contract claim against RLB first because it is straightforward. Quasi-contract is a species of equity – fittingly, given RLB's equitable adjustment with the Corps – a legal fiction imposed by law. See generally *Walker v. Cotter Properties, Inc.*, 181 S.W.3d 895, 900 (Tex. App. 2006).

RLB argues that Diamond's quasi-contract claims against RLB fail because the subject matter is covered by a contract. RLB fails to note that by necessity, RLB request for an equitable adjustment from the Corps is beyond the scope of RLB's contract with the Corps – otherwise, the Corps would have told RLB that it is entitled no more than the contractual price. RLB told the Corps, Rec. Doc. 22-4, that RLB's equitable request was based on "subsurface or latent physical conditions at the site which differ materially from those indicated in this contract." RLB explains at length to the Corps that the debris on the job site were both material and unforeseeable, and based on that, RLB asked for an additional nearly $9,000,000. Because the equitable adjustment is beyond the scope of RLB's contract, the equitable adjustment is also beyond the scope of Diamond's contract, and Diamond has a claim in quasi-contract.

It is true that where the subject matter is governed by a contract, there is no claim in quasi-contract. See e.g. *Coghlan v. Wellcraft Marine Corp*., 240 F.3d 449, 454 (5th Cir. 2001) ("In Texas, unjust enrichment is based on quasi-contract and is unavailable when a valid, express contract governing the subject matter of the dispute exists.") RLB would have this Court remove the second portion of the quote: RLB argues the existence of a written contract vitiates a claim in quasi-

contract, regardless of whether the contract governs the subject matter of the dispute. The argument goes too far. Diamond's is a classic case of quasi-contract, preventing RLB from profiting off Diamond's work, and courts have routinely held as much. See e.g. *Austin v. Shalala*, 994 F.2d 1170, 1176 (5th Cir. 1993); *United States ex rel PBT v. Frankenmuth Mutual Ins. Co.*; C/A No. 18-2785-B (N.D. Tex. May 3, 2019).

When a subcontractor has performed work outside the terms of the contract that benefit the prime contractor, the subcontractor can recover on quantum meruit / quasi-contract. See e.g. *United States ex rel. C.J.C., Inc. v. Western States Mechanical Contractors, Inc.*, 834 F.2d 1533, 1550 (10th Cir. 1987); see also *United States v. City of Palm Beach Gardens*, 635 F.2d 337, 341-42 (5th Cir. 1981) ("Quasi-contractual obligations arise, however, only when one party has been unjustly enriched at the expense of another"); *Coastal Steel Erectors, Inc. v. Algernon Blair, Inc.*, 479 F.2d 638 (4th Cir. 1973) (holding that In a Miller Act suit, an unjust enrichment claim can be joined with a breach of contract claim; the presence of a written contract does not preclude the unjust enrichment claim.)

A contractor who bids on work has the right to rely on the plans submitted for the bidding process, and burdens placed on the contractor beyond the contract allow for additional compensation. *Wunderlich Contracting Co. v. United States ex rel. Reischedl & Cottrell*, 240 F.2d 201, 205 (10th Cir. 1957). When that happens, quantum meruit is the appropriate vehicle for recovery. *Id.*, citing *Southern Painting Co. of Tenn v. United States*, 222 F.2d 431 (10th Cir. 1955).

The Diamond contract has no reference to delay, and no waiver of delay damages, and no differing-circumstances damages waiver. The Diamond contract does not define what Diamond should expect to find. Article 4 governs changes, and it provides that "Contractor (RLB) *may* direct Subcontractor in writing to make changes to Subcontractor's work," indicating that it may also

make oral modifications. It may be true that RLB and Harbor could have placed the burden of differing site conditions on Diamond, but they did not. (It would be bizarre if RLB could collect money from the Corps because of an unanticipated and unanticipatable site condition, but Diamond bore that same risk. Ostensibly, the parties could contract in that manner, but they did not here.) Because the contract is silent with regard to differing-circumstances damages, the contract does not cover RLB's differing-circumstances equitable claim against the Corps, and it does not cover Diamond's quasi-contract / quantum meruit claim against RLB.

