UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| DIAMOND SERVICES CORPORATION § § §<br>Plaintiff, § §<br>v. §<br>§<br>RLB CONTRACTING, INC., HARBOR DREDGING, INC. AND TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA § § § § § §<br>Defendants. § | Civil Action No. 3:21-cv-00253-JVB |

### RLB'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS

RLB[1] files this reply ("Reply") in support of RLB's motion to dismiss pursuant to Rule 12(b)(6), DN 22 ("Motion to Dismiss"), and to Diamond's response to the Motion to Dismiss, DN 23 ("Response").[2]

### I.   SUMMARY

1.   Diamond presents no valid reason in its Response to deny any ground of RLB's Motion to Dismiss. RLB's Motion to Dismiss should be granted because: (a) there is no direct contractual relationship between Diamond and RLB; (b) the terms of the Sub-Subcontract between Diamond and RLB's subcontractor, Harbor, are not binding on RLB and do not establish contractual privity between Diamond and RLB; (c) the Sub-

---

[1] Capitalized terms defined in the Motion to Dismiss are incorporated herein by reference and used in this Reply without the need for defining the terms again herein.

[2] Diamond's Response also generally requests that the Court grant it summary judgment on its "quasi-contract" and Miller Act claims, apparently pursuant to Fed. R. Civ. P. 56(f). DN 23, p. 2, 9. Pursuant to the Local Rules and to the extent necessary, RLB opposes and will respond to Diamond's request for a summary judgment <u>after</u> the Court gives notice of conversion to a motion for summary judgment and sets a deadline for such response.

1

Subcontract covers the subject matter of Diamond's implied contract, *quantum meruit*, and quasi-contract claims against RLB;[3] (d) Diamond does not qualify as first-tier "subcontractor" under the Miller Act and failed to plead proper and timely notice required for it to recover under the Miller Act; and (e) Diamond failed to identify in the Complaint that it incurred extra costs, or what those extra costs were, that it is entitled to recover under the Miller Act and thus, failed to sufficiently plead the element of damages for a valid Miller Act claim. Diamond's Response also fails to even address several challenges in the Motion to Dismiss that warrant dismissal of any claims by Diamond that rely on the matters challenged but Diamond did not respond to. Finally, there is no valid basis for converting the Motion to Dismiss into a motion for summary judgment because all of exhibits attached to it were referenced by Diamond in its Complaint and are central to its claims.

## II.     ARGUMENTS & AUTHORITIES

A.     **RLB Does Not have Any Direct Contractual Relationship with Diamond.**

2.     In its Response, Diamond again concedes that its written contract is with Harbor, not RLB. DN 23, p. 2. It is undisputed that: (i) RLB is not, and never has been, a party to the Sub-Subcontract; and (ii) Diamond is not, and never has been, a party to the RLB-Harbor Subcontract or the Prime Contract. Seeking to avoid these fatal facts to its breach of contract claims against RLB, Diamond asserts the Subcontract and Sub-Subcontract are "effectively, identical, except ***Harbor changed*** some of the names and figures around before sending its contract with RLB to Diamond for Diamond's signature."

---

[3] Diamond's response does not appear to separately address its implied contract or *quantum meruit* claims and in various places refers to *quantum meruit* claims and quasi-contract claims interchangeably.

DN 22, p. 3 (emphasis added). But Diamond also concedes that any reason why the Sub-Subcontract is similar to Subcontract is due to **Harbor's** actions and not RLB's. Simply because two contracts are nearly identical does not mean the all parties to those separate agreements are bound to both contracts. Individuals and businesses enter countless form and back to back contracts and the parties to one of those form or back to back contracts are not considered parties to all of those contracts with others. There also are several notable differences between the Sub-Subcontract and Subcontract, including but not limited to: (i) the parties are different; (ii) the compensation structures and payment amounts are different; and (iii) the Subcontract defines RLB as the "Contractor" and Harbor as the "Subcontractor" whereas the Sub-Subcontract refers to RLB as the "General Contractor" and Harbor as the "Contractor." *Compare* DN 1-2; *with* DN 22-1.

