## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| **DIAMOND SERVICES** | § | |
| **CORPORATION** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:21-cv-00253-JVB** |
| | § | |
| **RLB CONTRACTING, INC., HARBOR** | § | |
| **DREDGING, INC. AND TRAVELERS** | § | |
| **CASUALTY AND SURETY COMPANY** | § | |
| **OF AMERICA** | § | |
| | § | |
| **Defendants** | § | |

## RLB CONTRACTING, INC.'S MOTION FOR SUMMARY JUDGMENT AGAINST DIAMOND SERVICES CORPORATION'S CLAIMS

Subject to and without wavier of Defendant RLB Contracting, Inc. ("RLB") pending Motion to Dismiss, **DN** 22, RLB respectfully submits this Motion for Summary Judgment ("Motion") as to all claims made by Plaintiff Diamond Services Corporation ("Diamond") in its Original Complaint ("Complaint"), **DN** 1, and First Amended Complaint, **DN** 41 (collectively "Complaint"), and respectfully shows the Court the following:

### I.    SUMMARY

1.     Diamond has been paid all it is entitled to for its work on the project at issue. Nevertheless, Diamond greedily seeks more.[1] For the reasons discussed below, this Court should grant summary judgment dismissing with prejudice these patently untenable claims and permit RLB to recover its attorneys' fees, expenses and costs upon further application.

---

[1] In fact, Diamond has been paid more than it is entitled to and, as set forth in RLB's Counterclaim, RLB is entitled to recover that overpayment from Diamond.

2.      After the passage of an adequate time for discovery, the following relevant facts cannot credibly be disputed and, together with the summary judgment evidence and legal issues discussed below, are dispositive of Diamond's claims in this Lawsuit as a matter of law: (1) Diamond's contract is with Harbor, not RLB; (2) RLB did not sign and is not a party to the sub-subcontract between Diamond and Harbor ("Sub-Subcontract"); (3) Diamond is neither a party to or a third party beneficiary of either the subcontract between RLB and Harbor ("Subcontract") or the prime contract between the United States Army Corps of Engineers ("USACE") and RLB ("Prime Contract"); (4) Diamond at all times was directly managed and supervised by Harbor and not RLB, communicated with Harbor and not RLB, and issued its contemporaneous invoices for its work on the project in the Houston Ship Channel between Brady Island and the Houston Ship Channel Turning Basin, wholly within Texas ("Project") to Harbor and not to RLB; (5) More than a month after completion of its work, Diamond submitted its total certified costs, including overhead and profit, for the Project to Harbor for inclusion in Harbor's submission of Harbor's total certified costs to RLB for inclusion in RLB's amended request for equitable adjustment ("Amended REA") of the Prime Contract due to a differing site condition, and Diamond did not submit those costs directly to RLB; (6) Diamond has been paid in full for its work under the Sub-Subcontract and in addition has been paid the $950,000 it agreed to accept out of proceeds of settlement of the Amended REA; (7) As reflected in its own job cost report, Diamond's total receipts on the Project substantially exceed both its total certified costs on the Project, including overhead and profits, and its costs reflected in the job cost report such that it is inconceivable that Diamond is entitled to any further

2

compensation for the Project under any theory; and (8) Diamond never provided RLB timely and proper notice required to maintain its claim against RLB under the Miller Act..

3.     Despite these facts, Diamond asserts claims for breach of contract, implied contract, and quasi-contract claims against RLB, request for *quantum meurit*/unjust enrichment damages against RLB, and Miller Act claims against RLB and Defendant Travelers Casualty and Surety Company ("Travelers"). RLB moves for summary judgment against Diamond's above-referenced claims asserted against RLB, pursuant to Federal Rule of Civil Procedure 56, because:

(a)     Diamond has no evidence to establish all of the necessary elements for its breach of oral or written contract against RLB;

(b)     Diamond has no evidence to establish all the necessary elements for its Miller Act claim against RLB or Travelers;

(c)     Diamond's third-party beneficiary claim fails as a matter of law under both the express terms of the Sub-Subcontract and the failure of the Prime Contract and Subcontract to express any intention to confer any benefit upon Diamond;

(d)     Diamond has no evidence of any alleged oral agreement with RLB for RLB to compensate Diamond for Diamond's cost to furnish a tug to perform part of Diamond's work or entitlement to any share of RLB's settlement of the Amended REA (other than Diamond's agreement with Harbor to accept the $950,000 amount in satisfaction of any claims to the proceeds of the Amended REA);

(e)     There is no new consideration for any alleged oral agreement with RLB or Harbor for either to compensate Diamond for its cost to furnish a tug to perform part of Diamond's work because Diamond was legally obligated to furnish the vessels necessary to perform its work under the Sub-Subcontract;

(f)     Diamond's claims for implied or quasi-contract against RLB fail as a matter of law because Diamond's Sub-Subcontract with Harbor covers the subject matter serving as the basis for Diamond's claims;

(g)    Diamond's *quantum meruit* and unjust enrichment claims against RLB fail as a matter of law because Diamond's Sub-Subcontract with Harbor covers the subject matter serving as the basis for these equitable theories; and

(h)    Diamond cannot demonstrate uncompensated costs or damages, recoverable under the Miller Act or otherwise, because Diamond has been paid substantially more than its certified total Project costs, including overhead and profit and received receipts substantially in excess of the costs reflected in Diamonds job cost report.

4.      Consequently, RLB requests this Court to grant this Motion and enter a summary judgment that Diamond take nothing against RLB and Travelers by reason of its claims against RLB and Travelers.

## II.    <u>NATURE AND STATE OF PROCEEDINGS</u>

5.      On September 16, 2021, Diamond filed its Original Complaint against RLB, Harbor, and Travelers. **DN** 1. In its Original Complaint, Diamond brought claims for breach of contract, implied contract, and quasi-contract against Harbor and RLB and a claim under the Miller Act against RLB and Travelers. *Id*. On December 3, 2021, RLB filed its Motion to Dismiss. **DN** 22. On December 27, 2021, Diamond filed its Opposition to RLB's Motion to Dismiss. **DN** 23.[2] On May 13, 2022, Diamond filed its First Amended Complaint, **DN** 41, to designate this Lawsuit as an admiralty claim within the meaning of Federal Rule of Civil Procedure 9(h) but "re-plead[ing] its original Complaint in full." The discovery deadline passed on August 29, 2022. **DN** 45, ¶ 5. Accordingly, RLB now files this Motion seeking summary judgment on Diamond's claims against RLB and Travelers.

---

[2] The Motion to Dismiss has been fully briefed and is ripe for review and ruling.

