**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **DIAMOND SERVICES** | § | |
| **CORPORATION** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:21-cv-00253-JVB** |
| | § | |
| **RLB CONTRACTING, INC., HARBOR** | § | |
| **DREDGING, INC. AND TRAVELERS** | § | |
| **CASUALTY AND SURETY COMPANY** | § | |
| **OF AMERICA** | § | |
| | § | |
| **Defendants.** | § | |

<u>**RLB CONTRACTING, INC.'S MOTION FOR SUMMARY JUDGMENT ON ITS
COUNTERCLAIMS AGAINST DIAMOND SERVICES CORPORATION**</u>

Subject to and without wavier of Defendant/Counter-Plaintiff RLB Contracting, Inc. ("RLB")[1] pending Rule 12(b) Motion to Dismiss ("Motion to Dismiss"), **DN** 22, RLB respectfully submits this Motion for Summary Judgment ("Motion") against Plaintiff/Counter-Defendant Diamond Services Corporation ("Diamond") on RLB's counterclaims for declaratory relief, promissory estoppel, and money had and received, as asserted in RLB's Original Answer and Counterclaim, **DN** 48, and respectfully shows the Court the following:

---

[1] Capitalized terms stated herein shall have the same meaning ascribed to those capitalized terms in RLB's Answer and Counterclaim. Further, such defined terms from RLB's Answer and Counterclaim are incorporated herein by reference and used herein without the need for defining the terms again.

## I.   <u>SUMMARY</u>

1.      Diamond is not entitled to any additional payments for its work on the federal dredging project at issue here because it has been fully paid for its work pursuant to the Sub-Subcontract with Defendant Harbor Dredging, Inc. ("Harbor") and was paid substantial additional amounts, above and beyond the Sub-Subcontract, pursuant to the its representations and agreement that it would accept $950,000 in satisfaction of its share of the proceeds of the settlement of the amended Request for Equitable Adjustment of the Prime Contract ("Amended REA") for the differing site conditions encountered in the work. For the reasons discussed below, this Court should grant summary judgment in favor of RLB's on its claims for promissory estoppel and money had and received against Diamond, provide RLB the declarations requested its Original Answer and Counterclaim, and permit RLB to recover its attorneys' fees, expenses and costs from Diamond in an amount as determined upon further application.

2.      The deadline for discovery has passed. The following relevant facts cannot be credibly disputed and, together with summary judgment evidence and the legal issues discussed below, establish RLB's entitlement to summary judgment as a matter of law because: (1) Diamond's contract was with Harbor, not RLB; (2) RLB is not, and never has been, a party or a signatory to the Sub-Subcontract between Diamond and Harbor; (3) Diamond has not, and never has been, a party to the Subcontract between RLB and Harbor or the Prime Contract between the United States Army Corps of Engineers ("USACE") and RLB; (4) Diamond at all times communicated with Harbor and issued its contemporaneous invoices for its work on the project in the Houston Ship Channel between

2

Brady Island and the Houston Ship Channel Turning Basin, wholly within Texas ("Project") to Harbor, not RLB; (5) Diamond submitted its certified costs for the Project to Harbor for inclusion in RLB's request for equitable adjustment ("REA") of the Prime Contract due to a differing site condition, not to RLB; (6) Diamond has been paid in full for its work under the Sub-Subcontract and has been paid the $950,000 it agreed to accept out of the proceeds of settlement of the Amended REA; (7) as evidenced by its own project job costs report, Diamond's total receipts on the Project substantially exceed its total certified costs on the Project, including overhead and profits, and the costs included in the job cost report, such that it is inconceivable that Diamond is entitled to anymore compensation on the Project under the Miller Act or any other theory; and, (8) Diamond never provided timely and proper notice to RLB for its Miller Act claim to RLB.

3.     Pursuant to Federal Rule of Civil Procedure 56, these facts combined with summary judgment evidence detailed below establish that RLB is entitled to summary judgment against Diamond on RLB's claims for promissory estoppel and money had and received, that the Court should provide the declaratory relief requested by RLB in its original Answer and Counterclaim, enter judgment that Diamond take nothing against RLB and Travelers Casualty and Surety Company ("Travelers") by reason of its Miller Act claims against RLB and Travelers, and award RLB's its costs, expenses, and attorneys' fees incurred in this Lawsuit in amounts to be determined in a separate application.

## II.     NATURE AND STATE OF PROCEEDINGS

4.     On September 16, 2021, Diamond filed its Original Complaint against RLB, Harbor, and Travelers. **DN** 1. In its Original Complaint, Diamond brings claims for breach

of contract, implied contract, and quasi-contract against Harbor and RLB and a claim under the Miller Act against RLB and Travelers. *Id*. On December 3, 2021, RLB filed its Motion to Dismiss. **DN** 22. On December 27, 2021, Diamond filed its Opposition to RLB's Motion to Dismiss. **DN** 23. The Motion to Dismiss has been fully briefed and is ripe for review and ruling. On May 13, 2022, Diamond filed its First Amended Complaint, **DN** 41, to designate this Lawsuit as an admiralty claim within the meaning of Federal Rule of Civil Procedure 9(h) but "re-plead[ing] its original Complaint in full."

5.      On September 22, 2022, without waiver of its pending Motion to Dismiss, RLB filed its Original Answer and Counterclaim. **DN** 48. As part of its Counterclaim, RLB seeks declaratory relief from this Court establishing: (a) RLB does not have any direct or indirect contractual relationship with Diamond; (b) RLB was entitled to rely upon and did rely upon Diamond's representation that Diamond would accept $950,000 for settlement of its claims of the proceeds of RLB's Amended REA of the Prime Contract, in RLB's negotiations and agreement with the USACE for the settlement of the Amended REA; (c) Diamond's agreement to accept, and acceptance of, the $950,000 from RLB and Harbor from the proceeds of the settlement of the Amended REA constitutes an accord and satisfaction of Diamond's claim for any amounts allegedly owed from the proceeds of RLB's settlement of the Amended REA with the USACE; and (d) Diamond does not have a valid Miller Act claim against RLB or its surety, Travelers for any additional share of the proceeds of  settlement of the Amended REA, because Diamond failed to provide timely

and proper notices required to perfect any such potential rights under the Miller Act. *Id*.[2]

Additionally, RLB has brought claims against Diamond under the theory of promissory

estoppel to enforce Diamond's representation and agreement to accept $950,000 in

satisfaction of its claims to a share of the proceeds of RLB's settlement of the Amended

REA and to establish accord and satisfaction arising from Diamond's acceptance of the

$950,000 amount and if the Court does not enforce this representation and agreement on

either of those theories, RLB has asserted claims for money had and received in order to

recover the amount RLB overpaid Diamond for its share of the proceeds of the settlement

of the settlement of the Amended REA. *Id*.

