# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DIAMOND SERVICES CORPORATION | § § § § § § § § § § § § § § | |
| Plaintiff, | | |
| v. | | Civil Action No. 3:21-cv-00253-JVB |
| RLB CONTRACTING, INC., HARBOR DREDGING, INC. AND TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA | | |
| Defendants. | | |

## DECLARATION OF RANDY L. BOYD

Under the penalty of perjury, Randy L. Boyd declares as follows:

1. My name is Randy L. Boyd. I am over eighteen years of age, of sound mind, am not disqualified by law from making this Declaration, have personal knowledge of the facts and matters set forth below except where expressly stated otherwise, and they are true and correct.

2. I am the President of RLB Contracting, Inc. ("RLB") and have been since the company was founded in 2000. RLB is a family-owned civil and marine construction and dredging contractor with a principal place of business in Port Lavaca, Texas.

3. In my capacity as President of RLB, I have personal knowledge of RLB's work as the prime contractor for the United States Army Corps of Engineers ("USACE") under Contract No. W912HY19C0015 ("Prime Contract"). RLB served as the prime contractor under the Prime Contract on a project that involved dredging and debris disposal work in the Houston Ship Channel Between Brady Island and the Houston Ship Channel Turning Basin, wholly within Texas ("Project"). Further, I have personal knowledge of the Miller Act payment bond ("Bond"), which RLB obtained from Defendant Travelers Casualty and Surety Company of America ("Travelers") pursuant to RLB's obligations under the Prime Contract. I also have personal knowledge of the subcontract entered between RLB and Defendant Harbor Dredging, Inc. ("Harbor") for Harbor to perform certain portions of the Project ("Subcontract"). Finally, although RLB was not a party to, did not sign and did not negotiate or prepare the sub-subcontract between Harbor and

Diamond, by virtue of this Lawsuit, I have been made aware of and have personal knowledge of the terms and conditions of said sub-subcontract ("Sub-Subcontract"). Further, I did not nor did any other representative of RLB have any contact or communication with Diamond related to the Project prior to the execution of the Sub-Subcontract.

      4.      I have over 40 years of experience in and significant knowledge about the dredging business and performing federal dredging contracts. Based on my knowledge and experience, I have personal knowledge, among other things, regarding the bidding, negotiating, and entering contracts involving federal dredging projects, performing those projects, the subsurface materials regularly encountered during dredging projects, like the Project at issue here, along the Texas Gulf Coast, the evaluation of differing site conditions related to those projects, the reasonable and necessary costs incurred by participants in dredging projects incurred as a result of differing site conditions, the typical and customary processes used by contractors in the industry to request and price such requests for equitable adjustments to federal dredging contracts due to differing site conditions, and calculating costs for purposes of negotiating and negotiating requests for equitable for adjustment of prime contracts and claims on prime contracts on federal dredging projects involving the USACE. I also have personal knowledge of the processes that RLB used to calculate and make the requests for equitable adjustment to the Prime Contract due to the differing site conditions encountered on the Project.

      5.      As it relates to this Project, RLB's contracts were with USACE through the Prime Contract and with Harbor through the Subcontract. Under the Prime Contract, the dredging scope of work included dredging at a unit rate per cubic yard, which included the transfer and disposal of the dredge materials at a disposal site. The Prime Contract also included a scope of work for removal of debris, such as tires and tree logs that were unsuitable for placement in the disposal site. On this Project, RLB self-performed overall Project administration and management, furnished the pump off barge that had an excavator and dredge pump and other equipment needed to operate the unloading and disposal sites, the management, maintenance and operation of the unloading and disposal sites, the unloading of debris and dredge spoils from barges at the unloading site and disposal of the dredged materials and debris as required under the Prime Contract. RLB entered into the Subcontract with Harbor for Harbor to perform certain portions of the Project, including the management and oversight of the dredge and dredge operation used to excavate material, the operation of the dredge at the dredging site, furnishing the barges used to transfer and/or transport debris and dredged material from the dredged areas to the unloading barge, the transit of dredged material and debris from the dredging site to the unloading site and furnishing the tug boats and other vessels and equipment necessary to perform this scope of work. Harbor then entered into the Sub-Subcontract for Diamond to perform portions of Harbor's scope of work on the Project, with Harbor retaining the responsibility to RLB to perform overall management and oversight of the dredge and dredge operation and Diamond to furnish the hopper barge to transport the debris and

dredged material from the dredged areas to the unloading barge. Throughout the Project, my direct contact regarding the Project was with Harbor's principal, Mr. Roland Maturin ("Mr. Maturin"). In most, if not all, instances Diamond directed all communications on the Project to Harbor and/or Mr. Maturin.