A closely analogous case is *United States ex rel. D & P Corp. v. Transamerica Ins. Co.*, 881 F.Supp. 1505 (D. Kan. 1995). There, as here, there was a differing site condition based on bad information from the government. There, the Air Force gave the prime contractor bad information with regard to incorrect information with regard to what tanks should be removed. The prime contractor submitted an equitable request to the government for additional funds, because the government had given them incomplete information. The general contractor included a claim for the subcontractor. The subcontractor was, of course, entitled to recoup its additional expenses under quantum meruit. The Court held that "[a] subcontractor may recover in quantum meruit from the prime contractor and surety in at least two instances. First, where there is a substantial breach of the subcontract, the subcontractor may forego any suit on the contract and sue for the reasonable value of his performance. Second, the subcontractor may recover in quantum meruit where it has performed work outside the terms of the contract that benefits the prime contractor." *Id.* at 1508. The Court found the first circumstance inapplicable, but found recovery appropriate on the second. The same result should follow here.

In *United States ex rel. Lochridge-Priest, Inc. v. Con-Real Support Group, Inc.*, 950 F.2d 284 (5th Cir. 1992), the Fifth Circuit affirmed the district court's award of quantum meruit

damages. There, the subcontractor performed work past the contract: the general contractor "required [the subcontractor] to perform work in addition to that specified in the Subcontract. Specifically, [the general contractor] demanded the submission of excessive data and the digging of an underground oxygen line." *Id*. at 286. See also *Worley Bros Co., Inc. v. Marus Marble and Tile Co., Inc.*, 209 Va. 136 (1968).

In *Jones v. Chaney & Games Const. Co.*, 399 F.2d 84, 89 (5th Cir. 1968), the contractor argued just what RLB argues here: that the contract governed the entire job. The subcontractor argued, but the trial court rejected, that the definition of "excavate" in the contract was ambiguous. The contractor claimed it means remove and dispose of; the subcontractor claimed it means remove only. The subcontractor removed and disposed of detritus and sought damages for the extra disposal work. The contractor argued the work was covered by the contract. In appeal, the Fifth Circuit held the term "excavate" was ambiguous, and therefore there must be a jury trial – including on quantum meruit – on whether the subcontractor did extra work under the contract and was entitled to compensation, and it reversed the district court. These facts are much easier: it is uncontested and uncontestable that Diamond did extra work. If Diamond did not do extra work, there would have been no equitable adjustment that included Diamond's work.

Last, in *United States ex rel. Pratt Farnsworth, Inc. v. Talley*, 294 F.Supp. 1345 (E.D. La. 1969) (Rubin, J.), the Court found a valid contract in a Miller Act job for the rental of a crane. The owner of the crane sent an invoice, but the invoice was incomplete: it did not charge for the crane operator. The Miller Act contractor paid for the short invoice, but disputed the additional balance. Judge Rubin found that "there is no doubt that the equipment rental quoted the defendant was fair and that the plaintiff would, in any event, be entitled to recover that sum plus the operator's and oiler's wages on a quantum meruit basis." *Id*. at 1347. Quantum meruit exists as an actionable

12

claim unless the specific subject matter sought to be recovered under quantum meruit is the subject matter of the written contract. RLB's equitable request to the Corps manifestly is not.

In cases holding otherwise, there is a clear contractual prohibition. For instance, in *Millgard Corp. v. McKee/Mays*, 49 F.3d 1070 (5th Cir. 1995), the contract expressly placed the risk of a change in the soil conditions on the contractor. The contractor could not complain that the soil conditions were not as expected. So too, in *PYCA Industries v. Harrison County*, 177 F.3d 351 (5th Cir. 1999), the Fifth Circuit addressed a no-damages-for-delay clause, and found it was enforceable unless (a) the delay was not contemplated by the parties; (b) the delay was caused by bad faith or active inadvertence; or (c) the delay was tantamount to abandonment of the contract. *Id.* at 362. Diamond's contract here does not have any provision that places any risk of differing conditions on Diamond. To the contrary, RLB's submittal to the Corps offers, and the Corps accepts, that the differing site conditions are on the Corps. Furthermore, the Diamond contract does not include a no-damages-for-delay clause. Delay is the responsibility of RLB (passed on to the Corps through the equitable adjustment), not the responsibility of Diamond.

2.  For purposes of the Miller Act, Diamond is a subcontractor to RLB as a matter of law.

Shown above, of all the funds promised in the contract, RLB promised Harbor $2,745,700, and Harbor promised Diamond $2,482,150: 88.43% of the total take. So too, 90.7% of Harbor's submission to RLB's equitable adjustment is for its claimed overhead in passing along Diamond's invoices. It is not accidental that these numbers land close to the same place: Harbor's work was bringing Diamond to the job, and passing along Diamond's invoices.