3.      Still, Diamond claims that certain "confusing" language in the Sub-Subcontract somehow supports its breach of contract claims against RLB. For example, Diamond points to: (i) the Sub-Subcontract reference to RLB as the "General Contractor" after the agreement had previously defined Harbor as the "Contractor"; and (ii) the Sub-Subcontract defining Diamond as the "Sub-Contractor" in the first sentence of the agreement and then later generally noting "Harbor Dredging. Inc.I [sic] Diamond Services Corportation [sic]" as Sub-Contractor. DN 1-2, p. 1. Diamond incorrectly claims these terms constitute "strong evidence that Diamond was a subcontractor of RLB, not Harbor, and that was the intent of the parties." DN 23, p. 16. To the contrary, the facts that Diamond asserts its breach of contract claims against Harbor as well as RLB, RLB is not listed as a party to the Sub-Subcontract, RLB did not sign the Sub-Subcontract, Diamond directed all

3

of its project invoices and payment requests to Harbor (and there is no allegation in the Complaint or other evidence Diamond directed them to RLB), and Diamond directed its certified costs for the request for equitable adjustment to Harbor and not RLB, constitute strong evidence that Diamond knew it had contracted with Harbor and not RLB. DN-1; DN 1-2; DN 22-2. The terms Diamond and Harbor agreed to in their Sub-Subcontract do not transform Diamond into a direct subcontractor of RLB because RLB is not, and never has been, a party to the Sub-Subcontract. DN 1-2. Any "confusing" or other language that Harbor and/or Diamond elected to use in their Sub-Subcontract has no effect on RLB as a non-party. Conclusory statements by Diamond about its intent aside, there is no evidence that RLB intended to contract with Diamond.[4]

4. Further, in harmonizing provisions in a contract that may seem conflicting, rules of contract construction dictate that "terms stated earlier in an agreement must be favored over subsequent terms." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). As such, even if the terms "Contractor" and "*General* Contractor" were interchangeable, which they are not, the Sub-Subcontract defining Harbor as the "Contractor" first is favored over a claim that the agreement later defines RLB as the "Contractor"—which it does not. Likewise, Diamond and Harbor's election to define Diamond as the "Sub-Contractor" in the first sentence of their Sub-Subcontract is favored over their general reference to

---

[4] Additionally, the Sub-Subcontract defining Harbor as the "Contractor" in the first sentence does not conflict with the general reference to RLB as the "General Contractor" later in the agreement. Nor does the subsequent "General Contractor" reference make the prior provision defining Harbor as the "Contractor" null and void or inapplicable. To the contrary, the use of these two different terms reinforces that Harbor and RLB are to be considered two separate and distinct entities as to the Sub-Subcontractor. Accordingly, any time the Sub-Subcontract states the "Contractor" would pay the "Sub-Contractor" this meant under its defined terms Harbor, and not RLB, would pay Diamond.

"Harbor Dredging. Inc.I [sic] Diamond Services Corportation [sic]" as Sub-Contractor later. Therefore, even if this language in the Sub-Subcontract is now "confusing" to Diamond, it cannot result in the Sub-Subcontract's terms being binding on RLB or causing Diamond to somehow transform into RLB's direct subcontractor.[5]

5. Next, Diamond argues RLB is not a stranger to the Sub-Subcontract because Diamond alleges the Sub-Subcontract incorporates by reference the Prime Contract "in full." DN 23, p. 3. However, "[a] mere reference to another document is insufficient to establish a wholesale incorporation of the referenced document." *Tribble & Stephens Co. v. RGM Constructors, L.P.*, 154 S.W.3d 639, 665 (Tex. App.—Houston [14th Dist.] 2004, pet. denied), *opinion supplemented on overruling of reh'g* (Feb. 10, 2005). Instead, well-settled Texas law holds that references in one contract to a separate agreement for a specified purpose incorporates the referenced agreement *only* for the purpose specified. *Id.* at 664 (citing *Guerini Stone Co. v. P J Carlin Constr. Co.*, 240 U.S. 264, 277 (1916)).