### III.    RELEVANT FACTS

**A.    The Project and Contractual Relationships.**

6.    RLB was the prime contractor for the USACE under the Prime Contract, Contract No. W912HY19C0015, involving dredging work at the Project. **Ex. 1-A**. As part of its obligations under the Prime Contract, RLB was required to provide a Miller Act payment bond which RLB obtained from Travelers ("Bond"). **Ex. 1-B**. RLB entered into a Subcontract with Harbor for Harbor to perform certain portions of RLB's scope of work on the Project. **Ex. 1-C**. Harbor then entered into a Sub-Subcontract with Diamond to perform portions of Harbor's work on the Project. **Ex. 1-D**. Accordingly, and setting aside the Bond, the flow of contractual relationships between the parties to the Project were:



7.    Notably, RLB did not negotiate, prepare, or sign the Sub-Subcontract and is not listed as a party to it. **Ex. 1-D**. Rather, the Sub-Subcontract is exclusively between Harbor and Diamond. *Id*. Moreover, RLB and Diamond had absolutely no contact or communications about the Project at all before Diamond entered into the Sub-Subcontract. *See* **Ex. 5**, 34:14-23. Accordingly, Diamond's invoices were addressed and directed to Harbor and Harbor paid Diamond's invoices, not RLB. *See* **Ex. 3**; **Ex. 4**. In fact, none of Diamond's contemporaneous invoices on the Project were ever addressed or directed to RLB or issued in RLB's name. **Ex. 9**, RFA Resp. No. 8; **Ex. 5**, 114:11-15, 133:22-25; **Ex. 6**, 63:17-65:1, 85:20-22. Further, Diamond directed all communications on the Project to Harbor and not RLB.  **Ex. 6**, 86:23-87:2, 90:13-91:3.

**B.**      **RLB's Request for Equitable Adjustment on the Prime Contract.**

8.      During the performance on Project, RLB, Harbor, and Diamond encountered a differing site condition in the area where the dredge was operating to excavate material. **Ex. 1**; **DN** 1, ¶ 18. As a result, on October 26, 2020, RLB submitted an initial REA of the Prime Contract ("Initial REA"). **Ex. 1-E**. The Initial REA was ultimately withdrawn by RLB because the USACE's instructed RLB that if USACE granted the Initial REA that the USACE would not allow subsequent REAs for the costs of differing site conditions encountered during the remainder of the Project that were not covered by the Initial REA and that RLB would have to release its claims for all differing site conditions if the Initial REA was approved. **Ex. 1**; **Ex. 7**, 59:5-60:22. Accordingly, after the Project was completed, RLB submitted the Amended REA covering the entire Project. **Ex. 1-F**. The submission of the Amended REA came after RLB received Harbor's total certified costs for the entire Project, which included Diamond's total certified costs for the entire Project (including Diamond's direct costs, overhead and profit). **DN** 22-2; **DN** 22-3; **Ex. 7**, 93:21-94:3, 95:22-25, 97:8-18. RLB calculated its additional costs due to the differing site conditions using a measured mile methodology and submitted its Amended REA to the USACE in April 2021, requesting a time extension and compensation of $8,867,212 for the additional costs, including overhead and profit, that RLB incurred performing the Prime Contract due to the differing site conditions at the Project. **DN** 22-4

9.      Ultimately, RLB negotiated a settlement of the Amended REA in the amount of $6,000,000 from the USACE. *See* **DN** 23-1. Notwithstanding the amounts already paid to Harbor and Diamond under the Subcontract and Sub-Subcontract, Harbor and Diamond

6

were paid $500,000 and $950,000, respectively, in satisfaction of their claims for a share of RLB's settlement of the Amended REA according to a mutual agreement amongst the parties. **Ex. 1**; **Ex. 1-G**; **Ex. 7**, 114:5-23; **Ex. 5**, 91:18-92:3; **Ex. 6**, 51:1-5; **Ex. 8**, 134:3-5.

**C.**     **The Inescapable Facts.**

10.     As illustrated above, and supported by the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, granting the Motion is proper because the following facts cannot credibly be disputed:

(a)     RLB entered into the Subcontract with Harbor for Harbor to perform certain portions of the Project and Diamond is not a party to the Subcontract. *See* **Ex. 1**; **DN** 1, ¶ 10; **Ex. 9**, RFA Resp. No. 4.

(b)     Harbor entered into the Sub-Subcontract with Diamond for Diamond to perform portions of Harbor's work on the Project and RLB is not a party to the Sub-Subcontract and RLB did not sign the Sub-Subcontract. *See* **Ex. 1**; **DN** 1, ¶ 11; **Ex. D-1**; **Ex. 9**, RFA Resp. No. 7; **Ex. 5**, 74:2-6; **Ex. 6**, 82:2-17; **Ex. 8**, 174:2-6.

(c)     There was no written contract between RLB and Diamond. *See* **Ex. 1**; **Ex. 9**, RFA Resp. No. 6.

(d)     RLB made no oral agreement with Diamond or Harbor regarding payment for Diamond's tug; rather Diamond's communication about any cost related to the tug was directed to and had with Harbor, not RLB. *See* **Ex. 5**, 26:16-27:1-4; 36:3-6; **Ex. 8**, 188:10-18; **Ex. 6**, 85:12-22.

(e)     While the Project was ongoing, RLB made no agreement with Diamond to the effect that RLB would ensure Diamond would be made whole out of the proceeds of a future equitable adjustment of the Prime Contract and RLB did not agree to provide any particular share or percentage of the proceeds of settlement of a future  request for equitable adjustment; rather, after the Project was over RLB only had communications with Harbor as its direct subcontractor and not with Diamond regarding the amount Harbor would accept in satisfaction of its share of the proceeds of a settlement of the Amended REA.  *See* **Ex. 8**, 189:4-11; **Ex. 6**, 86:23-87:8, 90:13-91:3.

(f)     Diamond and RLB had no contact or communications related to the Project prior to the execution of the Sub-Subcontract and Diamond directed all communications on the Project to Harbor and not RLB, except for one incident related to a crane breakdown which is unrelated to the issues in this Lawsuit. *See* **Ex. 5**, 34:14-23; **Ex. 6**, 86:23-87:8; 90:20-91:3.

(g)     Diamond received its directions related to its work on the Project from Harbor, not RLB. *See* **Ex. 5**, 27:2-4.

(h)     Diamond invoiced Harbor for its work on the Project, not RLB. *See* **DN** 1, ¶ 15; **Ex. 9**, RFA Resp. No. 8; **Ex. 5**, 109:20-110:3; **Ex. 6**, 85:12-22.

(i)     Save and except one $950,000 joint check from RLB to Harbor and Diamond that was endorsed by Harbor in favor of  Diamond for the share of the proceeds of the settlement of the Amended REA that Diamond agreed to accept,  Harbor was the only company that paid Diamond for its work on the Project. *See* **Ex. 6**, 83:25-84:5.