6.      As of the date of this Motion, RLB has filed a Motion for Summary Judgment

as to all claims made by Diamond against RLB and Travelers in its Original Complaint.

*See* **DN** 49. In the interest of judicial economy, RLB respectfully suggests that the Court

consider that motion first before it considers this Motion as granting that motion might

obviate the need to consider this Motion.

### III.      <u>RELEVANT FACTS</u>

**A.      The Project.**

7.      RLB was the prime contractor for the USACE under the Prime Contract,

Contract No. W912HY19C0015, to be engaged in dredging work at the Project. **Ex. 1-A**.

As part of its obligations for the Project, RLB was required to provide a Miller Act payment

bond ("Bond"), which RLB obtained from Travelers. **Ex. 1-B**. RLB entered into the

---

[2] In addition, RLB requests recovery of its attorneys' fees, expenses, and cost that RLB incurred in this Lawsuit.

Subcontract with Harbor to perform certain portions of the Project. **Ex. 1-C**. Harbor then entered into the Sub-Subcontract with Diamond to perform portions of Harbor's work on the Project. **Ex. 1-D**. Accordingly, and setting aside the Bond, the flow of contractual relationships between the parties to the Project were:



8. Relevant to this Motion, and as a byproduct of the contracting structure, the flow of communication among the parties during the Project was generally limited to the specific party they had a direct contract with for the Project. For example, RLB and Diamond did not have any contact or communications regarding the Project before Diamond entered into the Sub-Subcontract. *See* **Ex. 2**, 34:19-23. Further, Diamond directed all communications on the Project to Harbor and not RLB. *See* **Ex. 3**, 86:23-87:2, 90:13-91:3.

**B.      RLB's Request for Equitable Adjustment on the Prime Contract.**

9. During the performance of the Project, RLB, Harbor, and Diamond encountered a differing site condition in the area where the dredging excavation work was being performed. **Ex. 1**; **DN** 1, ¶ 18. As a result, on October 26, 2020, RLB submitted an initial REA of the Prime Contract ("Initial REA") to the USACE. **Ex. 1-E**. The Initial REA was ultimately withdrawn by RLB because the USACE instructed RLB that if it equitably adjusted the Prime Contract based on the Initial REA that the USACE would not entertain future requests for equitable adjustment based on the same conditions during the remainder

of the Project for costs not included in the Initial REA and it would require RLB to release its claims for all differing site conditions at the Project. **Ex. 1**; **Ex. 4**, 59:5-60:22.

10. Accordingly, after the Project was completed, RLB submitted the Amended REA covering the additional costs for the entire Project. **Ex. 1-F**. In preparation for calculating and submitting the Amended REA, RLB requested that Harbor submit certified total costs for the Project for inclusion in RLB's subcontractor costs in the Amended REA . **Ex. 1**; *see also* **Ex. 4**, 93:21-94:3; 95:22-25; 97:8-98:25. Harbor in turn requested that Diamond do the same for inclusion in Harbor's subcontractor costs.  On March 30, 2021, Diamond submitted its total certified costs for the Project, including its direct costs, overhead and profit, to Harbor in the amount of $2,362,344. **DN** 22-2. Harbor then submitted its total certified costs to RLB, which incorporated Diamond's certified costs, and Harbor's direct costs, overhead, and profit. **DN** 22-3. After receipt of the certified costs, overhead and profit from Harbor, RLB submitted its Amended REA to the USACE requesting an equitable adjustment of the Prime Contract of $8,867,212 for the differing site conditions at the Project. **Ex. 1**; **DN** 22-4. Following negotiations between RLB and the USACE, the USACE offered $6,000,000 to RLB in satisfaction of the Amended REA claim, which RLB accepted. **Ex. 1**; **DN** 23, p. 1, 6, 17; **DN** 23-1, p. 2.

11. Notably, prior to negotiating with the USACE regarding the settlement of the Amended REA, RLB's President, Randy Boyd, asked Harbor's principal, Roland Maturin to advise him as to what amount Harbor would accept to settle any claims to the proceeds of the Amended REA, so that Mr. Boyd would know what negotiating room RLB had with the USACE. *See* **Ex. 4**, 93:23-94:3; 119:17-25. In turn, Mr. Maturin spoke with Diamond's

representative, Vice President of Operations, Jim Furlette, and asked the same question. *See* **Ex. 5**, 183:1-13. Mr. Furlette represented to and agreed with Mr. Maturin that Diamond would accept $950,000 in satisfaction of Diamond's claim for the share of the excess costs recovered in a settlement of the Amended REA. *See e.g.* **DN** 46-16 (audio recording of Mr. Furlette); **Ex. 3**, 42:2-18, 94:18-24. Further, Mr. Furlette understood that Mr. Maturin would convey and inform RLB of Diamond's representation and agreement to accept $950,000 in satisfaction of Diamond's claim for the share of the proceeds of a settlement of the Amended REA. *See* **Ex. 3**, 95:10-15, 95:21-24.

12. Notably, Mr. Furlette confirmed with Diamond's Executive Vice President, Stephen Swiber, that the $950,000 was an acceptable number for Diamond's claim for the share of the excess costs recovered in a settlement of the Amended REA. *See* **Ex. 3**, 42:2-18, 52:15-15; **Ex. 2**, 69:12-18. Moreover, Mr. Swiber also knew that Mr. Furlette would pass the $950,000 settlement offer to Harbor and then to RLB. *See* **Ex. 2**, 184:21-25.