6. During the course of performance on the Project, RLB, Harbor, and Diamond encountered a differing site condition – predominantly debris and tires – in the dredging area. These differing site conditions resulted in an extended time of performance of the Project and caused an increase in the costs of performance of the Project because they negatively impacted the productivity of the dredging, unloading and disposal operations and increased the costs of the disposal of debris unsuitable for the disposal site. As a result, pursuant to the terms of the Prime Contract, RLB provided notice to the USACE of the differing site condition on June 18, 2020. In October 2020, RLB submitted a request for equitable adjustment ("Initial REA"). The Initial REA was subsequently withdrawn because the USACE informed RLB that it would not allow RLB to submit subsequent REA's during the remainder of the Project not covered by the Initial REA and would require RLB to release claims for all differing site conditions as a condition to approving the Initial REA.

7. After the completion of the Project, RLB submitted an amended REA ("Amended REA") covering the entire project. Before submitting the Amended REA to the USACE, I spoke with Mr. Maturin and requested that Harbor submit its certified costs for the entire Project, including direct costs, overhead, and profits, for inclusion in the calculations that would form RLB's Amended REA. I also suggested to Mr. Maturin that Harbor include the certified costs for the entire Project, including direct costs, overhead and profit of its sub-subcontractor, Diamond. After receipt of these certified costs, in April 2021, RLB personnel recalculated the Amended REA based on a measured mile calculation, including the certified total costs of RLB, Harbor and Diamond. I submitted the Amended REA to the USACE requesting a time extension and compensation of $8,867,212 for the additional costs, including overhead and profit that RLB incurred in performing the Prime Contract due to differing site conditions at the Project, based on a measured mile calculation that computed the excess costs incurred due to inefficiency caused by the differing site conditions.

8. RLB negotiated with the USACE to ultimately reach a settlement of the Amended REA in the amount of $6,000,000. Prior to entering into negotiations with the USACE to reach this settlement, I requested from Mr. Maturin that he provide me the amount that Harbor would accept in satisfaction of its claim for the share of the excess costs recovered by RLB from the USACE in settlement of the Amended REA. To formulate this amount, I understand that Mr. Maturin, in turn, asked the same question of its Sub-Subcontractor, Diamond, through Mr. Jim Furlette ("Mr. Furlette"), Diamond's Vice President and Chief Operating Office. I was informed by Mr. Maturin that Mr. Furlette indicated that Diamond would accept $950,000.00 and that relying on these

3

representations from Mr. Furlette, Mr. Maturin reported to me that Harbor would accept a total $1,450,000, with Harbor retaining $500,000 for itself and disbursing $950,000 to Diamond. I relied on this representation and agreement in negotiating a settlement with the USACE of the Amended REA. RLB would not have agreed to the $6,000,000 settlement amount had I known that Diamond or Harbor would seek more than the $1,450,000 total.

9. During the performance of the Project, I never represented to either Diamond or Harbor that either would be made whole from any proceeds RLB received of the Amended REA, nor did I ever agree or represent to provide Diamond or Harbor any particular share or percentage of the Amended REA or the settlement of it, except based on the agreement I thought I had with Harbor and indirectly with Diamond, for Harbor to accept a total of $1,450,000 and out of that to pay Diamond $950,000 from the proceeds of the $6,000,000 settlement of the Amended REA.

10. In accordance with the agreement and representations that Harbor and Diamond would accept a total of $1,450,000 in satisfaction of any claim to the proceeds of the Amended REA and shortly after receiving the funds from the USACE for the settlement of the Amended REA, RLB paid Harbor $500,000 and issued a joint check to Harbor and Diamond, which was endorsed by Harbor in favor of Diamond, for $950,000 ("Joint Check").

11. Attached to RLB's Motion for Summary Judgment are true and correct copies of the following documents:

> **Exhibit 1-A**: Prime Contract Executed by USACE and RLB for the Project ("Prime Contract");
>
> **Exhibit 1-B**: Miller Act Payment Bond obtained by RLB from Travelers ("Bond");
>
> **Exhibit 1-C**: Subcontract Executed by RLB and Harbor for the Project ("Subcontract");
>
> **Exhibit 1-D**: Sub-Subcontract Executed by Harbor and Diamond for the Project ("Sub-Subcontract");
>
> **Exhibit 1-E**: RLB's Initial Request for Equitable Adjustment dated October 26, 2020 ("Initial REA");
>
> **Exhibit 1-F**: RLB's Amended Request for Equitable Adjustment dated April 6, 2021 ("Amended REA"); and,
>
> **Exhibit 1-G**: Joint check issued by RLB issued to Harbor and Diamond, which was endorsed by Harbor in favor of Diamond in the amount of $950,000 ("Joint Check").

12. In my capacity as President of RLB, I am a custodian of records for RLB. Exhibits 1-A through 1-G attached to RLB's Motion for Summary Judgment on are true and correct copies of documents that are retained in the files of RLB. These records are kept by RLB in the regular course of business; and it was the regular course of business of RLB for an employee or representative of RLB, with knowledge of the act, event, or condition, to make the record or to transmit the information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are exact duplicates of the originals, except for the numbered labels affixed thereto for identifying purposes.

13. I declare under the penalty of perjury under the laws of Texas and the United States that the foregoing is true and accurate.

Executed in Calhoun County, Texas on this 29TH day of SEPTEMBER 2022

_____
Randy L. Boyd, President
RLB Contracting, Inc.