Diamond's submittal to RLB for the equitable adjustment shows what work Diamond performed: dredging, boat rentals, and labor. The equipment, labor, and rental portion of Diamond's submittal, Rec. Doc. 22-2 at p. 2, are $681,531, $346,331, and $666,146, respectively.

In comparison, Harbor Dredging's equipment, labor, and rental portions are $0, $64,371, and $0. Diamond did the work on this job.

Under the Miller Act, this makes Diamond a subcontractor not of Harbor but of RLB. The Supreme Court held as much in *FD Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 123 - 24 (1974): the test for whether a company is a subcontractor under the Miller Act is not counting contracts like rungs on a ladder, it is "the substantiality and importance of his relationship with the prime contractor." *FD Rich* compels the conclusion that Diamond had a direct contractual relationship with RLB for purposes of the Miller Act. There, the Supreme Court held that, because the Miller Act is remedial, the Court should "look at the total relationship" between the two parties, "not just the contract," to determine whether there was a subcontractor relationship. The would-be materialman in *FD Rich* "not only agreed to supply standard plywood but also had a separate contract to select, modify, detail, and install all custom millwork for the Beale project. Cerpac, in effect, took over a substantial part of the prime contract itself." So finding, the Supreme Court held that Cerpac was a subcontractor and entitled to the benefits of the Miller Act.

So too, in *United States ex rel. E & H Steel Corp. v. C. Pyramid Enter's, Inc.*, 509 F.3d 184 (3d Cir. 2007), the Third Circuit reviewed the case law and reached the same conclusion. The purpose of the Miller Act, it explained, is to protect "those whose labor and materials go into public projects." *Id.* at 186. The Miller Act should protect those "relatively few subcontractors who perform part of the original contract and are well known to the prime contractor. *Id.* at 187, citing *J.W. Bateson Co. v. United States ex rel Bd. of Trustees*, 434 U.S. 586, 591 (1978). The *C. Pyramid* Court explained Supreme Court precedent: "'subcontractor' status applies to one who performs a specific part of the original contract and has a substantial and important relationship with the prime contractor." *Id.* at 188. The Third Circuit then addressed a host of factors that different courts have

14

evaluated, finding they generally turn on how (a) significant and (b) integral the work done was to the job. This case is easy because the significance of Diamond's work to RLB's job speaks for itself: under any of the factors the Third Circuit addressed, Diamond easily clears the hurdle. At the risk of belaboring the point, Diamond did the dredging work on a dredging contract. Not some of it, all of it. Diamond performed, looking at everything most favorably to RLB, at least 88% of the total value of the subcontract, and, measured by dollars, around half of RLB's total contract. Diamond was a subcontractor, not a sub-subcontractor.

In addition to contradicting Supreme Court precedent, a holding otherwise is an invitation to chicanery. If RLB can avoid the Miller Act by a subcontract when the subcontractor does approximately nothing other than pass along invoices, then the Miller Act becomes nearly useless: instead of a one-year window to bring a claim, Diamond has a 90 day window. Meantime, sub-subcontractors have no rights at all. Learning an important lesson, in the next contract, RLB (or its analogue) can internally subcontract to RLB II, a wholly-owned subsidiary with no assets. RLB II can subcontract to Harbor (or RLB III), then Harbor can sub-sub-subcontract to a dredging company, thereby avoiding the Miller Act in its entirety.

Because Diamond is a subcontractor of RLB under the Miller Act, not a sub-subcontractor, Diamond has stated a valid Miller Act claim against Travelers.

3. Diamond can recover its damages, but not its lost profit damages, under the Miller Act against Travelers.

RLB argues that Diamond's claims against Travelers fail because Diamond includes its lost profit in its submittal to RLB. In *US v. Millers Mut. Fire Ins. Co. of Texas*, 942 F.2d 946 (5th Cir. 1991), the Fifth Circuit held that "a subcontractor can recover increased out-of-pocket costs for labor and materials furnished in the course of performing its subcontract caused by contractor or government delay," citing *United States ex rel. Pertun Construction Co. v. Harvesters Group,*

*Inc.*, 918 F.2d 915 (11th Cir. 1990). That case controls: Diamond has a claim against Travelers for its additional expenses arising out of the additional work. The Fifth Circuit noted, though, that it is only actual costs expended and attributable to the delay – no loss of profit. Diamond concedes it cannot recover its lost profit from Travelers: only its actual expenses. Significantly, under *Millers Mutual*, Diamond can recover from Travelers whether or not RLB recovered from the Corps.