6. Although the Sub-Subcontract incorporates by reference the "Project's Contract Documents numbered W9126019C0015," it does so *only for purposes of the work to be performed* by Diamond as identified in Article 2 of the Sub-Subcontract. DN 1-2, p. 1. What the Sub-Subcontract did not, and could not, do was incorporate by reference *the parties* to the Prime Contract to make the Sub-Subcontract binding on RLB, just as it did not operate to place the USACOE in contractual privity with Diamond or Harbor. If

---

[5] Even more irrelevant for purposes of its breach of contract claims against RLB are Diamond's assertions about the "evidently mislaid portions" of the Sub-Subcontract, including "calls for subcontractor to indemnify Owner, Architect, and Architect's consultants" despite the Sub-Subcontract not defining those terms. DN 23, p. 4. Regardless of whether these terms are defined or not, Diamond's indemnification obligations have no bearing on whether RLB is somehow bound by the terms of the Sub-Subcontract.

5

Diamond's illogical and unfounded argument on incorporation by reference were accepted, then every subcontractor with a subcontract where the prime contract is incorporated by reference would have contractual privity with the project owner.[6] Diamond cites no authority for such a specious proposition.

**B.  Diamond's Implied Contract, *Quantum Meruit*, and Quasi-Contract Claims Fall Within the Scope of Its Sub-Subcontract with Harbor.**

7.  Diamond relies heavily on its assertion that RLB's request for an equitable adjustment from the USACOE for the differing site conditions and delays on the Project shows that the work performed in connection with these matters was beyond the scope of the Prime Contract and as such, Diamond's claims arising from such work is also beyond the scope of the Sub-Subcontract. DN 23, p. 9. This analysis is incorrect. First, Diamond omits the fact that RLB's equitable adjustment request for differing site conditions was a measure provided for in the Prime Contract.

```
Section 00 72 00 - General Conditions

CLAUSES INCORPORATED BY REFERENCE
. . .
52.236-2         Differing Site Conditions                         APR 1984
```

**Exhibit 5**, p. 6-7 (Excerpts from the Prime Contract).

```
C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
    FAR 52.236-2 DIFFERING SITE CONDITIONS
```

DN 23-1, p. 2.

---

[6] If such were true, any party to that different contract could force itself into contractual privity with a party to the incorporated contract. Such a proposition would be counter to basic tenants of contract law, mutual assent and consent.

> RLB Contracting, Inc. ("RLB") hereby submits this Request for Equitable Adjustment ("REA") in connection with the above-referenced Contract to the U.S. Army Corps of Engineers ("USACE"). As discussed in detail below, RLB is presenting a Type 1 Differing Site Condition as outlined in FAR 52.236-2 (1): *Subsurface or latent physical conditions at the site which differ materially from those indicated in this contract* to support this REA.

DN 1-3, p. 1; *see also* DN 22-4, p. 1. The "FAR 52.236-2" provision is required to be incorporated in federal government project contracts like the Prime Contract and provides:

> If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

48 C.F.R. § 52.236-2(b); *see also* 48 C.F.R. § 36.502.

8. Unlike RLB's rights under the Prime Contract, Diamond's claim for additional funds for work based on differing site conditions is not considered additional work, it ***is within*** the scope of the Sub-Subcontract with Harbor based on well-settled Texas law, and thus, Diamond is not entitled to additional payment for it under its implied contract, *quantum meruit*, or quasi-contract claims.[7] *See* DN 1-2, Art. 2, p. 1 (Diamond agreed to perform "all work necessary or incidental to complete . . . Dredging Section 16"); *see also id.*, Art. 3, p. 2 ("Time is of the essence. [Diamond] shall begin work on or about March 10, 2020 and progress with work diligently until the completion and acceptance of dredging sections."); *City of Dallas v. Shortall,* 114 S.W.2d 536, 540 (Tex.

---

[7] Texas law is controlling on this point because Diamond's quasi-contract claims against RLB that are separate from the Miller Act claims are state law claims and it is undisputed that the Project was located entirely, and Diamond's work was performed entirely, in Texas. *See Hinkley v. Envoy Air, Inc.*, 968 F.3d 544, 552 (5th Cir. 2020) ("it hardly seems necessary to note that a federal court must apply the relevant state's substantive law when adjudicating a claim arising under that state's law"). The Sub-Subcontract also provides that "the laws of the State of Texas shall govern this agreement." DN1-2, Art. 10, p.2

1938) (denying recovery for extra expenses for a differing site condition where the contract did not have a differing site condition entitlement clause and repeating the frequently quoted dicta "it is practically a universal rule that 'where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered.'") (quoting *United States v. Spearin*, 248 U.S. 132 (1918)); *Brown-McKee v. Western Beef*, 538 S.W.2d 840, 841 (Tex. Civ. App.—Amarillo 1976, writ ref'd n.r.e.) ("Extra work is work arising outside and independent of the contract, something not required in its performance. In the case before us, the work and consequent expense incurred in digging in rock was necessary in the performance of the very thing which Brown-McKee contracted to do.") (internal citation omitted).