(j)     Exclusive of the joint check $950,000 that Diamond received and deposited, Harbor paid Diamond $2,253,346 in total for its work on the Project but its total certified costs for the entire Project, including overhead and profit, was in the amount of $2,362,344. *Compare* **DN** 46-10, *with* **DN** 46-6; *see also* **Ex. 10**, RFA Resp. No. 4.

(k)     Harbor submitted to RLB its total certified costs for the entire Project, which also included Diamond's total certified costs for the entire Project, including Diamond's direct costs, overhead and profit. **DN** 46-6; **DN** 22-2; **DN** 22-3

(l)     Diamond's Vice President of Operations, Jim Furlette, agreed and represented to Harbor's principal, Roland Maturin, that Diamond would accept $950,000 in settlement of Diamond's claims to the proceeds of the settlement of the Amended REA and Diamond understood this representation would be conveyed to RLB. *See* **Ex. 6**, 42:2-18; 94:18-24; 95:10-15; 95:21-24; **Ex. 8**, 136:15-137:5.

(m)     When negotiating the settlement of the Amended REA with the USACE, RLB relied upon Harbor and Diamond's representations and agreements to accept the total amount of $1,450,000 in settlement of any right to proceeds of the settlement of the Amended REA with Harbor agreeing to retain $500,000 for itself and disbursing $950,000 to Diamond. *See* **Ex. 7**, 114:5-23.

(n)     RLB reached a settlement of the Amended REA with the USACE in the amount of $6,000,000. **DN** 23-1.

(o)     After receiving the funds from the Amended REA, RLB paid Harbor who then tended a joint check – from RLB, payable to Harbor and Diamond, and endorsed by Harbor in favor of Diamond – in the amount of $950,000 and Diamond accepted and deposited that check. *See* **DN** 24-2; **Ex. 5**, 91:18-92:3; **Ex. 6**, 42:2-18, 51:1-5; **Ex. 1-G**.

## IV.     <u>MOTION, ARGUMENTS & AUTHORITIES</u>

### A.     **Summary Judgment Standard.**

11.     The summary judgment standard is well known and only a brief recitation is necessary. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). As such, summary judgment is intended to pierce the pleadings and access the proof to determine whether there is a genuine need for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing the Advisory Committee Note to 1963 Amendment to FED. R. CIV. P. 56(e)).

12.     Summary judgment is proper when there is no genuine issue as to any material fact. FED. R. CIV. P. 56(a); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007). A defendant who seeks summary judgment on a plaintiff's claim must demonstrate the absence of a genuine dispute of material fact by either: (1) submitting summary-judgment evidence that negates the existence of a material element of the plaintiff's claim; or (2) showing there is no evidence to support an essential element of the plaintiff's claim. *See Celotex Corp.*, 477 U.S. at 322–23. The Court is permitted to grant summary judgment if it determines that "the pleadings, depositions, answers to interrogatories, and admission on

9

file, together with the affidavits, show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52 (1986).

13.     Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the nonmoving party has the burden of coming forth with specific evidence in the record and to articulate the precise manner in which the evidence supports its claim. *Ragas v. Tennessee Gas Pipeline Company*, 136 F.3d 455, 458 (5th Cir. 1998). Reliance on mere conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation or a scintilla of evidence is insufficient to defeat a motion for summary judgment.  *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *see also Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

**B.     Motion for Summary Judgment.**

14.     On the grounds set forth in this Motion, RLB moves for a summary judgment pursuant to Federal Rule of Civil Procedure 56(a) on Diamond's claims of breach of contract, implied contract, and quasi-contract claims against RLB, request for *quantum meurit*/unjust enrichment damages against RLB, and Miller Act claims against RLB and Travelers. Diamond cannot present any evidence to support or raise a genuine issue of material fact to support these claims, theories, and requests for damages and as such, RLB is entitled to summary judgment on these claims as a matter of law.[3]

---

[3] It should be noted, as set forth by RLB in its Reply in Support of its Motion to Dismiss, DN 24, p. 14-15, Diamond **never disputed** the following challenges: (1) Diamond's failure to plead sufficient facts to show an agency relationship existed between RLB and Harbor, DN 22, p. 9-12; (2) Diamond's third-party beneficiary claim fails due to Diamond's insufficient pleadings and the express terms of the Subcontract, *Id.*, p. 12-14; (3) Diamond's failure to plausibly plead existence of an enforceable oral contract, or oral modification to an existing agreement, with RLB, *Id.*, p. 14-21; (4) Diamond's fails to plead sufficient facts to plausibly show existence of an implied or quasi-contractual relationship with RLB, *Id.*, p. 21-22; (5) Diamond's failure to plead a Miller Act claim

**C.**     **Diamond's Breach of Contract Claim Against RLB Fails as a Matter of Law Because it has No <u>Direct</u> Contractual Relationship with RLB.**

15.     Under Texas law,[4] a plaintiff must prove the following elements to prevail on a breach of contract claim: "(1) a valid contract exists between the plaintiff and the defendant, (2) the plaintiff tendered performance or was excused from doing so, (3) the defendant breached the terms of the contract, and (4) the plaintiff sustained damages as a result of the breach." *Turner Construction Company v. Rockley Interset, Inc.*, 2019 WL 13191626, at *2 (S.D. Tex. Aug. 19, 2019)(quoting *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 579 (5th Cir. 2019). Contract interpretation is purely a legal question, and as applicable here, the contract is interpreted according to Texas law. *Gonzalez v. Denning*, 394 F.3d 388, 391 (5th Cir. 2004).

16.     Diamond broadly asserts in its Complaint that "[t]he contract referenced above, as modified orally and confirmed through performance, is a valid and enforceable contract with Harbor, and with RLB." **DN** 1, ¶ 49. While Diamond's Complaint is unclear as to "which contract referenced above" it refers to as a contract with RLB, the depositions and Diamond's discovery clarify this claim. In Diamond's Complaint there were three different contracts "referenced above" *i.e.* the Prime Contract (**DN** 1, ¶ 8-9), Subcontract (*id.* 1 ¶ 10), and Sub-Subcontract (*id.*, ¶ 11-12). However, Diamond concedes it is not a party to the Subcontract and that it had no contractual privity with the USACE and thus,

---

as a second-tier subcontractor, *Id.*, p. 25-26; and, (6) Diamond's failure to provide timely and adequate notice under the Miller Act. *Id.*, p. 26-27. Subject to proper dismissal from RLB's Motion to Dismiss, the failure to dispute these challenges should also be construed to establish Diamond's inability to provide evidence to support such claims as additional grounds for summary judgment.

[4] Although Diamond alleges that it has invoked this Court's jurisdiction by asserting a federal question claim under the Miller Act, Diamond's claims are governed by Texas state law as it is undisputed the Project was located entirely in, and Diamond's work was performed entirely within, Texas. DN 1, ¶¶ 5, 7.