13. Accordingly, based on Mr. Furlette's representations to and agreement with Mr. Maturin that Diamond would accept this $950,000 amount in satisfaction of Diamond's rights to the proceeds of settlement of the Amended REA, Mr. Maturin reported to Mr. Boyd that Harbor would accept $1,450,000 in total satisfaction of Harbor's rights to the proceeds of settlement of the Amended REA, with Harbor retaining $500,000 for itself and disbursing $950,000 to its sub-subcontractor Diamond. **Ex. 1**; **Ex. 4**, 114:5-23; **Ex. 2**, 91:18-92:3; **Ex. 3**, 51:1-5; **Ex. 5**, 134:3-5. RLB relied on these representations in the negotiations with the USACE to ultimately reach a settlement of the Amended REA with

the USACE in the amount of $6,000,000. *See* **Ex. 1**; **Ex. 4**, 114:5-23; 119:17-25; 125:17-126:15.

14.     Shortly the settlement was reached with the USACE, and after receiving the funds from the Amended REA from the USACE, RLB paid Harbor the $500,000 it agreed to accept. **Ex. 1**. Harbor then tendered a joint check – from RLB, payable jointly to Harbor and Diamond, and endorsed by Harbor in favor of Diamond – in the $950,000 amount representing Diamond's representation and agreement to accept that amount in satisfaction of Diamond's rights to the proceeds of settlement of the Amended REA and Diamond accepted and deposited that check. *See* **Ex. 1**; **DN** 24-2; **Ex. 2**, 91:18-92:3; **Ex. 3**, 42:2-18, 51:1-5. Notably, prior to accepting the $950,000 joint check, Diamond had already been compensated in full for the amounts due it under the Sub-Subcontract as well as its costs incurred in performing the work on the Project (including overhead thereon and profit at the percentages included in its certified total costs submission to Harbor in connection with the Amended REA)[3] in the amount of $2,253,346.00. *See* **Ex. 6** (Diamond's Job Cost Report); **Ex. 7** (Checks from Harbor to Diamond); **Ex. 9**, RFA Resp. No. 4. As a result, and in addition of  the amounts already paid under the Subcontract and Sub-Subcontract, Diamond and Harbor were paid their shares of the proceeds of the Amended REA in accordance with their representations and  agreement reached between the respective parties regarding the proceeds of the settlement of  the Amended REA. **Ex. 1, Ex. 4**, 114:5-23, **Ex. 2**, 91:18-92:3; **Ex. 3**, 51:1-5; **Ex. 5**, 134:3-5.

---

[3] *Compare* **Ex. 6** (Diamond's Job Cost Report showing to its revenue ($3,548,838), costs ($1,789,404.49), and profits ($1,759,433.51) *with* **DN** 46-6, Ex. F.

15.     Despite Diamond being fully paid all amounts due to it under the Sub-Subcontract, its active participation in the negotiation of a mutually agreeable settlement amount from the proceeds of the Amended REA, and its representation that it would accept and subsequent acceptance of the $950,000 from the proceeds of settlement of the Amended REA, Diamond claims that it is owed yet more money from the proceeds of settlement of the Amended REA and claims that somehow it is owed additional money under the Miller Act. This Court should not allow Diamond the opportunity to receive any additional payments for its work on the Project and should grant this Motion because, among other evidence:

(a)     Not including the $950,000 joint check that Diamond received and deposited, Diamond has already been fully paid by Harbor $2,253,346 under the Sub-Subcontract for its work on the Project. *Compare* **DN** 46-10, Ex. J. *with* **DN** 46-6, Ex. F; *see also* **Ex. 9**, RFA Resp. No. 4.

(b)     Diamond's Vice President of Operations, Jim Furlette, agreed and represented to Harbor's principal, Roland Maturin, that Diamond would accept $950,000 in settlement of Diamond's rights to the proceeds of the settlement of the Amended REA and Diamond understood this representation would be conveyed to RLB. **Ex. 3**, 42:2-18, 94:18-24, 95:10-15, 95:21-24; **Ex. 5**, 136:15-137:5; **Ex. 2**, 184:21-25.

(c)     RLB relied upon Harbor and Diamond's representations and agreement to accept the total amount of $1,450,000 in settlement of any right to proceeds of the settlement of the Amended REA – Harbor agreeing to retain $500,000 for itself and disbursing $950,000 to Diamond. *See* **Ex. 4**, 114:5-23.

(d)     After receiving the funds from the settlement of the Amended REA and in reliance on the representations and agreement of the parties, RLB paid Harbor $500,000 and then tendered a joint check – from RLB, payable jointly to Harbor and Diamond in the amount of $950,000, which Harbor endorsed in favor of Diamond and tendered that check to Diamond and Diamond accepted and deposited that check. *See* **DN** 24-2; **Ex. 2**, 91:18-92:3; **Ex. 3**, 42:2-18, 51:1-5.

16.     For the reasons set forth herein, RLB's Motion should be granted and this Court should provide the declarations set forth below in RLB's favor, grant RLB summary judgment on its claim for promissory estoppel and enter judgment that Diamond take nothing against RLB and Travelers by reason of its claims against RLB and Travelers for additional amounts of the proceeds of the settlement of the Amended REA.  If the Court does not grant RLB summary judgment on its claim for promissory estoppel, RLB requests that the Court grant RLB summary judgment against Diamond as to liability on its claims for money had and received, and then determine in the future the amount RLB has overpaid Diamond as its share of the proceeds of the settlement of the Amended REA.  RLB also requests that the Court grant RLB's request to recover from Diamond its costs, expenses, and attorneys' fees incurred in amounts to be determined in a separate application.

## IV.     MOTION, ARGUMENTS, & AUTHORITIES

### A.     Summary Judgment Standard.

17.     The summary judgment standard is well known and only a brief recitation is necessary. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). As such, summary judgment is intended to pierce the pleadings and access the proof to determine whether there is a genuine need for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing the Advisory Committee Note to 1963 Amendment to Fed. R. Civ. P. 56(e)).

18.     Summary judgment is proper when there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007). The

Court is permitted to grant summary judgment if it determines that "the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52 (1986). Reliance on mere conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation or a scintilla of evidence is insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *See also Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

**B.     Motion for Summary Judgment**

19.     On the grounds set forth in this Motion, and as shown through the evidence accompanying this Motion and on record with the Court, and pursuant to Fed. R. Civ. P. 56(a), RLB moves for a summary judgment on its claims against Diamond for declaratory relief, promissory estoppel, and alternatively, money had and received as well as its request to recover from Diamond its costs, expenses, and attorneys' fees incurred in connection with Diamond's Miller Act claims. Diamond cannot present any evidence or raise a genuine issue of material fact which would preclude this Court from granting summary judgment as to these claims and requested relief as a matter of law.