   4.  There are genuine fact issues regarding Diamond's contractual claims against RLB, and with regard to the tug MISS KERRILYN.

   Noted above, the Diamond/Harbor contract separately identifies Harbor and RLB as contractor, and Harbor and Diamond as subcontractors. It indicates that RLB will get money from the Corps and then pay Diamond directly, although, as a practical matter, all Diamond's invoices were run through Harbor at the insistence of RLB. Furthermore, Randy L. Boyd, the principal of RLB, personally told Diamond Services that RLB would make Diamond whole through the equitable adjustment process.

   Because Diamond's contract with Harbor identifies Diamond as a subcontractor of RLB, not of Harbor, that is strong evidence that Diamond was a subcontractor of RLB, not Harbor, and that was the intent of the parties – this would be true not just as to Travelers under the Miller Act, but as to RLB on the contractual claim. Furthermore, consistently through the contract, it provides that Contractor (RLB) will pay Subcontractor (Harbor and Diamond). The Harbor/Diamond contract provides that Diamond was a contractor of RLB. Finally, as alleged in the Complaint, Randy Boyd personally told Diamond that RLB would make Diamond whole out of the equitable adjustment. There is a strong factual basis for Diamond's direct-contractual claims against RLB.

   Still, Diamond concedes that there is a fact question here because the Harbor/Diamond contract also refers to Harbor as the Contractor. Under *Jones v. Chaney & Games Const. Co.*, 399

16

F.2d 84, 89 (5th Cir. 1968), the issue is reserved for the fact-finder. Unlike Diamond's quasi-contractual claims or its Miller Act claims, this Court cannot realistically rule for Diamond that it was in direct privity of contract with RLB, or an agent of RLB, or a third-party beneficiary of the Harbor/RLB contract, at this stage in the litigation.

The same is true of Diamond's claim for the tug MISS KERRILYNN. Diamond notes that Diamond's submittal to RLB for the tug MISS KERRILYNN is included in RLB's submittal to the Corps – see Rec. Doc. 22-4, p. 11: under Diamond equipment, the last line is TUG MISS KERRILYNN (Itemized on rental tab), and the tug is again referenced at p. 13 – 14. At p. 38, RLB includes all the invoices for the M/V MISS KERRILYNN (the vendor is Central Boat Rentals). RLB cannot recoup payments for the MISS KERRILYNN that were made by Diamond, but Diamond will not repeat the analysis above: at the very least, there are material fact questions that preclude judgment for RLB.

5. <u>Diamond's damages</u>

Diamond submitted $2,362,344 to RLB. RLB submitted this to the Corps, and RLB was paid $6,000,000. RLB has never disputed Diamond's submittal: instead, RLB passed it to the Corps with a 33.7% markup.

*As to RLB*, Diamond is owed the full amount: $2,362,344, under quasi-contract. This is the value of the work Diamond provided to RLB, and this is the amount RLB owes to Diamond. This Court need not address Diamond's contractual claims; it can rule for Diamond on Diamond's quasi-contract claim.

*As to Travelers*, Diamond is not owed the full amount. It is owed everything except for profit. Diamond is owed its damages, less its 9% profit: $2,167,288.

### IV.     Conclusion

RLB's argument is closer to theft than equity. To borrow from Lincoln, RLB dares to ask a just Court's assistance in wringing their bread from the sweat of other men's faces, and this Court should not tolerate it.  This Court should convert RLB's motion to dismiss to a summary judgment motion, deny it, and enter judgment for Diamond.

RLB's submittal to the Corps establishes Diamond's damages: $2,362,322, which, as a matter of law, is owed to Diamond from RLB under quasi-contract. Less the profit, $2,167,288 is owed to Diamond by Travelers under the Miller Act.

Respectfully submitted:

**BOHMAN | MORSE, LLC**

/s/Harry E. Morse
HARRY E. MORSE (#31515)
MARTIN S. BOHMAN (#22005)
400 POYDRAS STREET, SUITE 2050
NEW ORLEANS, LA  70130
TELEPHONE: (504) 930-4009
FAX: (888) 217-2744
E-MAIL: HARRY@BOHMANMORSE.COM
E-MAIL: MARTIN@BOHMANMORSE.COM

*Attorneys for Diamond Services Corporation*