9. As stated in *Fortune Prod. Co. v. Conoco, Inc.*, "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory . . . . because parties should be bound by their express agreements." 52 S.W.3d 671, 684 (Tex. 2000). Therefore, because the Sub-Subcontract addresses the subject matter of Diamond's claims, Diamond's Complaint fails to state a claim on which relief can be granted against RLB for Diamond's non-Miller Act[8] breach of implied contract, *quantum meruit*, and quasi-contract claims against RLB.[9]

---

[8] As discussed below, RLB and its surety Travelers are entitled to dismissal of the Miller Act claims on other reasons.
[9] As noted below, the Motion to Dismiss also challenged Diamond's quasi-contract claims for failing to plead sufficient facts to plausibly show the existence of a quasi-contractual relationship with RLB. DN 22, p. 21-22. But Diamond failed to address this challenge and thus, this Court should dismiss such claims due to its lack of opposition.

10. The cases Diamond cites in its Response as support for its quasi-contract claims cannot salvage these claims from dismissal under Rule 12(b)(6). The majority of these cases come from federal jurisdictions that did not follow Texas law that is applicable and controlling here. These cases provide no valid authority with respect to Diamond's quasi-contract claims.[10] Also, many of the cases concern Miller Act claims instead of a separate state law based action for breach of a quasi-contract and thus, are not applicable to an evaluation on whether Diamond's Complaint pleads an independent state law cause of action against RLB for breach of quasi-contract upon which relief can be granted.

C. **Diamond is Not a First-Tier Subcontractor to RLB Under the Miller Act.**

11. As detailed above, and in the Motion to Dismiss, Diamond did not have a direct contractual relationship with RLB. *See supra* Section II.A; DN 22, Section III.B, p. 7-23. Instead, as expressly pled in its Complaint, "Diamond's contract was with Harbor" on the Project. DN 1, ¶¶ 11-12; DN 1-2. Thus, Diamond clearly does not qualify as a "subcontractor," *i.e.* a first-tier subcontractor, under the Miller Act. 40 U.S.C. § 3133(b)(1). Diamond at most was a subcontractor to a subcontractor, *i.e.* a second-tier subcontractor but it failed to plead a Miller Act claim as a second-tier subcontractor and as such, its Miller Act claims fails to state a claim upon which relief can be granted.

12. All of the Miller Act cases cited by Diamond in its Response neither change this reality nor support Diamond's position that it somehow was a direct subcontractor to

---

[10] Further, several of these cases do not support Diamond's quasi-contract position at all, including but not limited *United States for Use & Benefit of PBT & JBJ All. v. Frankenmuth Mut. Ins. Co.*, in which the court dismissed with prejudice the plaintiffs' *quantum meruit* claim to the extent it was asserted as a separate and distinct state-law claim because the Miller Act is the exclusive remedy available for a subcontractor to recover against a surety on a Miller Act bond. No. 3:18-CV-2785-B, 2019 WL 1979362, at *5 (N.D. Tex. May 3, 2019).

RLB.[11] Most of Diamond's cases pertain to the distinction between a second-tier subcontractor (sub to a sub to a prime), which may recover under the Miller Act and a supplier below the second-tier subcontractor level (supplier to a supplier to a sub to a prime), who may not. Notably, the decision Diamond relies on the most, *F. D. Rich Co. v. U. S. for Use of Indus. Lumber Co.*, 417 U.S. 116 (1974), is the case that most soundly disapproves its argument. In *F. D. Rich*, the Supreme Court reiterated the rights afforded by the Miller Act are limited. 417 U.S. at 122 (citing *MacEvoy Co. v. United States for Use and Benefit of Calvin Tomkins Co.*, 322 U.S. 102, 109-11 (1944)). Ultimately, the Supreme Court was determining whether Industrial was a party that supplied materials to a "subcontractor" that would allow it to have a valid claim under the Miller Act or a mere supplier to a materialman that would not. *Id.* at 122-24. The Supreme Court was not weighing whether Industrial skipped over the party it supplied it materials to on the project to be considered a first-tier subcontractor under the Miller Act, as Diamond aspires to do here.[12] Accordingly, *F. D. Rich*, does not support Diamond's argument that it, and not Harbor, is the subcontractor for purposes of its Miller Act claims.