11

was not a party to the Prime Contract. *See* **Ex. 9**, RFA Resp. No. 4; **Ex. 5**, 81:11-17, 138:18-20. Accordingly, per Diamond's pleadings and concessions, the Sub-Subcontract was the only purported "valid and enforceable contract with Harbor, and [allegedly] with RLB." But Diamond has no evidence showing RLB was a party to the Sub-Subcontract. To the contrary the Sub-Subcontract's own terms and the evidence show RLB was not a party to it. Moreover, Diamond has no evidence showing how the Sub-Subcontract was orally modified and confirmed through performance, as it alleges, to make it a valid contract with RLB as a party or how Diamond can enforce the Sub-Subcontract's terms or any modification of its terms, against RLB.

1.      *There is no valid written contract between Diamond and RLB.*

17.     Diamond admits in its pleadings, discovery responses, and deposition testimony that there was no written contract signed between RLB and Diamond and the only express, written contract for its work on the Project was its Sub-Subcontract with Harbor. *See* **DN** 1, ¶¶ 11, ("Harbor Dredging subsequently contracted with Diamond"), 12 ("Diamond's contract was with Harbor"); **Ex. D-1**; **Ex. 9**, RFA Resp. No. 6 ("Diamond admits there is no written contract signed by RLB and Diamond); **Ex. 5**, 74:2-6; **Ex. 6**, 72:3-6. This alone is sufficient to establish there is no direct contract between Diamond and RLB.

18.     Further, the Sub-Subcontract itself shows that it is only between Harbor and Diamond. First, the Sub-Subcontract unambiguously and explicitly states "[t]his agreement is . . . by and between" Harbor as "Contractor" and Diamond as "Sub-Subcontractor."

**SUBCONTRACT**

Job No:  W9 I 260 19C0015                                    Date: February 24. 2020

This agreement is made this 29,·a day of February 2020, and effective the 29" day of February 2020, by and between Harbor Dredging, Inc, 14905 Southwest Fwy, Sugar Land TX, 77478 hereinafter known as "Contractor", and Diamond Services Corporation, 503 South DeGravelle Road, Amelia, Louisiana 70340 hereinafter known as "Sub-Contractor," to perform the work identified in Article 2, in accordance with the Project's Contract Documents numbered W9126O19C0015 which is incorporated to this subcontract by reference.

**Ex. 1-D**, p. 1 (highlighting added). In addition, as shown by the agreement itself, and undisputed by Diamond, RLB is not a signatory to the Sub-Subcontract. *See* **Ex. 1-D**, p. 3; **Ex. 6**, 82:15-17. Instead, only Diamond and Harbor signed the Sub-Subcontract.

In witness whereof the parties have executed this Agreement under Seal, the day and year first written above.

Diamond Services, Corporation.                       HARBOR DREDGING, INC.

By: _____                By: _____
Title: Executive VP                              Title   President

**Ex. 1-D**, p. 3 (highlighting added).

19.     Despite these inescapable facts, Diamond claims RLB is a party to the Sub-Subcontract. Diamond's claims that RLB is a party to the Sub-Subcontract is hinges on the Sub-Subcontract's one reference in the recitals to "General Contractor: RLB Contracting, Inc." and other reference to "Sub-Contractor: Harbor Dredging. Inc.I [sic] Diamond Services Corportation [sic].". **Ex. 1-D**, p. 1; **Ex. 9**, RFA Resp. No. 6; and **Ex. 5**, 81:3-10. Notably, the Sub-Subcontract also lists the USACE as "Owner" in the same section but Diamond does not contend that the USACE is a party to the Sub-Subcontract. **Ex. 5**, 81:3-14. Likewise, the mere fact that RLB is listed as "General Contractor," and Harbor and Diamond as "Subcontractor [sic]," in the Sub-Subcontract does magically convert a non-signatory like RLB into a contractual party, does not mean RLB is in privity with Diamond, and does not render RLB obligated to the terms and conditions of the Sub-Subcontract.

13

20.     Additionally, the Sub-Subcontract references RLB as the "General Contractor" and not the "Contractor." **Ex. 1-D**, p. 1. Instead, Harbor is defined as a the "Contractor" in the Sub-Subcontract. *Id.* Moreover, the Sub-Subcontract only lists RLB or the "General Contractor" this one time in the recitals but refers to the "Contractor" throughout the agreement when discussing obligations under the Sub-Subcontract. Accordingly, there is no confusion on who the "Contractor" was in this agreement nor any ambiguity on who had certain obligations under the Sub-Subcontract.[5]

21.     Moreover, Diamond's performance and conduct on the Project illustrates and reinforces this conclusion, including the following admissions:

(a)     Diamond and RLB had no contact or communications prior to the execution of the Sub-Subcontract and Diamond's directed all communications on the Project to Harbor and not RLB, except for one incident related to a crane breakdown which is not subject to the issues in this Lawsuit. *See e.g.*, **Ex. 5**, 34: 14-23; **Ex. 6**, 86:23-25; 87: 1-8; 90:20-25, 91:1-3.

(b)     Diamond received its directions related to its work on the Project from Harbor, not RLB. *See e.g.*, **Ex. 5**, 27: 2-4.

(c)     Diamond would invoice Harbor, not RLB, for its work on the Project. *See e.g.*, **DN** 1, ¶ 15; **Ex. 9**, RFA Resp. No. 8; **Ex. 5**, 110: 1-3; **Ex. 6**, 85: 12-22.

(d)     Diamond directed its certified costs for the request for equitable adjustment to Harbor and not RLB. **Ex. 5**, 103: 5-10; 125:1-4.

---

[5] Even if the Sub-Subcontract listed both Harbor and RLB as the "Contractor," there is no disputing Harbor was defined as the "Contractor" earliest in the agreement. As such, Harbor would be considered the "Contractor," and not RLB, because under Texas law when harmonizing provisions in a contract that may seem conflicting, rules of contract construction dictate that "terms stated earlier in an agreement must be favored over subsequent terms." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

22.    Because there is no evidence to support a direct contractual relationship between Diamond and RLB, Diamond can raise no genuine issue of material fact to support its breach of written contract claims against RLB and such claims should be dismissed.