**C.     RLB is Entitled to Summary Judgment on its Declaratory Judgment Claims.**

20.     A party may bring an action in federal court seeking a declaration of its "rights and other legal relations." 28 U.S.C. § 2201. The Declaratory Judgment Act, however, is an "enabling" statute only, "confer[ing] a discretion on the courts rather than an absolute right upon the litigant." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995)

(quoting *PSC v. Wycoff Co.*, 344 U.S. 237, 241 (1952)) (internal quotation marks omitted). As part of its discretionary analysis, "[a] federal district court must determine: (1) whether the declaratory action is justiciable; (2) whether the court has the authority to grant declaratory relief; and (3) whether to exercise its discretion to decide or dismiss the action." *Sherwin-Williams Co. v. Holmes County*, 343 F.3d 383, 387 (5th Cir. 2003).

21.     Here, an actual controversy exists between the parties – namely, whether a contractual relationship exists between Diamond and RLB, whether Diamond's representation and agreement that it would accept $950,000 in satisfaction of Diamond's claims to the proceeds of settlement of the Amended REA is binding and enforceable under principles of promissory estoppel, whether Diamond's agreement to accept and/or acceptance of the $950,000 constitutes an accord and satisfaction of its claim for any amounts allegedly owed from the proceeds of RLB's settlement of the Amended REA, and whether Diamond has a valid Miller Act claim against RLB or its surety, Travelers. Consequently, this Court has the authority to grant the declaratory relief requested by RLB in this Lawsuit and grant RLB's request to recover from Diamond its costs, expenses, and attorneys' fees incurred in connection with this Lawsuit.

   **1.     *This Court should declare that RLB does not have a direct or indirect contractual relationship with Diamond.***

22.     Under Texas law,[4] a plaintiff must prove the following elements to prevail on a breach of contract claim: "(1) a valid contract exists between the plaintiff and the

---

[4] Although Diamond alleges that it has invoked this Court's jurisdiction by asserting a federal question claim under the Miller Act, Diamond's breach of contract claims are governed by Texas state law as it is undisputed that the Project was located entirely in, and Diamond's work was performed entirely within, Texas. **DN** 1, ¶¶ 5, 7.

defendant, (2) the plaintiff tendered performance or was excused from doing so, (3) the defendant breached the terms of the contract, and (4) the plaintiff sustained damages as a result of the breach." *Turner Construction Company v. Rockley Interset, Inc.*, 2019 WL 13191626, at *2 (S.D. Tex. Aug. 19, 2019)(quoting *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 579 (5th Cir. 2019). Contract interpretation is purely a legal question, and as applicable here, the contract is interpreted according to Texas law. *Gonzalez v. Denning*, 394 F.3d 388, 391 (5th Cir. 2004).

23.    Here, and as admitted by Diamond in its pleadings, discovery responses, and deposition testimony there was no written contract signed between RLB and Diamond and the only express, written contract for its work on the Project was its Sub-Subcontract with Harbor. *See e.g.*, **DN** 1, ¶¶ 11, ("Harbor Dredging subsequently contracted with Diamond"), 12 ("Diamond's contract was with Harbor"); **DN** 1-2; **Ex. 10**, RFA Resp. No. 6 ("Diamond admits there is no written contract signed by RLB and Diamond"); **Ex. 2**, 74:2-6; **Ex. 3**, 72:3-6.  Notably, the Sub-Subcontract unambiguously and explicitly states "[t]his agreement is . . . by and between" Harbor as "Contractor" and Diamond as "Sub-Subcontractor" and its signatories are Diamond and Harbor only. **Ex. 1-D**. The mere fact that Sub-Subcontract lists the USACE as "Owner" and RLB as "General Contractor"[5] does

---

[5] As noted above, the Sub-Subcontract references RLB as the "General Contractor" and not the "Contractor." **Ex. 1-D**, p. 1. Instead, Harbor is defined as a the "Contractor" in the Sub-Subcontract. *Id.* Moreover, the Sub-Subcontract only lists RLB or the "General Contractor" this one time in the recitals but refers to the "Contractor" throughout the agreement when discussing obligations under the Sub-Subcontract. Accordingly, there is no confusion on who the "Contractor" was in this agreement nor any ambiguity on who had certain obligations under the Sub-Subcontract. Even if the Sub-Subcontract listed both Harbor and RLB as the "Contractor," there is no disputing Harbor was defined as the "Contractor" earliest in the agreement. As such, Harbor would be considered the "Contractor," and not RLB, because under Texas law when harmonizing provisions in a contract that may seem conflicting, rules of contract construction dictate that "terms stated earlier in an agreement must be favored over subsequent terms." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

not render either obligated to or a party under the Sub-Subcontract when, among other fatal flaws, the USACE and RLB are non-signatories to the Sub-Subcontract, let alone there is not even a space for either's signature. **Ex. 1-D**; *see also* **Ex. 3**, 82:15-17. Further, Diamond concedes that it is not a party to the Subcontract and had no contractual privity with the USACE and thus, was not a party to the Prime Contract. *See* **Ex. 10**, RFA Resp. No. 4; **Ex. 2**, 81:11-17, 138:18-20. Accordingly, based on the Diamond's pleadings, discovery responses, and deposition testimony, Diamond cannot plausibly claim that it had a direct written contract with RLB.

24.     Second, Diamond attempts to shoehorn in a claim that there existed an enforceable oral contract, or oral modification to an existing contract. **DN**-1, ¶ 49. However, the necessary elements required for establishing an enforceable written and oral contract are the same. *Wal-Mart Store, Inc. v Lopez*, 93 S.W.3d 548, 55 (Tex. App.—Houston [14th Dist.] 2002, no pet); *Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 702 (Tex. App.—Dallas 2008, no pet.). Among others requirements, to be enforceable a contract must be supported by valid consideration and contain terms sufficiently definite to enable a court to understand the parties' obligations. *Tex. Gas Utilities Co. v. Barrett*, 460 S.W.2d 409, 412 (Tex. 1970); *see also Provision Group, Inc. v. Crown Toxicology Ltd.*, 2017 WL 11221433, at *3 (W.D. Tex. Oct. 19, 2017) (citing *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000). Further, a modification, like a contract, must be supported by *new* consideration and the promise to fulfill a preexisting duty is not considered valid consideration. *Dieterich*, 270 S.W.3d at 702; see also *Martens*

*v. Prairie Producing Co.*, 668 S.W.2d 889, 891 (Tex. App.—Houston [14th Dist.] 1984, no writ).