13. In reaching its conclusion that Industrial was a *second-tier* subcontractor in *F. D. Rich*, the Supreme Court discussed the following facts similar to those in this case:

> Industrial was a supplier of materials to Cerpac. Thus, if Cerpac were a subcontractor for purposes of the Act, Industrial, having given the [sic]

---

[11] Indeed, Diamond appears to confuse status as a beneficiary under the Miller Act which can assert claims against a prime contractor and its surety under the Miller Act with status as a party with a direct contractual relationship with the prime contractor which can assert state law-based breach of contract claims against the prime contractor.

[12] In *U.S. ex rel. E & H Steel Corp. v. C. Pyramid Enterprises, Inc.*, the other case Diamond cites in its Response as support for its claim that it qualifies as a "subcontractor" under the Miller Act (DN 23, p. 14-15), the Third Circuit evaluated whether Havens, the party who the claimant, E & H, contracted with and supplied materials to, was a "subcontractor" under the Miller Act. 509 F.3d 184, 185-86, 190-91 (3d Cir. 2007). Similar to *F. D. Rich*, the Third Circuit did not evaluate whether E & H skipped over Havens to be considered a "subcontractor" under the Miller Act.

> required statutory notice, could assert a Miller Act claim against Rich, the prime contractor. But, if Cerpac were merely a materialman, Industrial could not assert its Miller Act claim since it would be merely a supplier of materials to a materialman, a relationship found too remote in MacEvoy to enjoy the protections of the Act.

*Id.* at 122. The Supreme Court also noted the petitioners in *F. D. Rich* claimed Cerpac was not a subcontractor because its role on the project "was that of a **broker** receiving standard lumber supplied by Industrial and, in turn, supplying it without modification to Rich"—like Diamond asserts about Harbor here. *Id.* (emphasis added). But after considering *Cerpac's role* on the project and *relationship* with the prime contractor, not Industrial's activities, the Supreme Court determined that Cerpac was a first-tier subcontractor under the Miller Act because, despite the petitioners' claims that it was a mere broker, "Cerpac, in effect, took over a substantial part of the prime contract itself." *Id.* at 123-24.

14. The pleadings as well as the documents attached to the Complaint and Motion to Dismiss, show Harbor's role on the project and relationship with RLB and demonstrate Harbor took over a substantial part of the Prime Contract. Thus, Harbor unquestionably is a first-tier "subcontractor" under the Miller Act. DN 1, ¶¶ 10-11, 15; DN 1-2; DN 22-1; DN 22-2; DN 22-3. At best then, Diamond could have been a second-tier subcontractor claimant under the Miller Act here.[13] The only material distinction between *F. D. Rich* and this case is the Supreme Court in *F. D. Rich* found that Industrial provided

---

[13] If Diamond had given proper notice under the Miller Act, properly pled a claim in the Complaint under the Miller Act, and failed to receive payments of project funds within the scope of the Miller Act, Diamond may have qualified as having standing to assert a claim as a second-tier subcontractor under the Miller Act. But that is not the case here.

the required statutory notice for a second-tier subcontractor to hold a valid Miller Act claim, whereas Diamond did not here. *Compare* 417 U.S. at 122; *with* DN 22, p. 25-27.