### 2.    *There is no evidence of an enforceable oral contract, or oral modification to an existing agreement, binding RLB.*[6]

23.    The necessary elements required for establishing an enforceable oral contract are the same as a written contract. *Wal-Mart Store, Inc. v Lopez*, 93 S.W.3d 548, 55 (Tex. App.—Houston [14th Dist.] 2002, no pet); *Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 702 (Tex. App.—Dallas 2008, no pet.). Among other requirements, to be enforceable a contract must be supported by valid consideration and contain terms sufficiently definite to enable a court to understand the parties' obligations. *Tex. Gas Utilities Co. v. Barrett,* 460 S.W.2d 409, 412 (Tex. 1970); *see also Provision Group, Inc. v. Crown Toxicology Ltd.*, 2017 WL 11221433, at *3 (W.D. Tex. Oct. 19, 2017) (citing *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000). Further, a modification, like a contract, must be supported by consideration. *Dieterich*, 270 S.W.3d at 702. However, a promise to fulfill a preexisting duty is not valid consideration. *Martens v. Prairie Producing Co.*, 668 S.W.2d 889, 891 (Tex. App.—Houston [14th Dist.] 1984, no writ) ("When a party agrees to do no more than that which he is already bound to do under an existing contract, the consideration is not sufficient to support a modification").

---

[6] Even if an oral contract, or oral modification to an existing agreement existed, it would be unenforceable and fail as a matter of law under the statute of frauds because it, in essence, constitutes an alleged agreement by RLB to answer for the debt or default of Harbor or the USACE and materially alters the obligations imposed under the Prime Contract, Subcontract, and/or Sub-Subcontract. *See* TEX. BUS. & COM. CODE § 26.01(b)(2).

24.     To support its oral contract and oral modification to an existing agreement claims, Diamond makes the following vague and unsupported allegations:

(a)     "The parties disagreed on who was responsible for the provision of a tug, so Diamond and RLB compromised: they would each fund half of the tug." **DN 1**, ¶ 33.

(b)     "The payment for the M/V MISS KERRILYNN operated such that Diamond paid for the tug, and invoiced half of the tug expenses to Harbor Dredging, which again, acting as a mere conduit, passed those invoices through to RLB." *Id.* ¶ 35.[7]

(c)     "Those invoices promised to be paid by RLB but unpaid by RLB . . . ." *Id.*, ¶ 40.

(d)     "The contract referenced above, as modified orally and confirmed through performance is a valid and enforceable contract with Harbor, and with RLB." *Id.*, ¶ 49.

(e)     ". . . And a separate oral agreement to make Diamond whole under the REA." **Ex. 5**, 80:24-25.

25.     First, the above vague assertions fail to show that the alleged oral contract or oral modification contain terms sufficiently definite to enable a court to understand the parties' purported obligations and as such, cannot be enforceable. *See Provision Group, Inc.*, 2017 WL 11221433, at *3. Further, Diamond has no admissible evidence to support its oral contract or oral modifications claims against RLB.

26.     As noted above, to be enforceable Diamond's alleged oral contract or oral modifications must be supported by valid consideration. *See Barrett,* 460 S.W.2d at 412; Diamond cannot present any evidence showing there was any *new* consideration to support

---

[7] Notably, Diamond's executive vice president, Mr. Swiber, confirmed the cost associated with the M/V/ MISS KERRILYNN were also included in the Diamond's total certified costs. *See* **Ex. 5**, 71:7-11; 180:4-22. Diamond's total certified costs were used to calculated the Amended REA.

its alleged oral contract or oral modification claims. Instead, all of the activities that Diamond allegedly performed that make the basis for its oral contract or oral modification claims were preexisting duties Diamond was required to perform under the Sub-Subcontract and thus, cannot constitute valid consideration for an enforceable oral contract or oral modification.

27.    Specifically, the Sub-Subcontract required Diamond to perform, among others, "all work necessary or incidental to complete" its work on the Project and Diamond was "responsible for traversing the hopper barges from excavation site to the unloading site." **Ex. D-1**, Art. 2, p. 1. Such provisions squarely covered Diamond's use of tugs for the Project as well as the work performed by Diamond on the Project, including the work performed in spite of the differing site conditions. Further, Diamond's Executive Vice President, Stephen Swiber, concedes the Sub-Subcontract imposed such preexisting duties onto Diamond:

> Q.    You knew under the subcontract between – or I should say the sub-subcontract between Harbor and Diamond that your company had the obligation to traverse the hopper barges from the dredging site to the disposal site, correct?
>
> A.    Correct.

**Ex. 5**, 42:1-6; *see also* **Ex. 6**, 24:11-25. Thus, Diamond had the preexisting obligation to furnish the necessary work, vessels and other equipment to adequately perform its work on the Project. Accordingly, there was no new consideration that supports Diamond's claims of an oral contract or oral modification to an existing contract sufficient to raise a genuine issue of material fact as to an alleged direct contractual relationship with RLB.

28.     Additionally, to the extent there was any proposed modification to the Sub-Subcontract attempting to adjust the contract's price or time, including changes due to the differing site conditions or need for additional tugs, such modifications were required to be in a change order pursuant to the Prime Contract's "Contract Documents."

---

**ARTICLE 4**

**CHANGES:** Contractor, without nullifying this Agreement, may direct Subcontractor in writing to make changes to Subcontractor's work. Adjustment, if any, in the contract price or contract time resulting from such changes shall be set forth in a Subcontract Change Order pursuant to the Contract Documents.

---

**Ex. D-1**, Art. 4. Accordingly, Diamond's *oral* modification claims fail due to this express provision in the Sub-Subcontract. Moreover, Diamond never sought nor obtained any such change orders and thus, there is no evidence to support Diamond's modification claims. Finally, there is no evidence to support Diamond's claim that the alleged oral contract or oral modification was "confirmed through performance."

29.     Consequently, neither Diamond's allegations about a separate oral agreement between RLB and Diamond, nor its claims about an oral modification to an existing agreement that purportedly binds RLB, are supported by any evidence and thus, this Court should dismiss such claims with prejudice.

**D.      Diamond has No Evidence Showing an "Agency" Relationship between Harbor and RLB to Support its Breach of Contract Claims Against RLB.**

30.     Despite no evidence showing a *direct* contractual relationship existed between Diamond and RLB, Diamond persists its breach of contract claims against RLB under the guise of an "agency" theory in an attempt to show an alleged *indirect* contractual relationship. However, Diamond has no evidence to raise a genuine issue of material fact

as to its "agency" theory and thus, cannot establish any indirect contractual relationship existed with RLB to support its breach of contract claims.

31.     Texas law will not presume the existence of an agency relationship; rather, the party alleging an agency relationship bears the burden of proving it. *Stross v. Centerra Homes of Texas, LLC* 2012 WL 5190877 (W.D. Tex. Sept. 27, 2021). Under Texas law, "[a]uthority to act on the principal's behalf and control are the two essential elements of agency." *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 589 (Tex. 2017). With respect to the "authority to act" element:

> [T]here must be a meeting of the minds as between the parties in establishing the agency and the consent of both the principal and the agent is necessary to create the agency. The principal must intend that the agent shall act for him and the agent must intend to accept the authority and act on it.