25.     But the purported basis for Diamond's oral contract or oral modification to an existing contact claims is not new consideration, let alone valid consideration, to support such claims. Rather, Diamond's claims are directly contradicted by the express terms of the Sub-Subcontract requiring Diamond to perform, among others, "all work necessary or incidental to complete" its work on the Project and Diamond was "responsible for traversing the hopper barges from excavation to the unloading site." **Ex. 1-D**. Diamond's claims are further contradicted by Diamond's Executive Vice President, Stephen Swiber, who concedes the Sub-Subcontract imposed a preexisting duty onto Diamond to traverse the hopper barges from the dredging site to the disposal site. *See* **Ex. 2**, 42:1-6; *see also* **Ex. 3**, 24:11-25. Thus, there is no new or valid consideration to support the alleged oral contract, or oral modification to an existing contract, because Diamond had the preexisting obligation to furnish the necessary work and equipment to adequately perform its work on the Project.

26.     Further, the evidence shows as a matter of law that there was no alleged oral contract or oral modification "confirmed through performance" as alleged by Diamond. **DN** 1, ¶ 49. Specifically, the following evidence concerning Diamond's performance, and the conduct of all the parties, during the Project establishes that there is no genuine material fact as to any conduct of performance confirming an alleged oral contract between RLB and Diamond or any oral modification to an existing contract to bind RLB:

(a)   Diamond and RLB had no contact or communications prior to Diamond's executing the Sub-Subcontract with Harbor. *See* **Ex. 2**, 34:14-23.

(b)   Diamond's directed all communications on the Project to Harbor and not RLB, except for one incident related to a crane breakdown which is not subject to the issues in this Lawsuit. *See* **Ex. 3**, 86:23-87:8; 90:20-91:3.

(c)   Diamond received its directions related to its work on the Project from Harbor, not RLB. *See* **Ex. 2**, 27:2-4.

(d)   Diamond invoiced Harbor, not RLB, for its work on the Project. *See* **DN** 1, ¶ 15; **Ex. 8**; **Ex. 10**, RFA Resp. No. 8; **Ex. 2**, 110:1-3; **Ex. 3**, 85:12-22.

(e)   Outside of the one joint check for $950,000, Harbor paid Diamond for its work on the Project, not RLB. *See* **Ex. 3**, 83:25-84:5; **Ex. 7** (Checks from Harbor to Diamond).

(f)   Diamond directed its certified costs for the request for equitable adjustment to Harbor and not RLB. **Ex. 2**, 103:5-10; 1251-4.

27.   Therefore, because the evidence shows there is not genuine issues of material fact as to any oral or written contractual relationship between Diamond and RLB, this Court should at least issue a declaration that RLB does not have direct contractual relationship with Diamond.

28.   Notwithstanding its lack of a contract with RLB, Diamond persists in its breach of contract claims against RLB under the guise of an "agency" theory in an attempt to show an alleged *indirect* contractual relationship. However, Texas law will not presume the existence of an agency relationship; rather, the party alleging an agency relationship bears the burden of proving it. *Stross v. Centerra Homes of Texas, LLC* 2012 WL 5190877 (W.D. Tex. Sept. 27, 2021). Under Texas law, "[a]uthority to act on the principal's behalf and control are the two essential elements of agency." *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 589 (Tex. 2017).  "Absent proof of the right to control, only an independent

17

contractor relationship is established." *Matter of Carolin Paxson Advert., Inc.*, 938 F.2d 595, 598 (5th Cir. 1991).

29.     The evidence in this case establishes as a matter of law that no agency relationship existed between RLB and Harbor and instead the parties had an independent contractor relationship. First, the Subcontract and Sub-Subcontract clearly show on their face that no agency relationship existed between RLB and Harbor in connection with Diamond's work on the Project. **Ex. 1-C**; **1-D**. Specifically, neither the Subcontract nor the Sub-Subcontract expressly state, or inherently infer, that: (i) RLB intended for Harbor to act as its agent, (ii) Harbor intended to accept the authority and act as RLB's agent, (iii) RLB had the requisite control over Harbor, or (iv) Harbor had the authority to contract on behalf of or to contractually bind RLB. *Id.* Further, neither the Subcontract nor the Sub-Subcontract show there was a meeting of the minds that RLB intended for Harbor to act as its agent, or that Harbor intended to accept the authority and act as RLB's agent, in connection with Diamond's work on the Project, and there is no competent evidence to the contrary.

30.     Additionally, all of Diamond's invoices for the Project were addressed directly to Harbor and in no way referenced that Harbor was passing such invoices along to RLB as its agent with the intent RLB would pay for such invoices directly or indirectly. *See* **Ex. 8**; **Ex. 10**, RFA Resp. No. 8; **Ex. 2**, 110:1-3; **Ex. 3**, 85:12-22. Moreover, outside of the one joint check for $950,000, Harbor paid Diamond for its work on the Project and none of those payments show in any way that they were made by Harbor on behalf of RLB as its agent. *See* **Ex. 3**, 83:25-84:5; **Ex. 7** (Checks from Harbor to Diamond). Accordingly,

the record and evidence establish there is no genuine issue of material fact as to the alleged agency relationship between RLB and Harbor to support Diamond's indirect contract claims.

31.     In light of the above, this Court should grant RLB's request for declaratory relief and declare that RLB does not have direct or indirect contractual relationship with Diamond. Based on such a declaration, and in addition to the reasons set forth in RLB's Motion for Summary Judgment Against Diamond's Affirmative Claims, **DN** 49, RLB is entitled to a judgment dismissing Diamond's breach of contract claims against RLB.