15. Although Diamond focused on the comment in *F. D. Rich* to look "not just at the contract" but also "to look at the total relationship," (DN 23, p. 14), Diamond ignores that the Supreme Court looked at both the contract and relationship between Cerpac, the first-tier subcontractor, and Rich, the prime contractor, and not the relationship between Industrial, the *second-tier* subcontractor, and Rich. 417 U.S. at 122. Also, subsequent to *F. D. Rich*, the Supreme Court in *J. W. Bateson Co. v. U.S. ex rel. Bd. of Trustees of Nat. Automatic Sprinkler Indus. Pension Fund*, held a contract with a prime contractor is a "***prerequisite***" to being a first-tier "subcontractor" under the Miller Act and noted a "sub-subcontractor may avail himself of the protection of the bond by giving written notice to the contractor **but that is as far as the bill goes**." 434 U.S. 586, 590-91 (1978) (citation omitted and emphasis added). The Supreme Court stated that "[i]n concluding that the word 'subcontractor' must be limited in meaning to one who contracts with a prime contractor, we not unmindful of our obligation to construe the 'highly remedial' Miller Act 'liberal[ly] . . . in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects.'" *Id.* at 594 (quoting *MacEvoy*, 322 U.S. at 107).

16. Since there is no direct contract between Diamond and RLB, Diamond cannot satisfy the initial prerequisite to be considered a first-tier "subcontractor" under the Miller Act, but instead is a sub-subcontractor. Consequently, because it is not a first-tier subcontractor, and because it failed to provide the required statutory notice (or even plead that it did so), Diamond's Miller Act claim should be dismissed.

**D.      Diamond Admits its Miller Act Damage Model is Improper.**

17.     While Diamond concedes it cannot recover lost profit for its Miller Act claim,[14] Diamond fails to point out where in its Complaint it identified that it has incurred extra costs in furnishing labor and materials to the Project that it is entitled to recover under the Miller Act. This is likely because Diamond's Miller Act claim seeks "54.16% of the equitable adjustment received by RLB" instead of extra costs. DN 1, ¶¶ 31, 46. But this 54.16% sought by Diamond is based on a ratio[15] and ***not*** based on its increased costs actually expended in furnishing labor or materials for prosecuting the work attributable to any delay or differing site conditions required for a Miller Act claim. *Id.*, ¶¶ 16, 19, 25, 31, 46; DN 1-2, Art. 2, p. 1. Thus, Diamond has failed to sufficiently plead the element of damages in its Complaint for a valid Miller Act claim and as a result, Diamond failed to state a claim on any theory for recovery of any portion of the REA under the Miller Act and such claims against RLB and Travelers should be dismissed under Rule 12(b)(6)**.**

18.     Further, in its Response Diamond only points to the $2,362,344 that *Diamond submitted to Harbor*, not RLB, and which Harbor provided to RLB as part of Harbor's certified costs to be included in the Amended REA requesting $8,867,212 from the USACOE for the delays and differing site conditions at the Project. DN 23, p. 17;[16] DN 22, p. 5-6; DN 22-2; DN 22-3; DN 22-4. However, this $2,362,344 that Diamond submitted

---

[14] DN 23, p. 16.
[15] This ratio is solely based on Diamond's unit rate per cubic yard of dredged materials in its Sub-Subcontract with Harbor that unquestionably contains built-in profits and RLB's unit rate in the Prime Contract which does the same.
[16] Although Diamond asserts that RLB did not dispute Diamond's *certified* costs submittal but instead passed it along to the USACOE, this is categorically different than RLB agreeing: (1) this amount is correct, (2) this amount constitutes only the increased costs actually expended by Diamond that is recoverable under the Miller Act, or (3) that RLB would pay this amount to Diamond directly or otherwise.

to Harbor for inclusion in the Amended REA also included overhead and profit calculated as percentages, which again are impermissible items of recovery under the Miller Act. DN 22-2; DN 22, p.27. Finally, as conceded by Diamond in its Response, the USACOE did not provide the full $8,867,212 requested in the Amended REA, that included Diamond's total job costs, plus overhead, plus profit of $2,362,344, but instead issued $6,000,000. DN 23, p. 1, 6, 17; DN 23-1, p. 2. And, while Diamond asserts in its Response that RLB accepted $6,000,000 from the USACOE for the equitable adjustment, Diamond omits the fact that Diamond accepted payment from Harbor of $950,000 out of that amount. **Exhibit 6**. RLB is not "keep[ing] the money that was paid for Diamond's work." DN 23, p. 1.