*A & S Elec. Contractors, Inc. v. Fischer*, 622 S.W.2d 601, 603 (Tex. App.—Tyler 1981, no writ). But "the key question is whether the principal has the right to control the agent with respect to the details of that conduct." *Rincones*, 520 S.W.3d at 589; *see also Northwinds Abatement, Inc. v. Employers Ins. of Wausau,* 258 F.3d 345, 351 (5th Cir. 2001). "Absent proof of the right to control, only an independent contractor relationship is established." *Matter of Carolin Paxson Advert., Inc.*, 938 F.2d 595, 598 (5th Cir. 1991).

32.     Diamond asserts the following in support of its agency theory:

(a)     "Harbor . . . was, at all relevant times, acting as an agent for RLB Contracting, Inc. to pursue additional dredging to fulfill [the Prime Contract]." **DN** 1, ¶ 3

(b)     "RLB needed assistance dredging the volume called-for by the [USACE] contract, so it contracted with Harbor Dredging, using Harbor Dredging as an agent to find a dredging company . . . ." *Id.,* ¶ 10.

(c)    "Though Diamond's contract was with Harbor Dredging, Harbor Dredging served only to broker Diamond to RLB." *Id.,* ¶ 12.

(d)    "The payment for the M/V MISS KERRILYNN operated such that Diamond paid for the tug, and invoiced half of the tug expenses to Harbor Dredging, which again, acting as a mere conduit, pass those invoices through to RLB." *Id.,* ¶ 35.

33.    Not only are these assertions unsupported by any admissible evidence but they are in fact contradicted by the record. First, the Subcontract and Sub-Subcontract clearly show on their face that no agency relationship existed between RLB and Harbor in connection with Diamond's work on the Project. **Ex. 1-C**; **1-D**. Specifically, neither the Subcontract nor Sub-Subcontract expressly state, or inherently infer, that: (i) RLB intended for Harbor to act as its agent, (ii) Harbor intended to accept the authority and act as RLB's agent, (iii) RLB had the requisite control over Harbor, or (iv) Harbor had the authority to contract on behalf of or to contractually bind RLB. *Id.* Further, neither the Subcontract nor Sub-Subcontract show, and there is no other evidence showing, there was a meeting of the minds that RLB intended for Harbor to act as its agent, or that Harbor intended to accept the authority and act as RLB's agent, in connection with Diamond's work on the Project.

34.    Additionally, as noted above, all of Diamond's invoices for the Project were addressed directly to Harbor and in no way referenced that Harbor was passing such invoices along to RLB **as its agent** with the intent RLB would pay for such invoices directly or indirectly. *See* **Ex. 3**; **Ex. 9**, RFA Resp. No. 8; **Ex. 5**, 110:1-3; **Ex. 6**, 85:12-22. Moreover, outside of the one joint check for $950,000, Harbor paid Diamond for its work on the Project and none of those payments show in any way that they were made by Harbor on behalf of RLB as its agent. *See* **Ex. 6**, 83:25-84:5; **Ex. 4**. There is no deposition

20

testimony from RLB or Harbor representatives that is inconsistent with the written Subcontract that demonstrates a anything other than an independent contractor relationship between RLB and Harbor or that would give rise to a fact issue on any agency relationship between the companies. Accordingly, there is no evidence of any agency relationship between RLB and Harbor and the competent evidence shows only an independent contractor relationship between RLB and Harbor. As such, there is no issue of material fact supporting Diamond's "indirect contract" claims and as such, this Court should dismiss with prejudice any cause of action based on Diamond's untenable "agency" theory.

E.      **Diamond's Miller Act Claim Fails as a Matter of Law and RLB is Entitled to Recover its Costs, Expenses, and Attorneys' Fees from Diamond.**

        35.      The Miller Act requires prime contractors on qualifying federal construction projects to procure payment bonds and grants *certain* parties the right to sue on such bonds. 40 U.S.C. § 3133(b). The right to bring a suit under the Miller Act extends only to those parties having either: (i) a direct contractual relationship with the prime contractor furnishing the bond ("First-Tier Subcontractor") or (ii) a direct contractual relationship with a subcontractor of the prime contractor ("Second-Tier Subcontractor"). *Id.* § 3133(b)(1)-(2); *see also J. W. Bateson Co. v. U.S. ex rel. Bd. of Trustees of Nat. Automatic Sprinkler Indus. Pension Fund*, 434 U.S. 586, 590-91 (1978); *U.S. ex rel. Gulf States Enters. v. R.R. Tway, Inc.*, 938 F.2d 583, 586-87 (5th Cir. 1991). Under the Miller Act, a First-Tier Subcontract has a right to bring a claim on a bond without being subject to the Miller Act's notice provisions. *See* 40 U.S.C. § 3133(b)(1). A Second-Tier Subcontractor, however, must provide timely and adequate written notice within 90 days of the last date

of performance of work prior to bringing a claim under the Miller Act. *Id.* § 3133(b)(2); *Liles Constr. Co. v. U.S.*, 415 F.2d 889, 890 n.2 (5th Cir. 1969). Finally, the notice "must state with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied for or whom the labor was done or performed." *Id.*

1. ***Diamond does not qualify as a First-Tier Subcontractor under the Miller Act and did not give timely and adequate notice as required by a Second-Tier Subcontractor.***

36.      As detailed above, and incorporated into this section by reference, Diamond did not have a direct contractual relationship with RLB. *See supra* Section C. Consequently, Diamond cannot qualify as a First-Tier Subcontractor under the Miller Act. 40 U.S.C. § 3133(b)(1). Accordingly, Diamond at most was a Second-Tier Subcontractor and thus, was required to provide timely and adequate pre-suit notice under the Miller Act as condition precedent to assert its claims against the Bond. *Id.*

37.      However, there is no evidence showing Diamond timely and adequately sent the required pre-suit notice under the Miller Act. The only possible pre-suit notice from Diamond to RLB is a letter attached as Exhibit C to the Complaint. **DN** 1, ¶ 26; **DN** 1-4. But this letter does not reference Harbor as a defaulting or delinquent subcontractor nor does it state with substantial accuracy the amount Diamond alleges it is owed for its Miller Act claims. *See* **DN** 1-4. Thus, the letter attached as Exhibit C to the Complaint is not sufficient evidence to satisfy the Miller Act's notice requirements and on this basis alone, Diamond's Miller Act claims against RLB and Travelers should be dismissed.