### 2.     *This Court should declare that RLB was entitled to rely on Diamond's representations as to the amount Diamond would accept in connection with the settlement of the Amended REA.*

32.     In preparation for negotiating the settlement of the Amended REA with the USACE, RLB engaged Harbor to collect information necessary to adequately calculate the change in costs resulting from the differing site conditions encountered by RLB, Harbor, and Diamond at the Project. Specifically, RLB's President, Randy Boyd, requested of Harbor's principal, Roland Maturin, to determine what Harbor would accept in satisfaction of its claim to the proceeds of settlement of the Amended REA. *See* **Ex. 4**, 114: 5-23; 119:17-120:6. In turn, Mr. Maturin then went to Diamond's representative, Vice President of Operations, Jim Furlette, and requested the same information. *See* **Ex. 5**, 136:15-137:5; 183:1-9. After confirming the acceptability of the number with Diamond's Executive Vice President, Stephen Swiber, Mr. Furlette articulated to Mr. Maturin that Diamond would accept "about $950[,000]" as Diamond's bottom line to settle the claim as evidenced by the following deposition testimony:

Q.      So, you [Mr. Furlette] talked to Stephen Swiber?

A.      Swiber.

Q.      Swiber. Excuse me, Swiber. About the bottom line that Diamond was willing to take on the claim, correct?

A.      Correct.

Q.      And what number did you guys decide was the bottom line that Diamond needed to settle the claim?

A.      About 950.

Q.      Un-huh. And you[] told that to Roland Maturin?

A.      Yes, I did.

*See* **Ex. 3**, 42:3-15; *see also id.*, 52:1-15; **Ex. 2**, 69:12-18; **Ex. 5**, 136:15-137:5.

33.     Notably, both Diamond's Vice President of Operations, Mr. Furlette, and Executive Vice President, Stephen Swiber, knew this representation about the $950,000 settlement in satisfaction of Diamond's claim for the share of the excess costs recovered in a settlement of the Amended REA would be passed along to RLB.  *See* **Ex. 3**, 95:10-15, 95:21-24; **Ex. 2**, 184:21-25. Thereafter, and based on Mr. Furlette's representations, Mr. Maturin reported to RLB that Harbor would accept $1,450,000 in total satisfaction of Harbor's rights to the proceeds of settlement of the Amended REA, with Harbor retaining $500,000 for itself and disbursing $950,000 to its sub-subcontractor Diamond. *See* **Ex. 5**, 136:15 -137:5; **Ex. 4**, 114:5-23; 119:17-120:6; 125:17-21; 126:3-11. In reliance on this representation and agreement, RLB ultimately negotiated, with the USACE, the settlement of the Amended REA in the amount of $6,000,000. *See* **Ex. 4**, 114:5-23.

34.     Accordingly, there is no genuine issue of material fact that RLB was entitled to rely on, and did reasonably rely on, Diamond's agreement and representations as to the

$950,000 settlement in satisfaction of Diamond's claim for the share of the excess costs recovered in a settlement of the Amended REA — particularly in light of Diamond admitting that it knew such agreement and representations would be conveyed and passed along to RLB.  Moreover, RLB would not have agreed to the $6,000,000 settlement amount for the Amended REA had it known Diamond would seek additional funds. **Ex. 1**. As a result, this Court should declare that RLB was entitled to rely on Diamond's agreement and representations to Harbor regarding the $950,000 and RLB reasonably relied on such agreement and representations.

### 3. *The Court should declare Diamond's agreement to accept, and/or acceptance of, the $950,000 constitutes an accord and satisfaction of its claim for any amounts allegedly owed from the proceeds of RLB's settlement of the Amended REA with the USACE.*

35.     A valid accord and satisfaction requires that there initially be a legitimate dispute between the parties about what was expected. *Ostrow v. United Business Machines, Inc.*, 982 S.W.2d 101, 104 (Tex. App.—Houston [14th Dist.] 1998, no pet.). Then there must be "unmistakable communication" that acceptance of the sum will satisfy the underlying obligation. *Id*.

36.     It is undisputed that prior to RLB's negotiations with the USACE to settle the Amended REA, there was a legitimate dispute and uncertainty between the parties about what they expected as part of any settlement of the Amended REA in connection with the differing site conditions at the project.  Further, as referenced above and fully incorporated by reference herein, Diamond unmistakably communicated to Harbor that it would "accept" $950,000 as Diamond's bottom line to settle the Diamond's claim to a

portion of the settlement proceeds of the Amended REA and Diamond understood this representation would be conveyed to RLB. *See* **Ex. 3**, 42:2-18, 94:18-24, 95:10-15, 95:21-24; **Ex. 5**, 136:15-137:5; **Ex. 2**, 184:21-25. Mr. Maturin then reported to RLB that Harbor would accept $1,450,000 in total satisfaction of Harbor's rights to the proceeds of settlement of the Amended REA, with Harbor retaining $500,000 for itself and disbursing $950,000 to its sub-subcontractor Diamond. *See* **Ex. 5**, 136:15 -137:5; **Ex. 4**, 114:5-23; 119:17-120:6; 125:17-21; 126:3-11.

37.     After receiving the funds following RLB's settlement of the Amended REA in the amount of $6,000,000, RLB paid Harbor the $500,000 it agreed to accept. **Ex. 1**. Harbor then tendered to Diamond a joint check – from RLB, payable jointly to Harbor and Diamond, and endorsed by Harbor in favor of Diamond – in the $950,000 amount representing Diamond's promise and agreement to fulfill the satisfaction of Diamond's claim to the proceeds of settlement of the Amended REA and Diamond accepted and deposited that check. *See* **Ex. 1**; **DN** 24-2; **Ex. 2**, 91:18-92:3; **Ex. 3**, 51:1-5. By virtue of the issuance of the joint check to Diamond and Diamond's subsequent acceptance and deposit of said check, the underlying obligation has been satisfied. Accordingly, the Court should declare that Diamond's agreement to accept, and/or acceptance of, the $950,000 constitutes an accord and satisfaction of its claim for any amounts allegedly owed from the proceeds of RLB's settlement of the Amended REA.