**E.      Diamond Did Not Dispute All of RLB's Challenges in the Motion to Dismiss.**

19.     Diamond's Response failed to address the following challenges found in RLB's Motion to Dismiss:

- Diamond's failure to plead sufficient facts to show an agency relationship existed between RLB and Harbor. DN 22, p. 9-12;[17]

- Diamond's third-party beneficiary claim fails due to Diamond's insufficient pleadings and the express terms of the Subcontract. *Id.*, p. 12-14;[18]

- Diamond's failure to plausibly plead existence of an enforceable oral contract, or oral modification to an existing agreement, with RLB. *Id.*, p. 14-21;[19]

- Diamond's Complaint fails to plead sufficient facts to plausibly show existence of an implied or quasi-contractual relationship with RLB. *Id.*, p. 21-22;

---

[17] The only agency reference made by Diamond in its Response was its assertions that "this Court cannot realistically rule for Diamond that it was in direct privity of contract with RLB, or an agent of RLB . . . ." DN 23, p. 17.

[18] The only a third-party beneficiary reference in the Response was Diamond's assertions that "this Court cannot realistically rule for Diamond that it was . . . a third-party beneficiary of the Harbor/RLB contract . . . ." *Id.*

[19] Although Diamonds points to alleged language in the Sub-Subcontract that would purportedly allow for oral modifications to that agreement, RLB is not a party to the Sub-Subcontract and Diamond makes no assertions about an oral modification to an existing contract with RLB or an oral contract with RLB. *See* DN 23, p. 3, 10-11.

14

- Diamond's failure to plead a Miller Act claim as a second-tier subcontractor. *Id.*, p. 25-26; and

- Diamond's failure to provide timely and adequate notice under the Miller Act. *Id.*, p. 26-27.

20. Therefore, this Court should at least dismiss all purported claims by Diamond that rely, or would require, the above challenged matters.

**F. RLB's Motion to Dismiss Should Not be Converted to a Motion for Summary Judgment.**

21. A court may consider documents attached to a Rule 12(b)(6) motion if the documents are referenced in the complaint and central to the plaintiff's claim. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498-99 (5th Cir. 2000). This Court found this to be a well-established exception to the general rule that if a motion to dismiss refers to matters outside the pleading it is more properly considered as a motion for summary judgment. *Irby*, 2020 WL 4504701, at *3; *Rivas v. U.S. Bank, N.A*., No. 4:19-CV-2021, 2019 WL 3892834, at *1 (S.D. Tex. July 29, 2019). All of exhibits attached to RLB's Motion to Dismiss were referenced by Diamond in its Complaint and are central to its claims. Diamond did not argue that these exhibits were not referenced in Diamond's Complaint or not central to its claims. Instead, Diamond continuously referenced and relied on these in its Response, confirming they are central to its claims. DN 23, p. 2, 4-5, 9, 13, 17. As such, there is no basis for converting the Motion to Dismiss into a motion for summary judgment.[20]

---

[20] If this Court were to consider converting RLB's Motion to Dismiss into a motion for summary judgment, which would contrary to the precedent noted above, further precedent from the Fifth Circuit requires that the Court provide RLB fair notice of this conversion and to allow RLB at least ten days to submit additional evidence to support a motion for summary judgment. *See Snider v. L-3 Commc'ns Vertex Aerospace, L.L.C.*, 946 F.3d 660, 667 (5th Cir. 2019).

## PRAYER

For the foregoing reasons, RLB requests that the Court dismiss Diamond's claims against RLB pursuant to Rule 12(b)(6), and that RLB recover all such other relief as it may show itself justly entitled.

    Respectfully submitted,

    **WINSTEAD PC**

    By:  */s/ Mark C. Guthrie*
          Mark C. Guthrie
          Texas Bar No. 08636600
          mguthrie@winstead.com
          Cody N. Schneider
          Texas Bar No. 24073595
          cschneider@winstead.com
          600 Travis Street, Suite 5200
          Houston, Texas 77002
          Telephone (713) 650-8400
          -and-
          D. Blake Wilson
          State Bar No. 24090711
          bwilson@winstead.com
          401 Congress Avenue, Suite 2100
          Austin, Texas 78701
          Telephone (512) 370-2800
    **COUNSEL FOR DEFENDANT**
    **RLB CONTRACTING, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2022, a true and correct copy of the foregoing was served on all counsel of record via the Court's CM/ECF system.

    */s/ Cody N. Schneider*
    Cody N. Schneider