2. ***Even if Diamond gave timely and adequate notice, Diamond's claimed damages are not allowed under the Miller Act.***

38.    The Fifth Circuit has held that the only delay damages a subcontractor can recover from a Miller Act principal or surety are the "additional or increased costs ***actually expended*** in furnishing the labor or material in the prosecution of the work provided for in the contract and ***attributable to the delay***." *U.S. v. Millers Mut. Fire Ins. Co.,* 942 F.2d 946, 951 (5th Cir. 1991) (emphasis original). The subcontractor may not recover delay damages due to its own delays. *Id.* at 952, n. 14. In other words, liability is limited to the "out-of-pocket costs of delay" and a claimant "cannot recover from a Miller Act surety the profits on out-of-pocket expenditures attributable to delay." *Id.* at 952-53. This same analysis applies to Diamond's Miller Act claims against RLB and Travelers for additional funds from the Amended REA.  Even if Diamond had given RLB proper notice of its Miller Act claim, the calculation of any recovery under the Miller Act based on the proceeds of the Amended REA is not appropriate for several reasons.

39.    Here, Diamond's Miller Act claim against RLB and Travelers for "54.16% of the equitable adjustment received by RLB" is not based on Diamond's increased costs ***actually expended*** in furnishing the labor or materials for Diamond to prosecute the work ***attributable to any delay or differing site condition claims***. *See* **DN** 1, ¶¶ 31, 46. Instead Diamond's claim for a larger share of RLB's settlement of the Amended REA is based solely on a ratio of Diamond's unit rate per cubic yard of dredged materials in its Sub-Subcontract with Harbor to RLB's unit rate in the Prime Contract.  **Ex. 5**, 188:2-8; **DN** 1, ¶¶ 16, 19, 25, 31, 46; **Ex. D-1**, Art. 2, p. 1. Diamond's unit rate unquestionably contains

built-in profits. Further, the total certified costs amount Diamond submitted to Harbor for inclusion in the Amended REA also included both overhead and profit calculated as percentages, which are not recoverable under the Miller Act. *See* **Ex. 5**, 98:19-99:13, 102:2-5; **DN** 46-6. Lastly, the Amended REA was a measured mile based calculation of costs expended, plus overhead and profit thereon, as a result of inefficiency and loss of productivity due to differing site conditions that started with total project costs and did not segregate out any delay costs, much less any delay costs of Diamond. **DN 22-4;** *See generally* **DN-22**, ¶¶ 53-56. While the total project cost necessarily includes costs for extended project duration, those costs include extended project duration caused by the differing site conditions and other reasons, including Diamond's own delays. Diamond has made no effort to compile and has provided no evidence of out of pocket costs attributable to delays caused by differing site conditions unmixed with its own delays or any other delays. **Ex. 5**, 148:14-18. In fact, Diamond never sent a letter or email to Harbor even claiming a delay on the project. **Ex. 5**, 148:2 – 148:13

40.     Further, Diamond cannot demonstrate that it has any uncompensated delays. Diamond's own records show it has not only been compensated in full for its Project costs (including overhead and profits)[8] but also shows Diamond has been compensated substantially more than its Project costs based on the payments made by Harbor under the Sub-Subcontract[9] combined with the $950,000 joint check Diamond accepted for its claims

---

[8] *Compare* **Ex. 2** (Diamond's Job Cost Report showing to its revenue ($3,548,838), costs ($1,789,404.49), and profits ($1,759,433.51); *with* DN 46-6.

[9] DN 46-10.

to the proceeds of the settlement of the Amended REA. Thus, Diamond cannot present any evidence to support its claims under the Miller Act for any additional funds from the settlement proceeds of the Amended REA and therefore, such claims against RLB and Travelers should be dismissed with prejudice.

**F.      Diamond's Third-Party Beneficiary Claim is Precluded by the Express Terms of the Subcontract.**

41.      Generally, only parties to a contract have the right to complain about its breach but an exception to this rule permits a third-party beneficiary to the contract to sue for damages caused by its breach. *See generally, Sojitz Energy Venture, Inc. v. Union Oil Company of California*, 394 F.Supp.3d 687, 710 (S.D. Tex. 2019). But there is a presumption against conferring a third-party beneficiary status. *See Baldwin v. Mortgage Elec. Registration Sys., Inc.*, No. 4:19-CV-03921, 2020 WL 4227591, at *3 (S.D. Tex. June 8, 2020). Based on this presumption, courts generally only confer a third-party-beneficiary status when the parties to the contract have "***clearly and fully spelled out their intention***" to contract or confer a direct benefit to a third party. *AK FortySeven*, 2018 WL 8755881, at *7 (quoting *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999)) (emphasis added). Thus, "[t]o determine whether the contracting parties intended to directly benefit a third party and entered into the contract for that purpose, ***courts must look solely to the contract's language*** . . . ." *First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017) (emphasis added). "If the contract's language leaves any doubt about the parties' intent, those 'doubts must be resolved against conferring third-party beneficiary status.'" *Id.* 103 (quoting *Tawes v. Barnes,* 340 S.W.3d 419, 425 (Tex. 2011)).

42.     In its Complaint, outside of Diamond's one-line conclusory statement that it is "a third-party beneficiary of the contract between Harbor and RLB," **DN** 1, ¶ 53, Diamond completely fails to support, or even point the Court to any language in the Subcontract which allegedly supports, its third-party beneficiary claim. Likewise, throughout this Lawsuit Diamond failed to present any evidence in response to discovery requests that would raise a fact issue related to its third-party beneficiary status. Instead of offering any such evidence or provisions in the Subcontract, Diamond merely points to its conclusory "agency" theory claims as purported support for its third-party beneficiary claims. **Ex. 11**, ROG Resp. Nos. 13-14. This clearly is not sufficient.

43.     Diamond's failure to provide any support for such claims is likely because a simply review of the Subcontract makes it is abundantly clear Diamond is not a third-party beneficiary of it. *See* **Ex. 1-C**. First, there is no reference to Diamond in the Subcontract. *See id.* Further, there is no language in the Subcontract that **"**clearly and fully spells out" an intention to contract or confer a direct benefit to any third party, let alone Diamond, sufficient to find any third-party beneficiary status was provided. *See id.*; *Sojitz Energy Venture*, 394 F.Supp.3d at 710. Therefore, Diamond's claim that it is a third-party beneficiary under the Subcontract fails as a matter of law because the express terms of the Subcontract do not confer any third-party beneficiary rights and Diamond has no evidence supporting its third-party beneficiary claim. The same arguments from this paragraph apply equally to the Prime Contract too. *See* **Ex. 1-A**. Therefore, any cause of action in this Lawsuit based on Diamond's third-party beneficiary theory should be dismissed.

G.      **Diamond's Claims of an Implied or Quasi-Contractual Relationship with RLB Fail as a Matter of Law.**

44.     Diamond also asserts it had an implied or quasi-contract with RLB entitling it to recover additional funds under the Amended REA and for the tug boat invoices. Under Texas law, an implied contract is like an express contract in that "there must be shown the element of mutual agreement which, in the case of an implied contract, is inferred from the circumstances." *Haws & Garrett Gen. Contrs., Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 608-09 (Tex. 1972). Moreover, where there exists a valid express contract covering the subject matter, there can be no implied contract and no recovery under a quasi-contract theory. *Woodard v. Sw. States, Inc.*, 384 S.W.2d 674, 675 (Tex. 1964); *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000).