**4.     This Court must should declare that Diamond does not have a valid Miller Act claim against RLB or its surety, Travelers, because Diamond failed to provide timely and proper notices perfecting any such potential rights under the Miller Act and therefore, Diamond's Miller Act claim should be dismissed.**

38.     The Miller Act requires prime contractors on qualifying federal construction projects to procure payment bonds and grants *certain* parties the right to sue on such bonds. 40 U.S.C. § 3133(b). The right to bring a suit under the Miller Act is limited only to parties that have: (1) a direct contractual relationship with the prime contractor furnishing the bond ("First-Tier Subcontractor") or (2) a direct contractual relationship with a subcontractor of the prime contractor ("Second-Tier Subcontractor"). *Id.* § 3133(b)(1)-(2); *see also J. W. Bateson Co. v. U.S. ex rel. Bd. of Trustees of Nat. Automatic Sprinkler Indus. Pension Fund*, 434 U.S. 586, 590-91 (1978); *U.S. ex rel. Gulf States Enters. v. R.R. Tway, Inc.*, 938 F.2d 583, 586-87 (5th Cir. 1991).

39.     It is important to distinguish between what type of subcontractor a party is classified as under the Miller Act because a First-Tier Subcontractor has a right to bring a claim on a bond without being subject to the Miller Act's notice provisions whereas a Second-Tier Subcontractor is required to provide timely and adequate written notice within ninety (90) days of the last date of performance of work prior to bringing a claim under the Miller Act. *See* 40 U.S.C. §§ 3133(b)(1), (b)(2); *Liles Constr. Co. v. U.S.*, 415 F.2d 889, 890 n.2 (5th Cir. 1969). Finally, with respect to the Second-Tier Subcontractor notice requirement, the notice "must state with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied for or whom the labor was done or performed." *Id.*

40.     As detailed above, and incorporated fully into this section by reference, the contractual relationships have been sufficiently explained through the pleadings on file in this Lawsuit. Namely, (1) the Prime Contract was between USACE and RLB; (2) the Subcontract was between RLB and Harbor; and (3) the Sub-Subcontract was between Harbor and Diamond. *See supra* Section C.1; *see also* **Ex. 1-A**; **Ex. 1-C**; **Ex. 1-D**. As further explained and supported by undisputed evidence, Diamond did not have a direct or indirect contractual relationship with RLB and consequently, Diamond cannot qualify as a First-Tier Subcontractor under the Miller Act. *See id.*; 40 U.S.C. § 3133(b)(1). Accordingly, Diamond, at most, was a Second-Tier Subcontractor and was required to provide timely and adequate pre-suit notice pursuant to the Miller Act as condition precedent to assert its claims against the Bond, which it did not.

41.     There is no- evidence showing Diamond provided timely and adequate pre-suit notice as required for a Second-Tier Subcontractor under the Miller Act. *See generally* **DN** 1, **DN** 23. The only correspondence from Diamond to RLB is a letter attached as Exhibit C to its Complaint. **DN** 1, ¶ 26; **DN** 1-4. However, this letter does not reference Harbor as a defaulting or delinquent subcontractor nor does it state with substantial accuracy the amount Diamond alleges it is owed under its Miller Act claims. *See* **DN** 1-4. Accordingly, the letter attached as Exhibit C to Diamond's Complaint is not sufficient evidence to satisfy the Miller Act's notice requirements. Accordingly, the Court should declare that Diamond does not have valid claim under the Miller Act and Diamond's Miller Act claims against RLB and Travelers should be dismissed.

42.     RLB also requests a declaration that it is entitled to recover from Diamond its costs, expenses, and attorneys' fees incurred in connection with Diamond's Miller Act claims in this Lawsuit. Although the Miller Act is silent with respect to the recovery of attorneys' fees, RLB's request is supported by case law. Specifically, in *United Sates v. Turner Construction Co*., the Eleventh Court of Appeals reversed and remanded the District Court's ruling that a general contractor and surety could not collect attorneys' fees in a case originally brought under the Miller Act. 676 Fed. Appx. 941, 943–44 (11th Cir. 2017). The Eleventh Court of Appeals held that a prime contractor and surety can recover attorneys' fees from a subcontractor under the Miller Act when provided for in a contract, even if the contract permitting an award of attorneys' fees is the subcontract and the prime contractor and surety are not parties to that subcontract. *See id*. at *943. Here, Article 10 of the Sub-Subcontract allows for the recovery of attorneys' fees, costs, and expenses to a prevailing party in any action arising out of or relating to the Project of Sub-Subcontract. **Ex. 1-D**, p. 3, Art. 10 (highlighting added). Notably, the Sub-Subcontract does not limit the definition of "prevailing party" to only the parties to the Sub-Subcontract, *i.e.* Harbor and Diamond, and the "any action arising out of or relating to" the Project or the Sub-Subcontract language is broad enough to encompass Diamond's Miller Act claims and other claims here. Additionally, the RLB's right to recover its attorneys' fees from Diamond, if RLB is a prevailing party in this Lawsuit was admitted by Diamond's Executive Vice President, Mr. Swiber. *See* **Ex. 2**, 82:14-18.

43.     Accordingly, RLB is entitled to recover from Diamond its attorneys' fees, costs, and expenses incurred in this Lawsuit, in amounts to be determined in a separate

application, pursuant to Article 10 of the Sub-Subcontract and this Court should issue a declaration as to such, Subcontract, and/or the Prime Contract.

**D.      RLB is Entitled to Summary Judgment on its Promissory Estoppel Claim.**

44.      Under Texas law, "[t]he requisites of promissory estoppel are: (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment." *See generally Walker v. Walker*, 631 S.W.3d 259, 264 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (internal citation omitted). "The function of the doctrine of promissory estoppel is ... defensive in that it estops a promisor from denying the enforceability of the promise." *Wheeler v. White*, 398 S.W.2d 93, 96 (Tex. 1965). In sum, "[w]here a promisee acts to his detriment in reasonable reliance upon an otherwise unenforceable promise, ... the disappointed party may have a substantial and compelling claim for relief.... 'A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" *Id.* (quoting Restatement of Contracts § 90); *see also, e.g., Fretz Const. Co. v. Southern Nat. Bank of Houston*, 626 S.W.2d 478, 480 (Tex. 1981) (quoting and applying Restatement test for promissory estoppel).