45.     Diamond asserts in support of its implied or quasi-contract claims with respect to the proceeds of settlement of the Amended REA that "RLB has received the benefit of Diamond's work - literally all of the dredging on the job, *inter alia* - and benefitted from it through receipt of an REA from the [USACE] but has not paid Diamond its proportionate share of the REA." **DN** 1, ¶ 50. With respect to Diamond's implied or quasi-contract claims in connection with the tug boat invoices, Diamond merely offers a one-line conclusory statement that "Diamond is further entitled to compensations for breach of contract and breach of quasi-contract as to RLB, for RLB's failure to pay for the M/V MISS KERRILYNN . . . " *Id.,* ¶ 52. However, as conceded by Diamond, there exists a valid, express contract (*i.e.* the Sub-Subcontract) that covers the subject matter of its alleged implied or quasi-contract claims *i.e.* Diamond's dredging work on the Project and

27

its use of tugs. **DN**-1. ¶¶ 11, 12; **Ex. D-1**, Art. 2, p. 1. Further, as set forth above, based on the total of payments Diamond has received for its work on the Project and Diamond's job cost report, Diamond has been paid in full, and then some. Moreover, in response to specific discovery requests on its implied or quasi-contract claims, Diamond has only improperly referenced its alleged "voluminous briefing on the issue in response to RLB's and Travelers' motions to dismiss, and documents attached thereto." **Ex. 11**, ROG Resp. No. 15. Thus, because Diamond cannot provide any evidence supporting its implied or quasi-contract claims, and a valid express contract covers the subject matter of such claims, Diamond's alleged implied or quasi-contract claims against RLB fail as a matter of law.

**H.**      **Diamond's *Quantum Meruit* and Unjust Enrichment Claims are Barred as a Matter of Law.**

46.      Under well-established Texas law *quantum meruit* and unjust enrichment are unavailable when an express contract covers the subject matter at issue. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005) (*quantum meruit*); *Hill v. Shamoun & Norman, LLP,* 544 S.W.3d 724, 732 (Tex. 2018) (same); *Garcia v. Loancare, LLC*, No. 3:17-CV-00343, 2018 WL 3614813, at *10 (S.D. Tex. June 25, 2018) (unjust enrichment); *Protectors Ins. & Fin. Servs., LLC v. Lexington Ins. Co.*, No. CIV.A. H-12-3469, 2013 WL 5164630, at *4 (S.D. Tex. Sept. 12, 2013). The express contract bar applies not only when the plaintiff seeks to recover under the equitable theories of *quantum meruit* and unjust enrichment from the party with whom he expressly contracted, "but also when the plaintiff seeks recovery from a third party foreign to the original contract but who benefitted from its performance." *See Christus Health v. Quality Infusion Care, Inc.*, 359 S.W.3d 719, 724

28

(Tex. App.—Houston [1st Dist.] 2011, no pet.). Diamond's *quantum meruit* and unjust enrichment claims are barred as a matter of law because a valid, express contract (*i.e.* the Sub-Subcontract) covers the subject matter underpinning these equitable theories. *See supra* Section C; **DN** 1, ¶¶ 46, 51-52; **Ex. D-1**, Art. 2, p. 1. Moreover, Diamond submits no evidence that RLB was unjustly enriched or the amount of such unjust enrichment. Therefore, Diamond's *quantum meruit* and unjust enrichment claims must be dismissed.

## I.      RLB is Entitled to Recover Its Costs, Expenses, And Attorneys' Fees from Diamond.

47.     In *United Sates v. Turner Construction Co.*, the Eleventh Court of Appeals reversed and remanded the district court's ruling that a general contractor and surety could not collect attorneys' fees in a case brought under the Miller Act. 676 Fed. Appx. 941, 943–44 (11th Cir. 2017). The Eleventh Court of Appeals held that a prime contractor and surety can recover attorneys' fees from a subcontractor under the Miller Act when provided for in a contract, even if the contract permitting an award of attorneys' fees is a subcontract and the prime contractor and surety are not parties to that subcontract. *See id*. at 943.

48.     Here, Article 10 of the Sub-Subcontract allows for the recovery of attorneys' fees, costs, and expenses to the prevailing party in any action arising out of or relating to the Project or the Sub-Subcontract. **Ex. D-1**, p. 3, Art. 10 (highlighting added). Notably, the Sub-Subcontract does not limit the definition of "prevailing party" to only the parties of the Sub-Subcontract, *i.e.* Harbor and Diamond, and the "any action arising out of or relating to" the Project or the Sub-Subcontract language is broad enough to encompass Diamond's Miller Act claims here as well as Diamond's claims against RLB for breach of

29

the Sub-Subcontract.   Moreover, even Diamond's Executive Vice President, Stephen Swiber, concedes that RLB should recover its attorneys' fees from Diamond under Article 10 of the Sub-Subcontract if it is the prevailing party in this Lawsuit. **Ex. 5**, 82:14-18.

49.     Accordingly, because, as set forth above, Diamond's Miller Act and Breach of Contract claims (which arise out of or related to the Project) must be dismissed, RLB constitutes a prevailing party under the Sub-Subcontract and as such, RLB is entitled to recover from Diamond its costs, expenses, and attorneys' fees incurred in connection with Diamond's Miller Act claim. RLB requests that the Court enter summary judgment that RLB is entitled to recover such fees with the amount to be determined by the Court according to a future application for award of such fees.

## **PRAYER**

50.     For the reasons herein, RLB respectfully prays that the Court: (1) grant this Motion; (2) grant summary judgment in favor of RLB on all of Diamond's causes of action against it and dismiss such claims with prejudice; (3) declare RLB is entitled to recover its costs, expenses, and attorneys' fees from Diamond incurred in connection with Diamond's Miller Act and breach of contract claims in an amount to be determined upon further application; and (4) award RLB all such other relief as it may show itself justly entitled.

Respectfully submitted,

By:   */s/ Mark C. Guthrie*
              Mark C. Guthrie
              Texas Bar No. 08636600
              Federal ID No. 6213
              mguthrie@winstead.com
              Cody N. Schneider
              Texas Bar No. 24073595

Federal ID No. 2228631
cschneider@winstead.com
John T. Wooldridge, Jr.
Texas Bar No. 24118590
Federal ID No. 3669002
jwooldridge@winstead.com
**WINSTEAD PC**
600 Travis Street, Suite 5200
Houston, Texas 77002
Telephone (713) 650-8400
**COUNSEL FOR DEFENDANT**
**RLB CONTRACTING, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 29, 2022, a true and correct copy of the foregoing was served on all counsel of record via the Court's CM/ECF system.

*/s/ Cody N. Schneider*