45.      As described above, prior to negotiating the settlement of the Amended REA, Diamond, by and through Mr. Furlette, represented and promised that it would accept $950,000 in satisfaction of Diamond's claims to a portion of the proceeds of the settlement of the Amended REA. **Ex. 3**, 42:2-18, 94:18-24, 95:10-15, 95:21-24; **Ex. 5**,136:15-137:5. Moreover, Diamond knew this representation and promise about the $950,000 settlement

in satisfaction of Diamond's claim for the share of the excess costs recovered in a settlement of the Amended REA would be conveyed or passed along to RLB.  *See* **Ex. 3**, 95:10-15, 95:21-24; **Ex. 2**, 184:21-25. As such, it was foreseeable or should have been foreseeable to Diamond that RLB would rely on this representation and promise and, RLB, in fact, did rely on this representation and promise to negotiate the settlement of the Amended REA with the USACE in the amount of $6,000,000. *See* **Ex. 4**, 114:5-23; **DN** 23-1; *see also* **Ex. 1**. Unfortunately, RLB relied on such to its detriment as RLB would not have negotiated and entered into a settlement of the Amended REA with the USACE in the amount of $6,000,000 but for Diamond's representation and promise to accept $950,000. **Ex. 1**.

46.     Diamond was paid the $950,000 in accordance with its representation and promise to accept this amount in satisfaction of its claims to the proceeds of settlement of the Amended REA. *See* **Ex. 1**; **DN** 24-2; **Ex. 2**, 91:18-92:3; **Ex. 3**, 42:2-18, 51:1-5.  Despite its acceptance of the $950,000, Diamond now claims it is entitled to a greater portion of the settlement of the Amended REA from the USACE and is attempting to renege on its promise to RLB's detriment. Accordingly, to the extent Diamond claims it needs to be paid additional money such claim is not warranted because per its own job costs report Diamond had already been fully compensated for its costs incurred in performing its work on the Project (including overhead and profits at the percentages included in its certified total costs submission to Harbor in connection with the Amended REA)[6]

---

[6] *Compare* **Ex. 6** (Diamond's Job Cost Report showing to its revenue ($3,548,838), costs ($1,789,404.49), and profits ($1,759,433.51) *with* **DN** 46-6, Ex. F.

**E.      RLB is Entitled to Summary Judgment on its Money Had and Received Claim.**

47.      If the Court does not enforce Diamond's representation and promise to accept $950,000 in satisfaction of its share of the proceeds of settlement of the Amended REA, then RLB is entitled to summary judgment against Diamond as to liability only on RLB's claim for money had and received because and RLB is entitled to a refund of the $950,000 or at least the difference between $950,000 and the amount Diamond would have received had it been the prime contractor with the USACE, *i.e.* its true entitlement, if any to a share of the proceeds of RLB's settlement of the Amended REA. The elements of a claim for money had and received are: (1) defendant holds money and (2) the money in equity and good conscience belongs to plaintiff. *See generally Midwestern Cattle Marketing, L.L.C. v. Legend Bank, N.A.*, 2020 WL 1042246 (5th Cir. March 3,2020). Under Texas law, "the quasi-contractual action for money had and received is a cause of action for a debt not evidenced by a written contract between the parties." *Villarreal v. First Presidio Bank*, 2018 WL 3618686 (5th Cir. July 27, 2018) (internal citations omitted).

48.      Here, as referenced above and fully incorporated by reference herein, there is no contract between Diamond and RLB that precludes RLB's claim for money had and received. *See* supra Section C.1. Rather, Diamond appears to claim it had no agreement with RLB or Harbor to accept the $950,000 in satisfaction of any interest it had in the proceeds of the Amended REA and that RLB somehow owes Diamond a greater portion of the settlement of the Amended REA even though Diamond has already been paid by Harbor under the Sub-Subcontract in the amount of $2,253,346 and Diamond agreed and accepted the additional amount of $950,000 of the proceeds of the settlement of the

Amended REA. Accordingly, the total sum of money that Diamond has received for this Project, including amounts paid by Harbor under the Subcontract and the $950,000, is at least $3,203,346 but Diamond's total certified costs for the entire Project, including overhead and profits, was only $2,362,344. *Compare* **DN** 46-10, Ex. J. *with* **DN** 46-6, Ex. F; *see also* **Ex. 9**, RFA Resp. No. 4. Accordingly, it is disingenuous for Diamond to now claim it is owed more when in reality it has been paid substantially more than both its total certified costs, including overhead and profit and the costs incurred in performing its work on the Project as reflected in Diamond's own job costs report. *See id.*; **Ex. 6** (Diamond's Job Cost Report). Therefore, if Diamond is not held to its representation and agreement to accept $950,000 in satisfaction of its share of the proceeds of the settlement for the Amended REA, then Diamond holds money, *i.e.* the $950,000 or the amount it otherwise would have been entitled to recover from the USACE, had it been the prime contractor, that in equity and good conscience belongs to RLB. Accordingly, RLB is entitled to recover from Diamond the difference, if any between $950,000 and the amount, if any Diamond would have received based on its Project costs had it been the prime contractor with the USACE based on the incorporation of the Prime Contract into the Sub-Subcontract through the flow down provisions in the Sub-Subcontract. *See* **Ex. 1-A**; **Ex. 1-D**, Art. 2.

## **PRAYER**

For the foregoing reasons, RLB respectfully prays that the Court: (1) grant this Motion and provide the declaratory relief described herein and as requested in RLB's Original Answer and Counterclaim; (2) grant final summary judgment in favor of RLB on its promissory estoppel counterclaim against Diamond or alternatively grant RLB summary

judgment as to liability only on its money had and received claims; (3) award RLB its costs, expenses, and attorneys' fees incurred in connection with this Lawsuit in an amount to be determined; and (5 award RLB all such other and further relief as it may show itself justly entitled.

Respectfully submitted,

By:   */s/ Mark C. Guthrie*
       Mark C. Guthrie
       Texas Bar No. 08636600
       Federal ID No. 6213
       mguthrie@winstead.com
       Cody N. Schneider
       Texas Bar No. 24073595
       Federal ID No. 2228631
       cschneider@winstead.com
       John T. Wooldridge, Jr.
       Texas Bar No. 24118590
       Federal ID No. 3669002
       jwooldridge@winstead.com
       **WINSTEAD PC**
       600 Travis Street, Suite 5200
       Houston, Texas 77002
       Telephone (713) 650-8400
    **COUNSEL FOR DEFENDANT**
    **RLB CONTRACTING, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2022, a true and correct copy of the foregoing was served on all counsel of record via the Court's CM/ECF system.

*/s/ Cody N. Schneider*