# EXHIBIT 2

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

DIAMOND SERVICES            )
CORPORATION,                )
   Plaintiff            )
                            )
VS.                         ) Civil Action
                            ) No. 3:21-cv-00253
RLB CONTRACTING, INC.,      )
HARBOR DREDGING, INC., and  )
TRAVELERS CASUALTY AND      )
SURETY COMPANY OF AMERICA,  )
   Defendants.          )

*********************************************************

ORAL DEPOSITION OF
STEPHEN P. SWIBER
AUGUST 10, 2022

*********************************************************

   ORAL DEPOSITION OF STEPHEN P. SWIBER, produced as a witness at the instance of the DEFENDANT RLB CONTRACTING, INC., and duly sworn, was taken in the above-styled and numbered cause on the 10th day of August, 2022, from 10:17 a.m. to 5:16 p.m., before Lesley A. Werner, CSR in and for the State of Texas, reported by stenographic method, at the offices of Winstead PC, 600 Travis Street, Suite 5200, Houston, Harris County, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

## Page 2

INDEX

|  | PAGE |
|---|---|
| Appearances | 3 |
| STEPHEN P. SWIBER | |
| Examination By Mr. Guthrie | 5 |
| Examination By Mr. Solop | 156 |
| Changes/Corrections | 197 |
| Signature Page | 198 |
| Reporter's Certificate | 199-200 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 20 | Email dated March 5, 2021 to Roland Maturin from Jim Furlette | 178 |
| 23 | Boat Log for Vessel Miss Kerrilyn | 194 |
| 24 | Subcontract dated February 24, 2020 | 74 |
| 26 | Emails ending on August 28, 2020 to Jim Furlette from Roland Maturin | 153 |
| 28 | Invoice to RLB Contracting dated 10/12/20 | 154 |
| 35 | Emails ending on March 25, 2021 and various other documents | 106 |
| 36 | Email dated March 25, 2021, to Roland Maturin from Stephen Swiber, including Diamond Services Monthly Trend Reports | 150 |
| 37 | Emails ending on March 30, 2021, to Stephen Swiber from Roland Maturin | 149 |

## Page 3

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 38 | Letter dated March 30, 2021, to Roland J. Maturin from Stephen Swiber | 103 |
| 39 | Letter dated April 6, 2021, to Ms. Maria E. Rodriguez from Randy Boyd, including various documents | 122 |
| 40 | Letter dated April 16, 2021, to Randy Boyd from Harry E. Morse, including various documents | 130 |
| 42 | Letter dated May 5, 2021, to Randy Boyd from Harry E. Morse | 137 |
| 43 | Letter dated May 28, 2021, to Mr. Harry E. Morse from Mark C. Guthrie | 140 |
| 46 | Email dated August 12, 2021, to Jim Furlette and Stephen Swiber from Roland J. Maturin | 152 |
| 50 | Harbor Dredging Louisiana Bill Payments List, including supporting documentation | 93 |
| 51 | Letter dated October 29, 2021, to Jim Furlette from Roland J. Maturin, including various documents | 90 |
| 52 | Declaration of Stephen Swiber | 142 |
| 53 | Diamond Services Corporation Job Cost Detail Reports | 94 |
| 54 | Jim Furlette's handwritten notes | 59 |
| 55 | Request For Equitable Adjustment Worksheet, including various documents | 128 |

## Page 4

APPEARANCES

COUNSEL FOR THE PLAINTIFF DIAMOND SERVICES CORPORATION:

   Mr. Harry E. Morse
   BOHMAN MORSE, LLC
   400 Poydras Street, Suite 2050
   New Orleans, Louisiana 70130
   Harry@BohmanMorse.com

COUNSEL FOR DEFENDANT RLB CONTRACTING, INC.:

   Mr. Mark C. Guthrie
   Mr. John T. Wooldridge, Jr.
   Mr. Cody N. Schneider (remotely)
   WINSTEAD PC
   600 Travis Street, Suite 5200
   Houston, Texas 77002
   mguthrie@winstead.com
   jwooldridge@winstead.com
   cschneider@winstead.com

COUNSEL FOR DEFENDANT HARBOR DREDGING, INC.:

   Mr. Christopher Solop (remotely)
   BIGGS, PETTIS, INGRAM & SOLOP, PLLC
   111 East Capitol Street, Suite 101
   Jackson, Mississippi 39201
   csolop@bpislaw.com

COUNSEL FOR DEFENDANT TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA:

   Ms. J. Megan Daily (remotely)
   KREBS FARLEY & DRY, PLLC
   400 Poydras Street, Suite 2500
   New Orleans, Louisiana 70130
   mdaily@krebsfarley.com

ALSO PRESENT:
   Mr. Roland Maturin
   Mr. Randy Boyd
   Ms. Joy Nail

Page 5

1  STEPHEN P. SWIBER,
2  having been first duly sworn, testified as follows:
3                  EXAMINATION
4  BY MR. GUTHRIE:
5      Q.  Good morning, Mr. Swiber.
6      A.  Good morning.
7      Q.  Is that how to correctly pronounce your name?
8      A.  Yes.
9      Q.  Okay.  You're here today to give your
10 deposition in a case that your company filed against RLB
11 Contracting and Harbor Dredging.  Do you understand
12 that?
13     A.  Yes.
14     Q.  And by "your company," I'm referring to
15 Diamond Services Corporation; is that right?
16     A.  Yes.
17     Q.  Did you have a chance to visit with your
18 attorney about the deposition process?
19     A.  Yes.
20     Q.  Have you ever given a deposition before?
21     A.  Yes.
22     Q.  How many times?
23     A.  Five, give or take.
24     Q.  Over what period of time?
25     A.  Since 2016.

Page 6

1      Q.  Okay.  So you do understand that you're under
2  oath today?
3      A.  Yes.
4      Q.  And that you have sworn to tell the truth, the
5  whole truth, and nothing but the truth?
6      A.  Yes.
7      Q.  And that if you do not do so, you could be
8  subject to prosecution or liability for perjury?
9      A.  Yes.
10     Q.  Couple of ground rules I want to go over with
11 you.  First of all, you can take a break anytime you
12 want to; but I will require that you answer any pending
13 question that's on the table before we take the break.
14 Do you understand that?
15     A.  Sure.
16     Q.  And we need to try to avoid talking over one
17 another.  So please try to let me finish my question,
18 and I will try to let you finish your answer; is that
19 fair?
20     A.  Yes.
21     Q.  If your attorney objects to one of my
22 questions, you can answer the question unless your
23 attorney instructs you not to.  Do you understand that?
24     A.  Yes.
25     Q.  It's important -- and you're doing a job of

Page 7

1  it -- to respond with "yes" or "no" instead of "uh-huh,"
2  "huh-uh" or nods of head because the court reporter here
3  has trouble taking those responses down.  Do you
4  understand that?
5      A.  Yes.
6      Q.  I want you to be sure that you understand my
7  questions.  And if you do not understand my question,
8  please tell me so; and I will try to rephrase it so that
9  you understand it.  Is that fair?
10     A.  Yes.
11     Q.  And if you answer a question, can we agree
12 that it's fair for somebody to conclude that you
13 understood it?
14     A.  Yes.
15     Q.  And lastly, you're here to give your
16 deposition in your individual capacity and not as a
17 corporate representative.  And what that means is, I am
18 seeking only your personal knowledge unless I ask you
19 otherwise.  Do you understand that?
20     A.  Yes.
21     Q.  What's your position at Diamond Services
22 today?
23     A.  Executive vice-president.
24     Q.  How long have you been executive vice-president?
25     A.  Since December of 2018.

Page 8

1      Q.  What position did you hold in Diamond Services
2  before December of 2018?
3      A.  I was the controller.
4      Q.  Okay.  When did you commence being a controller
5  at Diamond Services?
6      A.  In mid 2016.
7      Q.  And did you have a position at Diamond Services
8  before that?
9      A.  Before that, I was getting my education; but
10 during summers I worked for Diamond Services.
11     Q.  Okay.  What did you do during the summers at
12 Diamond Services?
13     A.  The first summers I was in high school.  I
14 processed accounts receivables, payroll, accounts
15 payable.  Pursuing summers, I was in college.  I was in
16 charge of reviewing the insurance program, which I would
17 say was mostly my job during the summers until
18 graduating university.
19     Q.  Okay.  Anything else during the summers?
20     A.  No.
21     Q.  You didn't work out in the field at all?
22     A.  No.
23     Q.  What were your duties as controller?
24     A.  I continued my role as sort of the head
25 insurance point of contact through the corporation.  I

Oral Deposition of Stephen P. Swiber

Page 25

1    A.  No.
2    Q.  Well, they were certainly there at the time
3  you visited at the inception, right?
4    A.  At the inception of our dredge mobilizing to
5  after the Stolt project, yes.
6    Q.  Did you get any written instruction to stand
7  down by anybody until RLB mobilized to the disposal
8  site?
9    A.  No.  We were told when to go, which is sort of
10  the opposite or the negative of an order not to go.
11    Q.  Who told you when to go?
12    A.  Roland Maturin from Harbor Dredging.
13    Q.  Tell me about the second time you went to the
14  disposal site during the Brady Island project.
15    A.  Oh, I don't recall exactly when it was.  I
16  came by to get feedback from our superintendent, to see
17  some of the clogs that were occurring at the disposal
18  unit.  It was a brief visit.
19    Q.  Did you speak with anybody from RLB at that
20  visit?
21    A.  I would have had to.
22    Q.  Are you speculating?
23    A.  Yes, and recalling.  I, of course, had to get
24  from the disposal barge to the dredging barge by a boat
25  which RLB would have had to facilitate from its dock.  I

Page 26

1  believe they were operating out of a dock set up --
2  assigned for the Corps of Engineers; but since our
3  operations weren't dockside, they had to get me to our
4  dredge.
5    Q.  You couldn't hitch a ride on a tugboat?
6    A.  Yes.  On one of the occasions, I hitched a
7  ride on a tugboat.
8    Q.  Whose tugboat was it?
9    A.  At the time, that was the Lady Lafon, our
10  tugboat.
11       THE COURT REPORTER:  I'm sorry.  The --
12       THE WITNESS:  The Lady Fafon, Diamond's tug.
13    A.  That was the -- that was the visit at the
14  inception of the project before we had employed a second
15  tug at the direction of RLB.
16    Q.  (By Mr. Guthrie)  Who gave you that direction?
17    A.  The direction was given to Jim Furlette when
18  he was told that -- by Roland of Harbor to employ a
19  second tug at the direction of RLB.
20    Q.  So it was actually Roland Maturin who,
21  according to your testimony, told Jim Furlette that RLB
22  had directed that a second tug be used; is that right?
23    A.  Correct.
24    Q.  You don't have personal knowledge of that
25  direction, do you?

Page 27

1    A.  It was told to me by Jim Furlette.
2    Q.  So you didn't receive that direction directly
3  from RLB, correct?
4    A.  I did not.
5    Q.  We'll come back to the tugboats in a minute.
6       Have you told me about all your visits to the
7  RLB disposal site during the Brady Island project?
8    A.  Yes.
9    Q.  How many times did you visit the dredge that
10  performed work on the Brady Island project?
11    A.  Twice.
12    Q.  Same two times as your disposal site visits?
13    A.  Yes.
14    Q.  And you don't remember anything about your
15  communications with anybody from RLB on those two
16  occasions?
17    A.  No.
18    Q.  So tell me what your duties were with regard
19  to the Brady Island project, specifically.
20    A.  Sorry.  I'm hearing a knock at the door, or is
21  that next door?
22    Q.  I don't know.  You can go ahead and answer.
23    A.  My duties with the Brady Island project
24  specifically were to oversee operations from my
25  operations manager, same as all other projects during my

Page 28

1  time as executive vice-president.
2    Q.  And that operations manager was Jim Furlette?
3    A.  Yes.  Sorry.  Vice-president of operations.
4    Q.  When was he given the title of vice-president
5  of operations?
6    A.  I do not know.
7    Q.  Does he have business cards that say that?
8    A.  Yes.
9    Q.  What were Jim Furlette's duties on the Brady
10  Island project?
11    A.  So Jim Furlette's duties were to first
12  estimate the project, and then they were to coordinate
13  with the superintendent to hire personnel to operate the
14  dredge and communicate with personnel on the ground to
15  ensure smooth operations.
16    Q.  Well, you had these -- several dredging
17  projects that you already testified about between 2017
18  and 2020 when this project started.  Why did you need to
19  hire dredge personnel?
20    A.  Well, dredge personnel have turnover.
21    Q.  So how many dredge personnel did Mr. Furlette
22  hire for this project?
23    A.  Well, the project began with no new personnel.
24  To spell personnel that had to come off for various reasons,
25  we had to hire at least one but I believe two crane

Oral Deposition of Stephen P. Swiber

Page 33

1  A. Well, November, December, January, it's more
2  winter.
3  Q. November, December 2019, January 2020?
4  A. Yes.
5  Q. Okay. So you've given Roland Maturin a price.
6  Tell me about the rest of the negotiation that led to
7  the signing of the written contract between Harbor
8  Dredging and Diamond Services.
9  A. Well, Roland sent over the subcontract agreement
10 and we reviewed it and executed it and returned it to
11 Roland.
12 Q. Did you make any changes in it before you signed
13 it and returned it?
14 A. I don't believe I did.
15 Q. Did you read the contract before you signed it?
16 A. Of course.
17 Q. Now, I didn't hear anything in your sequence
18 about going and looking at the project or having Mr.
19 Furlette go and look at the project before you signed
20 the contract; is that right?
21 A. That's right.
22 Q. And I didn't hear anything in your sequence
23 about looking at documents that may or may not have been
24 referenced in the prime contract that's referenced in
25 your subcontract; is that right?

Page 34

1  A. That's right.
2  Q. Is there any particular reason why you didn't
3  do that?
4  A. Well, a lot of the calculations that were
5  judgments that would have been made by reviewing the
6  contract and by reviewing the site conditions were already
7  relayed to us by Harbor Dredging, that the assets that
8  would be required, the quantities we could expect to
9  produce. That is the entirety of the information we need
10 to provide a unit price --
11 Q. Well --
12 A. -- or it's sufficient. Sorry. It's sufficient
13 information for us to provide a unit price.
14 Q. All right. I also didn't hear anything in your
15 sequence that led to the signing of the Harbor-Diamond
16 contract about talking to anybody from RLB Contracting;
17 is that right?
18 A. That's right.
19 Q. So there was no contact or communication at
20 all between Diamond Services and RLB Contracting before
21 Diamond Services signed the Diamond-Harbor subcontract,
22 correct?
23 A. Correct.
24 Q. So tell me how it is that your company has
25 claimed in its complaint that Harbor Dredging was RLB's

Page 35

1  agent.
2  A. That's a question. RLB -- Harbor Dredging did
3  not substantially do anything on the project. Their role
4  was to execute a subcontract and add Diamond to the
5  project.
6  Q. Any other basis for that claim based on your
7  personal knowledge?
8  A. Sorry. What specific claim?
9  Q. That Harbor Dredging was the agent of RLB
10 Contracting.
11 A. No.
12 Q. No, there is not any other basis. Are we
13 communicating?
14 A. Yes.
15 Q. I want you to tell me, sir, every reason why you
16 think RLB owes Diamond Services any money -- any further
17 money on this project.
18    MR. MORSE: Object to form.
19 A. I'll say first that our complaint speaks for
20 itself. In summary, that the proportion of the request
21 for equitable adjustment -- can we refer to that as the
22 REA going forward?
23 Q. (By Mr. Guthrie) Certainly.
24 A. That the proportion of the REA that RLB received
25 from the Corps of Engineers for Diamond Services' work,

Page 36

1  that the proportion that Diamond received was unfair.
2  Q. Any other reason?
3  A. Yes, that Roland, acting as agent for RLB,
4  committed to split the cost of the unpredicted or
5  unaccounted for in our bid, second tug, Miss Kerrilyn,
6  and then never paid those invoices.
7  Q. Any other reason?
8  A. Can I go back to one other thing when you
9  asked earlier about the agent relationship? Diamond was
10 pretty solidly of the understanding that Harbor wasn't
11 going to pay Diamond until it received payment from RLB,
12 as sort of asserted by Roland many times.
13 Q. It was asserted in your subcontract, wasn't
14 it, in writing?
15 A. If you say so, I think that could be accurate.
16 Q. Okay. Do you want to add anything else to
17 your testimony about why you believe that Harbor
18 Dredging was RLB's agent?
19 A. No. That's -- sorry to backtrack.
20 Q. No, that you don't want to add anything else
21 to your testimony?
22 A. Correct.
23 Q. What other reason do you have for believing
24 that RLB owes Diamond Services any money on this project
25 other than what you've already testified about?

Liberty Litigation Support
Phone: 281-200-5310   Fax: 713-533-8997

Page 41

1    A.  No.  There's -- the Kerrilyn took over the
2  original duty of the Lady Lafon to allow the Lady Lafon
3  to do an additional duty.
4    Q.  What was the additional duty the Lady Lafon
5  did?
6    A.  Moving the dredge spread in and out of the
7  Houston Ship Channel for higher than expected ship
8  traffic.
9    Q.  What was the Lady Lafon's original duty?
10    A.  To transverse the hopper barges to the
11  off-loading location.
12    Q.  Why do you say higher than expected channel
13  traffic?
14    A.  Because Harbor Dredging indicated to Jim
15  Furlette that the project could be performed with one
16  tug, which could include the Lady Lafon, the tug that we
17  sent perhaps performing the duties of shifting the
18  barges as needed in between traversing hopper barges.
19      There are time -- there's a time as the dredge
20  is working or when a hopper barge comes back that the
21  Lafon could have been free to shift our dredge spread as
22  needed.  But when we got there, we learned that was not
23  the case, that a dredge needed to -- a tug needed to
24  accompany the dredge spread to go in and out of the ship
25  channel many times a day.

Page 42

1    Q.  You knew under the subcontract between -- or I
2  should say the sub-subcontract between Harbor and
3  Diamond that your company had the obligation to traverse
4  the hopper barges from the dredging site to the disposal
5  site, correct?
6    A.  Correct.
7    Q.  And you also knew that your company had the
8  obligation to move the dredge around, right?
9    A.  Right.  When working, a dredge typically moves
10  itself.
11    Q.  How does it move itself?
12    A.  Spuds.
13    Q.  It typically moves itself out of the way of
14  ship traffic?
15    A.  No.  That would often require a tug.
16    Q.  So you didn't mention this discussion that you
17  testified about Roland Maturin telling you that the
18  project could be performed with one tug when we were
19  talking about the negotiation of this contract.  Did you
20  just miss that?
21      MR. MORSE:  Object to form.
22    A.  I did not.  I talked about it then.
23    Q.  (By Mr. Guthrie)  Are you sure about that?
24    A.  To my recollection.
25    Q.  What else did he tell you about this project?

Page 43

1    A.  Who?
2    Q.  Roland Maturin, before you signed the
3  sub-subcontract.
4    A.  As I described before.  He relayed to Jim
5  Furlette the requirements of the project.
6    Q.  So he didn't personally tell you, according to
7  your testimony, that only one tug would be required; he
8  told Jim Furlette that.  Is that your testimony?
9    A.  Yes.
10    Q.  So your understanding about that is secondhand.
11  Do you agree with that?
12    A.  Yes.
13    Q.  And when you estimated -- or Mr. Furlette
14  estimated the price of the sub-subcontract and came up
15  with the 650 per cubic yard amount, your testimony was
16  that you eyeballed average variable expenses or costs.
17  Do you recall that?
18    A.  Yes.
19    Q.  He wouldn't have taken into account any
20  equipment, based on your testimony, about the price when
21  he was setting the price, correct?
22    A.  Absolutely not.  I've said multiple times
23  during this deposition that the equipment is the basis
24  of the price.
25    Q.  You never have put in writing anywhere that

Page 44

1  anybody told anybody from Diamond Services that "You
2  told us that one tug could be used to perform the work
3  on this project."  Do you recall -- or is that true?
4    A.  I texted Roland Maturin of Harbor Dredging to
5  confirm; and I requested that he confirm in writing that
6  RLB agreed to split the cost of a second tug, which
7  implies the requirement originally of one tug.
8      MR. GUTHRIE:  Object to the portion of the
9  answer that's nonresponsive.
10    Q.  (By Mr. Guthrie)  Let me ask you my question
11  again, sir.  Diamond Services has never put in writing
12  that Roland Maturin or anybody else told Diamond
13  Services that one tug would be adequate to perform the
14  work on this project.
15    A.  I believe what I texted Roland would allow one
16  to conclude that.
17    Q.  The answer to my question is no, sir.
18      MR. MORSE:  Objection, asked and answered.
19    Q.  (By Mr. Guthrie)  Correct?
20      MR. MORSE:  You can answer.
21    A.  I believe we did.
22    Q.  Based on what?
23    A.  Based on the text I sent to Roland Maturin.
24    Q.  Any other basis?
25    A.  No.

Page 69

1  A. I can't recall anything involving RE- --
2  discussions between RLB and the Corps of Engineers.
3  Q. I wasn't asking you that.
4  A. I would have to --
5  Q. I was asking about your conversation with Jim
6  Furlette in which you and he discussed agreeing to
7  accept $950,000 and that coming before RLB had the final
8  negotiation with the Army Corps of Engineers regarding
9  the REA.
10  A. Again, I would have to know when RLB and the
11  Corps had that conversation to answer that question.
12  Q. So you had the conversation with Jim Furlette
13  in the summer of 2021 in which you discussed the
14  950,000-dollar amount, correct?
15  A. Correct.
16  Q. And that was after the project was over,
17  correct?
18  A. Correct. Yes. We came home around March.
19  Q. And it was after RLB had submitted its second
20  amended REA to the government, correct?
21  A. I don't know when RLB submitted its second REA
22  to the government.
23  Q. So were you involved in any conversation with
24  Roland Maturin about what Diamond Services would accept
25  in terms of the proceeds of the REA, or was that all Jim

Page 70

1  Furlette?
2  A. I was not -- I did not discuss that with
3  Roland Maturin outside of the compilation of the
4  certified costs report for the REA.
5  Q. So what was Diamond's offer regarding the
6  950,000-dollar offer agreement?
7  A. Well, we wanted to see how that was derived,
8  why that would be fair and whether or not it included
9  the split cost for the tug Kerrilyn.
10  Q. So is that what you instructed Jim Furlette to
11  communicate to Roland Maturin in terms of Diamond's
12  willingness to accept a certain amount of money under
13  the REA?
14  A. Yes.
15  Q. But you didn't witness any communication
16  between Jim Furlette and Roland Maturin that followed,
17  correct?
18  A. Correct.
19  Q. So according to your testimony, Diamond agreed
20  that it might be willing to accept $950,000 based on
21  exactly what?
22  A. The information we requested.
23  Q. Which was the REA calculation?
24  A. Correct.
25  Q. What else?

Page 71

1  A. Any -- to be privy or know what the Corps --
2  what proportion of the REA the Corps was willing to
3  award.
4  Q. What else?
5  A. Whether or not that settlement included
6  splitting the cost of the Kerrilyn.
7  Q. You included, did you not, the cost of the
8  Kerrilyn tug in the compilation of project costs that
9  you certified to Roland Maturin for inclusion in the
10  REA, didn't you?
11  A. Yes.
12  Q. You also included $400,000 in round numbers
13  for the cost of renting the Kerrilyn tug in your
14  950,000-dollar computation, didn't you?
15  A. I did not perform a 950,000 computation.
16  Q. Did Jim Furlette?
17  A. No.
18  Q. So if Roland Maturin said you told him
19  $900,000 first and then $950,000 -- and by "you," I mean
20  Diamond Services, somebody from Diamond Services -- he
21  would be lying, correct?
22  A. That we agreed to it? Yes, he would be lying.
23  Q. And he would be lying that it was Diamond
24  Services who proposed the number as opposed to Roland
25  Maturin.

Page 72

1  A. Yes.
2  Q. Had he ever lied to you about anything else?
3  A. Not to me, to my knowledge.
4  Q. Did Randy Boyd ever lie to you about anything?
5  A. Yes.
6  Q. What did he lie to you about?
7  A. That he lied to -- I'm sorry. He lied to
8  Diamond Services when he agreed to split the cost of the
9  Kerrilyn and that he lied to Diamond Services when he
10  induced us to benefit -- when he offered that we would
11  benefit from a measured mile analysis.
12  Q. When did he offer to split the cost of the
13  Kerrilyn?
14  A. According to Roland Maturin, nearabouts the
15  inception of the project.
16  Q. Okay. So this is something that you're
17  calling Mr. Boyd a liar about that he didn't even tell
18  Diamond Services directly, correct?
19  A. To clarify, I am saying someone lied to
20  Diamond Services. I don't know who.
21  Q. Well, you just attributed that to Randy Boyd,
22  didn't you?
23  A. I -- Diamond Services was lied to about it.
24  That can either be Roland or Randy. I have no way of
25  knowing.

18 (Pages 69 to 72)

Page 73

1  Q. Anything else that Randy Boyd or anybody else
2  from RLB Contracting that you think was a lie to Diamond
3  Services?
4  A. No.
5  Q. Have you done any business with Roland Maturin
6  since this project?
7  A. No.
8  Q. But you did before at least once, correct?
9  A. Correct.
10 Q. Any problems on that project?
11 A. No.
12 Q. Any problems unloading at the disposal site on
13 that project, the Stolt project?
14 A. No.
15 Q. Do you make a habit of attributing lies to
16 people you do business with?
17 A. I do not.
18 Q. When you give your word on something, do you
19 expect people to rely on it?
20 A. Sure.
21 Q. Does somebody need to have a written contract
22 with you to rely on what you said?
23 A. They do not.
24 Q. Sir, I've handed you what I've marked as
25 Exhibit 24 to your deposition. Do you know what this

Page 74

1  document is?
2  A. Appears to be the subcontract for the Brady
3  Island job.
4  Q. Between Diamond Services Corporation and
5  Harbor Dredging, correct?
6  A. Correct.
7  Q. Is this your signature on the last page?
8  A. It is.
9  Q. February 24th, 2020?
10 A. Correct.
11 Q. How was the execution of this contract handled?
12 Was it handled in person, via mail, via email, some other
13 way?
14 A. Via email.
15 Q. Now, you see on here under Article 2, there
16 are three pay items, right?
17 A. I do.
18 Q. You've got mobilization, demobilization, and
19 dredging. Do you see that?
20 A. I do.
21 Q. Do you see the 335,100 cubic yard quantity was
22 an estimated quantity?
23 A. I do.
24 Q. Did you understand that to mean that you
25 wouldn't get paid for less -- I'm sorry -- for more than

Page 75

1  the actual quantity that you dredged?
2  A. Yes.
3  Q. And just so we're clear about that, if the
4  actual quantity that the Army Corps of Engineers
5  recognized was dredged was 320,000 cubic yards, you
6  would only be entitled to be paid for the unit rate
7  times those 320,000 cubic yards and not this
8  335,100-yard total, right?
9  A. Correct.
10 Q. Now, if you look below this area that we were
11 looking at on the first page --
12 A. I'm sorry. Could you repeat?
13 Q. Sure. If you look immediately below the area
14 we were looking at on this first page, it's the last
15 paragraph at the bottom, "Subcontractor will only be
16 paid for volumes dredged and paid for by owner in
17 accordance with owner's before dredging and after
18 dredging surveys in accordance with prime contractor's
19 contract."
20    Do you see that?
21 A. Yes. Very good.
22 Q. And you understood that the Army Corps of
23 Engineers was the owner, correct?
24 A. Correct.
25 Q. And you understood that there was a dredging

Page 76

1  template that allowed for a certain quantity of
2  over-dredging that a contractor could be paid for; but if
3  you went, say, too deep and exceeded the over-dredging
4  template area, you would not be paid for dredging the
5  excess material outside of the template. You understood
6  that, right?
7  A. Correct.
8  Q. And you understood it was your obligation as
9  the sub-subcontractor here performing this work that you
10 were to manage the dredging template, didn't you?
11 A. Yes.
12 Q. It says: "Subcontractor will be responsible
13 for traversing the hopper barges from excavation site to
14 the unloading site."
15    Did I read that correctly?
16 A. Yes.
17 Q. That meant using a tugboat to transit the
18 hopper barges from the excavation site to the unloading
19 or disposal site, correct?
20 A. Correct.
21 Q. What sort of work did you have to do on the
22 dredge to meet the government requirements before you
23 could mobilize the dredge?
24 A. Fairly minor work. We welded a pollution rail
25 around the crane. We performed a stability analysis

19 (Pages 73 to 76)

Page 81

1    Q.  Where in this contract does it show that RLB
2  is a party or signed it?
3    A.  Prior to Article 1, RLB Contracting is listed
4  as general contractor; and subcontractor is Harbor
5  Dredging, including Diamond Services Corporation.
6    Q.  Who does it list as the parties?
7    A.  The owner is the Army Corps of Engineers,
8  Galveston District; general contractor, RLB Contracting;
9  subcontractor, Harbor Dredging, including Diamond
10  Services Corporation.
11    Q.  Under your reasoning, you agree that the
12  department of the Army Corps of Engineers, Galveston
13  District is also a party to this contract, don't you?
14    A.  No.
15    Q.  What's the difference?
16    A.  This is the subcontract.  We are the
17  subcontractors.
18    Q.  RLB didn't draft this, sir, did they?
19    A.  I believe they did.
20    Q.  What makes you believe that they did?
21    A.  Through litigation we discovered that the
22  contract between Harbor Dredging and RLB is nearly
23  identical.
24    Q.  You never spoke with anybody from RLB, never
25  met anybody from RLB before you signed this contract.

Page 82

1    A.  Accepting their agent.
2    Q.  And so you maintain that RLB Contracting,
3  despite your knowledge as a bank director, as a member
4  of the loan committee of that bank, as an executive
5  vice-president, somebody with a minor in business and a
6  master's that includes business, is a party to the
7  contract that they didn't sign, correct?
8    A.  Correct.  And I point out that I attended the
9  deposition of Roland Maturin when he testified that he
10  negotiated on behalf of RLB.
11    Q.  Okay.  You're going to maintain your position
12  that RLB is a party to this contract, correct?
13    A.  Yes.
14    Q.  Let's look at Article 10.  You, therefore,
15  agree that if RLB is a prevailing party in an action on
16  this contract, that it can recover attorneys' fees from
17  Diamond Services, right?
18    A.  Yes.
19    Q.  Which words in Exhibit 24 make you believe
20  that Harbor was the agent of RLB Contracting?  Point
21  them out for us, please.
22    A.  Well, where Diamond Services is included with
23  Harbor Dredging as a subcontractor and, of course,
24  supplemented by Mr. Maturin's testimony that he
25  negotiated on behalf of RLB.

Page 83

1    Q.  He negotiated what on behalf of RLB?
2    A.  At least the REA, but he was always
3  negotiating on behalf of RLB.
4    Q.  And what do you base that on other than your
5  sheer, utter make-believe speculation?
6    A.  The contract and Roland Maturin's testimony
7  and our conversations throughout the entire contract
8  with RLB and Harbor.
9    Q.  Let's talk about these five depositions that
10  you gave.  What was the last one you gave?  What was
11  that case about?
12    A.  The last one was about a personal injury claim.
13    Q.  Who was making it?
14    A.  A subcontractor of Diamond Services, a labor
15  contractor.
16    Q.  Were they Diamond Services' agent, too?
17    A.  They were not.
18    Q.  What's the difference?
19    A.  The contracts.
20    Q.  What was the subcontractor claiming?
21    A.  They were not claiming anything to Diamond.
22    Q.  So --
23    A.  This was an employee of the subcontractor.
24    Q.  Okay.
25    A.  I'm sorry.

Page 84

1    Q.  So why were you giving your deposition?
2    A.  Because we were named as a -- Diamond Services
3  was named as a defendant.  I'm sorry.  If I gave a
4  deposition on behalf of Diamond, that counts under your
5  question; or do you want the last time I gave a personal
6  deposition?
7    Q.  Any deposition.
8    A.  Okay.  Then continue.
9    Q.  Where was that case located?
10    A.  Which court?
11    Q.  Yes.
12    A.  I don't recall.  It was state court.
13    Q.  Did it ever come up that somebody thought that
14  subcontractor was Diamond's agent?
15    A.  No.
16    Q.  What was the next previous deposition you've
17  given?
18    A.  That would be a contract dispute with a
19  customer related to a personal injury claim.
20    Q.  Who was the customer?
21    A.  Cantium.
22    Q.  Can you spell that, please?
23    A.  C-A-N-T-I-U-M.
24    Q.  Where was that case?
25    A.  State court.

21 (Pages 81 to 84)

Page 89

1  for in the subcontract.
2  Q. Really? What words say that?
3  A. Well, it's a negative. So it's just not there.
4  Q. Are you sure about that?
5  A. Yes.
6  Q. Are you sure there's no provision in the prime
7  contract that obligates the dredging contractor to move
8  the dredge in and out of the ship channel?
9  A. Who is the dredging contractor?
10 Q. That would be you.
11 A. Under the prime contract?
12 Q. No, sir.
13 A. Oh.
14 Q. There's nothing in this Exhibit 24 subcontract
15 -- or sub-subcontract that excludes any obligation by
16 Diamond to provide a tug to move the dredge in and out
17 of the ship channel, is there?
18 A. That's true.
19 Q. So it's fair to say that the sub-subcontract,
20 Exhibit 24, covered all work Diamond performed on the
21 project, didn't it?
22 A. Correct. While you do that, do you mind if I
23 get up and get a coffee?
24 Q. Not a bit. I should have offered.
25 A. I am conditioned to a 1:30 coffee.

Page 90

1  Q. Are you ready?
2  A. Yes.
3  Q. Sir, I've handed you what I marked as Exhibit
4  51 to your deposition. It is an October 29, 2021 letter
5  from Roland Maturin at Harbor Dredging to Diamond
6  Services to the attention of Jim Furlette. Have you
7  seen this document?
8  A. I have.
9  Q. And among other things, this letter says:
10 "This letter is to reconcile the amount of yardage on
11 the above referenced project."
12     And then it refers to Article 2 of the
13 sub-subcontract that says: "Subcontractor will only be
14 paid for volumes dredged and paid for by the owner in
15 accordance with the owners before dredging and after
16 dredging surveys in accordance with the prime
17 contractor's contract."
18     Do you see that?
19 A. I do.
20 Q. And he attaches the pay estimates from the
21 Army Corps of Engineers as backup. Do you recall that?
22 A. I do.
23 Q. And I'll represent to you that these are
24 documents that are prepared by the Army Corps of
25 Engineers and not by RLB Contracting.

Page 91

1     And if you look on the page that's labeled at
2  the bottom HD-000065, which would be the fourth page of
3  the exhibit, you see under Item No. 3 "Dredging" and
4  then some cubic yards amounts. Do you see that?
5  A. I do.
6  Q. And the revised amount -- and by the way, this
7  is the final estimate, final pay estimate -- is 317,019
8  cubic yards in terms of a pay quantity for the dredging
9  under the prime contract, which would also be equal to
10 the pay quantity under Diamond Services' contract. Do
11 you agree with that?
12 A. Yes.
13 Q. Okay. Do you have any information that leads
14 you to believe that this 317,019 cubic yards as
15 determined by the Army Corps of Engineers' surveys is
16 not accurate?
17 A. I do not.
18 Q. This is also the letter that transmitted the
19 joint check from RLB in the amount of $950,000 that
20 represented proceeds from the REA that had been endorsed
21 by Harbor to the order of Diamond, correct? If you look
22 at the second paragraph of the letter and the last page
23 of the exhibit.
24 A. Correct. Yes.
25 Q. And there's no dispute, is there, that Diamond

Page 92

1  ultimately endorsed and deposited this 950,000-dollar
2  check?
3  A. There is not.
4  Q. Okay. If you take -- this is a math problem.
5  If you've got a calculator on your phone, you're welcome
6  to follow along.
7      If you take the 317,019 cubic yards in Exhibit
8  51, which you don't dispute, multiply that by $6.50,
9  which is the unit rate in your sub-subcontract, it comes
10 to $2,060,623.50.
11 A. Correct.
12 Q. And if you add the $125,000 for mobilization
13 provided for in the Exhibit 24 sub-subcontract and add
14 to that the 125,000 for demobilization in the
15 sub-subcontract, it totals $2,310,623.50. Do you agree
16 with that?
17 A. Yes.
18 Q. And during this job, do you recall that
19 Diamond Services had an issue with a crane? A crane
20 broke.
21 A. Yes.
22 Q. And RLB purchased parts for that crane on its
23 account because it was able to get them to the jobsite
24 faster than you could. Do you recall that?
25 A. Yes.

Oral Deposition of Stephen P. Swiber

Page 101

1  create that calculation.
2      Q.  Well, you are the person who compiled within
3  your company the certified cost that Diamond submitted
4  for the REA, are you not?
5      A.  I am.
6      Q.  Did anybody else help you?
7      A.  Roland Maturin instructed me to how he said
8  the Corps would like us to compile that.
9      Q.  So take us through what you did to compile
10 those costs.
11     A.  We were shared a spreadsheet that was from the
12 Walla Walla District website by Roland Maturin.  The
13 spreadsheet was called Checkrate.  That spreadsheet
14 attempts to capture by its own assumptions and
15 methodologies a cost estimate for the project.
16        We were directed to the spreadsheet.  We
17 submitted some set of values based on the prompts on the
18 spreadsheet.  We submitted those to Roland.  Roland
19 returned them, asked for some corrections.  He said that
20 these were all at the direction of the Corps.  We do not
21 know if that was true.
22        And so we finally ended up on a set that they
23 accepted, and they sent over a draft letter for us to
24 attach to the certified cost report.
25     Q.  That spreadsheet relates only to equipment

Page 102

1  cost -- equipment ownership cost, does it not?
2      A.  It does.  There's a tab in the sheet for
3  rentals, direct costs, and some -- I think we attached
4  the spreadsheet for labor as well.  If not, it was
5  attached in the REA, the certified cost.
6      Q.  Okay.  So you testified about how you compiled
7  equipment costs for the project.  How did you compile
8  the labor costs?
9      A.  To my recollection, I believe Roland pulled
10 our labor costs from our certified payrolls that we sent
11 to him for this project.
12     Q.  So you don't think you had any involvement in
13 compiling your own internal labor costs?
14     A.  We sent him the certified payrolls.
15     Q.  When did you send him the certified payrolls?
16     A.  Weekly.
17     Q.  Every week that you performed services on this
18 federal project, correct?
19     A.  Correct.
20     Q.  You left the project -- you completed the
21 project the third week of February, 2021?
22     A.  That sounds right.
23     Q.  So Roland would have had all of your certified
24 weekly payrolls, assuming Roland was the one who
25 compiled them, correct?

Page 103

1      A.  Received them, yes.
2      Q.  And did you check to see when you certified
3  your cost that that total was correct?
4      A.  No.
5      Q.  I'm going to hand you what I marked as Exhibit
6  38 to your deposition.  You recognize that as the
7  certified cost computation that you submitted to Harbor
8  Dredging March 30, 2021 for inclusion in the request for
9  equitable adjustment, right?
10     A.  Yes.
11     Q.  Now, you understand under the Federal
12 Acquisition Regulations, or FAR, that when a contractor
13 submits a claim for additional money, if it's over a
14 certain amount -- and I think it's $100,000.  But if
15 it's over a certain amount, that contractor must certify
16 that the costs were incurred in connection with the
17 project.  You understand that, don't you?
18     A.  I do.
19     Q.  And you knew that when you submitted Exhibit
20 38.
21     A.  Yes.
22     Q.  Now, where did the rental costs -- the
23 equipment rental costs come from that are included in
24 Exhibit 38?
25     A.  That comes from the invoices on the rental of

Page 104

1  the Tugboat Kerrilyn.
2      Q.  Well, it includes other rent equipment, does
3  it not?
4      A.  It does.  Sorry.  It's primarily -- I believe
5  the full -- a fuller accounting of these values should
6  be in this exhibit.  This is just our financials from
7  that period of all projects that's attached to this.
8  But there's a spreadsheet that was submitted with this
9  that has the actual certified cost calculation.
10     Q.  The financials that are attached as Pages 2
11 and 3 to Exhibit 38 were how your overhead percentage
12 was calculated, correct?
13     A.  Correct.
14     Q.  And that overhead percentage was based on your
15 12-month 2020 financials, right?
16     A.  Right.
17     Q.  And it's reasonable to assume that your
18 overhead percentage for the first month and a half of
19 2021 would be close to your overhead percentage for
20 2020, right?
21     A.  Correct.
22     Q.  But these costs that are referenced in Exhibit
23 38 are the costs for the entire project, correct?
24     A.  There are costs for equitable adjustment.
25     Q.  They're for the entire project, sir, aren't

26 (Pages 101 to 104)

Oral Deposition of Stephen P. Swiber

Page 109

1  Lady Lafon working as directed with Diamond Services'
2  dredge, right?
3     A. I agree that's what it says.
4     Q. And so that would be performing the work scope
5  of moving the dredge in and out of the ship channel,
6  right?
7     A. No. That was probably traversing hopper
8  barges to allow the Lafon to move the dredge.
9     Q. How do you know that's the case?
10    A. I don't. But that's the general -- the
11 general performance of the Kerrilyn on the project. So
12 I don't have any reason right here to assume this is
13 different, but maybe it relieved the Lafon on a
14 particular day. I don't right recall.
15    Q. If you go back to the page that's Bates
16 labeled 1527, bottom right-hand corner, it looks like
17 nearly halfway back.
18    A. Okay.
19    Q. Well, strike that.
20 Let's just take Page 1513. It's the third
21 page back. Fourth page, I'm sorry, in Exhibit 35 still.
22 You appear to be invoicing Harbor Dredging on August the
23 17, 2020 for this tug rental and fuel and lube. Do you
24 see that?
25    A. I do.

Page 110

1     Q. Diamond Services Corporation never directed
2  these invoices to RLB Contracting, did they?
3     A. They did not.
4     Q. And these invoices were never sent to RLB
5  Contracting until several months after the project was
6  over, correct?
7     A. I have no way of knowing if that's true.
8     Q. Do you have any information that would allow
9  you to deny that as you sit here today?
10    A. No.
11    Q. So was there any reason why you waited until
12 August 17, 2020 to invoice, it looks like for the first
13 time, Harbor Dredging for these tug rentals that started
14 back on May 15, 2020?
15    A. I do not recall.
16    Q. You had not had any discussion with Harbor
17 Dredging or RLB Contracting or anybody else about the
18 cost of the tugs -- or the tug that's referenced in
19 Exhibit 35 before they were rented and mobilized to the
20 jobsite, had you?
21    A. No.
22    Q. And it appears -- and tell me if this is
23 incorrect -- that Miss Kerrilyn was rented for just
24 about the entire time that Diamond Services performed on
25 this project.

Page 111

1     A. Substantially, yes.
2     Q. As well as the fuel and lube incurred, right?
3     A. Correct.
4     Q. Did anybody ever complain about Diamond taking
5  too long to cycle barges; that is, move them from the
6  dredge to the disposal site and back?
7     A. Not to me, no.
8     Q. Did it ever get back to you that anybody had
9  complained about that to Jim Furlette or anybody else at
10 Diamond Services?
11    A. Not to my knowledge, no.
12    Q. How did you communicate with the dredge
13 personnel, if at all, during the project?
14    A. Primarily through Jim Furlette.
15    Q. So you didn't primarily have direct
16 communications with the dredge personnel what you heard
17 from them and what they heard from you went through Jim
18 Furlette; is that fair?
19    A. Yeah.
20    Q. Can you think of any specific times that that
21 was not the case where you had specific communications
22 about the job with your dredge personnel?
23    A. One or two occasions, one person on the dredge
24 reached out to the health and safety manager about a
25 personal dispute with another person on the dredge, that

Page 112

1  she referred him to me to handle that. Very
2  occasionally I would have a phone conversation with a
3  Clyde Berryhill, our superintendent; but primarily his
4  direct report was Jim Furlette.
5     Q. Do you remember anything about your communications
6  with Clyde Berryhill, your superintendent?
7     A. No.
8     Q. Do you have any of those communications about
9  anything that would be relevant to this lawsuit?
10    A. No.
11    Q. Diamond was using a bucket dredge, was it not?
12    A. Correct.
13    Q. How big was the bucket?
14    A. 7 1/2 cubic yards.
15    Q. Do you have different size buckets you can
16 use?
17    A. We do.
18    Q. Did you take into account the 7 1/2-cubic-yard
19 bucket on the estimate?
20    A. Yes.
21    Q. Now, the tires that were encountered, the
22 tires and trash that form the basis of the differing
23 site conditions, didn't really slow down a dredge with a
24 7 1/2-foot bucket, did they?
25    A. Define "slow down," in that the tire is not

28 (Pages 109 to 112)

Page 125

1  Q. So would that lead you to believe that all of
2  the certified costs that you submitted to Harbor were
3  included in the RLB calculation for the REA?
4  A. Yes.
5  Q. As well as Harbor's cost, it would appear,
6  below Diamond's on RLB-277 in Exhibit 39. Okay?
7  A. Can you repeat?
8  Q. As well as similar information for Harbor
9  Dredging?
10  A. Well, it's dissimilar. The majority of
11  Harbor's cost is just Diamond's cost marked up.
12      MR. GUTHRIE: Object to the portion of the
13  answer as nonresponsive.
14  A. It's dissimilar would be my answer, then.
15  Q. (By Mr. Guthrie) But Harbor's costs were also
16  included, correct?
17  A. Correct.
18  Q. At the same profit percentage that got applied
19  to yours, right?
20  A. Correct.
21  Q. And your overhead percentage also, 27.94
22  percent, is the exact overhead percentage that you
23  submitted to Harbor on March 30 in Exhibit 38, right?
24  A. Correct.
25  Q. Now, these numbers relate to costs, right?

Page 126

1  A. Correct.
2  Q. They don't have anything to do with contract
3  amounts?
4  A. Correct.
5  Q. So do you understand that request for
6  equitable adjustment are calculated based on costs?
7  A. I do not.
8  Q. You do not know one way or the other?
9  A. I was not privy to that conversation.
10  Q. And that's never come up in your experience
11  before?
12  A. Change orders come up all the time.
13  Q. You have never calculated a measured mile,
14  have you?
15  A. No.
16  Q. Now, your complaint earlier with RLB's first
17  version of the REA was that it had incorrectly included
18  amounts for Diamond's costs, correct?
19  A. Not that to include Diamond's costs was
20  incorrect, but the way they calculated was incorrect.
21  Q. But you calculated the cost this time for
22  purposes of Exhibit 39, right?
23  A. Correct.
24  Q. With the assistance of Roland Maturin, right?
25  A. Correct.

Page 127

1  Q. And Tiffany Brandhurst, right?
2  A. To a much lesser degree.
3  Q. And you don't know what RLB's costs were on
4  this project, do you?
5  A. I do not.
6  Q. Don't know what their overhead was, do you?
7  A. I do not.
8  Q. Other than you could look at the request for
9  equitable adjustment calculation and read them, right?
10  A. Right.
11  Q. Now, do you remember in the meeting that you
12  testified about in September of 2021 where Roland
13  Maturin and Randy Boyd brought you a joint check in the
14  amount of $950,000 and whatever else you testified about
15  in that meeting?
16  A. You asked if I recall?
17  Q. Yes.
18  A. Yes.
19  Q. Do you recall that RLB had offered to explain
20  to you the numbers behind the request for equitable
21  adjustment, the modified calculation that happened after
22  the second amended REA which we just looked at as part
23  of Exhibit 39?
24  A. They did not.
25  Q. You deny that under oath?

Page 128

1  A. I do.
2  Q. Have you seen Exhibit 55 that was produced in
3  this litigation?
4  A. I believe I've seen some parts but not others.
5  Q. Okay. Do you know what the difference is
6  between Exhibit 55 and Exhibit 39 in terms of the
7  calculation?
8  A. I'm sorry. Where would you like me to turn in
9  each document?
10  Q. You can look at the first page of Exhibit 55.
11  You can look at Exhibit 39, beginning at Bates label 279.
12  A. Okay. I see two very similar sheets in
13  format. I see one has a value of 8.867 as a total, and
14  the other has a value of 6.636 as a total.
15  Q. Do you understand that the REA as finally
16  negotiated by RLB Contracting was in the amount of
17  $6,636,300 instead of $8,867,212?
18  A. My understanding is that it was 6 million.
19  Q. Well, that's the final settlement amount. But
20  the claim, do you understand, went down from 8,867,000
21  and change to 6,636,000 and change?
22  A. If that's what you're showing me, then, sure.
23  Q. Okay. But you haven't studied this enough to
24  explain why the claim went down?
25  A. No.

32 (Pages 125 to 128)

Page 137

1  you -- is there a slip green page in there?
2  **A. Yeah, I've got two copies of Harry's letter**
3  **here.**
4  Q. Why don't you let me have that back, please.
5  **A. But I don't know how to cut it off. Do you**
6  **want just the letter?**
7  Q. I wanted to get the whole package back --
8  **A. Yeah, just take it all.**
9  Q. -- to make sure that I have the correct
10 exhibit.
11      MR. MORSE: I'll give you this back so we're
12 all looking at the same thing.
13      MR. GUTHRIE: Yeah. Yeah.
14      We're just going to go on. Skip that one.
15 Q. (By Mr. Guthrie) Sir, I've handed you what I've
16 marked as Exhibit 42, which is your lawyer's May 5, 2021
17 letter to RLB and to Travelers Casualty and Surety, RLB's
18 surety. Do you see that?
19 **A. Is that a question for me?**
20 Q. Yes.
21 **A. Yes.**
22 Q. Did you review this letter before it was sent
23 out?
24 **A. Yes.**
25 Q. In this letter your lawyer acknowledges RLB's

Page 138

1  payment of 1.5 million -- $1.05 million to Diamond. Do
2  you see that?
3  **A. Yes.**
4  Q. Now, Harbor paid that $1.05 million to Diamond,
5  correct?
6  **A. Yes.**
7  Q. And then at the bottom, it refers to these tug
8  invoices, at the bottom of the first page. Do you see
9  that?
10 **A. I do.**
11 Q. And it repeats; "All these invoices have been
12 sent to you prior," right?
13 **A. Correct.**
14 Q. Then on the second page, it complains that RLB
15 has not involved Diamond in the process regarding the
16 Corps, right?
17 **A. Correct.**
18 Q. Diamond didn't have any contractual privity
19 with the Army Corps of Engineers, did they?
20 **A. No.**
21 Q. Do you know one way or the other what the Army
22 Corps of Engineers' position is about negotiating with
23 subcontractors with whom they have no contractual
24 privity?
25 **A. I do not.**

Page 139

1  Q. And here it claims in the second paragraph
2  $1,383,768.77 in addition to the 414,934.59 amount that
3  Diamond claimed for the Tug Kerrilyn, right?
4  **A. That's there, yes.**
5  Q. What were those numbers based on?
6  **A. Incomplete information, as stated in the**
7  **letter.**
8  Q. Well, take us through the calculation. I
9  mean, I understand the tug tow; but what's the
10 calculation for the rest of this $1,383,768.77?
11 **A. I don't recall precisely what that number was**
12 **based on in that letter.**
13 Q. And this letter doesn't say, does it?
14 **A. It does not.**
15 Q. And it doesn't even say specifically what it
16 is for, does it?
17 **A. It does not, and it clarifies that.**
18 Q. Where does it clarify that?
19 **A. It clarifies that it is based on incomplete**
20 **information and that further communication on Diamond's**
21 **behalf to the Corps may have similar errors that go**
22 **uncorrected.**
23 Q. So who calculated this $1,383,768.77 amount?
24 **A. Probably me.**
25 Q. But you have no idea as you sit here today

Page 140

1  what it includes?
2  **A. Nope.**
3  Q. Let me hand you what I've marked as Exhibit 43.
4  This is my May 28, 2021 letter to your lawyer responding
5  to the April 29 and May 5, 2021 letters and also, in part,
6  to the December 14, 2020 letter to RLB.
7      Do you see that?
8  **A. Yes.**
9  Q. Have you seen this letter before?
10 **A. Yes.**
11 Q. Now, RLB never agreed to pay Diamond Services
12 for any portion of the rental, fuel, and other charges
13 related to the Tug Kerrilyn, correct?
14 **A. I don't know that.**
15 Q. Can you deny under oath?
16 **A. I can't confirm or deny under oath. We relied**
17 **on information given by Roland Maturin.**
18 Q. Okay. So you don't have any personal firsthand
19 knowledge that RLB ever made this agreement?
20 **A. No.**
21 Q. No, you do not.
22 **A. No, I do not.**
23 Q. Right?
24 **A. Correct.**
25 Q. RLB never made any kind of oral agreement with

Page 181

1  Q.  And you heard Mr. Furlette's testimony the
2  other day, and he said that he believed that that number
3  was reflective of the cost -- the extra cost incurred by
4  Diamond as a result of the differing site conditions.
5  Did you hear that testimony?
6      A.  I did.
7      Q.  Do you have any reason to doubt his testimony
8  as being true and accurate with regard to that $500,000?
9      A.  I think Jim -- well, Jim wasn't privy to a lot
10  of the conversations we had about REAs up to that point.
11  He could have been basing his numbers on hard costs or
12  the job costs report.  I did not help him prepare the
13  figure of 500,000.
14     Q.  Well, that's not what he said in his
15  testimony, was it?
16     A.  I don't recall precisely.
17     Q.  Okay.  We've got a copy of his transcript.
18  We'll look at that later on.
19         But as far as you know, based on his
20  testimony, the $500,000 in his opinion reflected the
21  additional costs associated with the differing site
22  condition on the Brady Island project, correct?
23     A.  It very well may have.
24     Q.  All right.  And so if you add the 500,000 to
25  the differing site condition, extra work, it doesn't

Page 182

1  matter.  It could be a differing site condition.  It
2  could be some other stuff but, you know, extra work.
3  That's the total amount of extra work he thought was
4  incurred by Diamond on the job, correct?
5     A.  Perhaps.
6     Q.  Well, it's what he said, wasn't it?
7     A.  It was.
8     Q.  He said it could be -- okay.  Thank you.
9        All right.  And then you add the -- what was
10  it?  400,000 and change for the tow; is that correct?
11     A.  Yeah.  That's been established before.  I
12  don't need to look it up.
13     Q.  And if you add those two numbers together,
14  that's about $900,000, isn't it?
15     A.  935, yeah, something like that.
16     Q.  Less than 950,000, isn't it?
17     A.  It's almost 950,000; but it would be less.
18     Q.  Yeah.  Okay.  And Harbor and RLB cut a check
19  for 950,000 to Diamond to resolve the differing site
20  condition, correct?
21     A.  They did.
22     Q.  And you didn't accept that, did you?
23     A.  I did not.
24     Q.  Even though that was discussed with Jim
25  Furlette who passed that along to Roland, that that

Page 183

1  would be an acceptable number for Diamond, correct?
2     A.  That it could be, yes.
3     Q.  Do you know if -- well, let me back up.
4        Did you say to Jim Furlette when there was a
5  discussion about what it would take to get the REA
6  settled with Diamond, did you say, "$950,000 is enough.
7  I want $2,362,344 and not a dime less"?
8     A.  Not a dime less.  I had shared with Jim
9  Furlette that we were in the REA process and that we had
10  requested several times in writing to be privy to the
11  conversations between the contractors and the Corps.
12     Q.  Okay.  That wasn't my question.  My question
13  was, did you ever -- when you were talking about the
14  $950,000 that was going to be conveyed to Roland as
15  settlement for the REA, did you say to Jim Furlette,
16  "$950,000 isn't enough.  I want more" at that point in
17  time?
18     A.  I said I wanted to see what that entailed.
19  And then when -- so these are kind of two different
20  conversations, right?  When I received a settlement
21  agreement, then I said I want more.
22     Q.  But when you were talking to Jim Furlette who
23  was going to pass this information on to Roland who was
24  going to pass it on to RLB, you didn't say, "I want more
25  than 950."

Page 184

1        You told them that 950 would be acceptable to
2  settle the REA, correct?
3     A.  Depending on what it entailed.
4     Q.  Did Jim Furlette ever say that it was
5  conditioned?  Did you hear him testify that depending on
6  what it -- what was the language you used?  I didn't
7  write it down.  Depending on what?
8     A.  I believe Jim testified that he conveyed to
9  Harbor that there were conditions.
10    Q.  Well, no.  Tell me what you just said when I
11  asked you the question.  I'm not interested in what Jim
12  said.  I want to hear what you just said in response to
13  my question.
14    A.  What?
15    Q.  When I said -- when I asked you -- I said, did
16  you ever say to Jim Furlette when the $950,000 was being
17  discussed, that you knew would be conveyed to Roland who
18  would convey it to RLB, "$950,000 isn't going to be
19  enough"?
20    A.  Yes, I did.
21    Q.  Okay.  But yet you knew he was going to pass
22  the 950,000-dollar settlement offer to Harbor and to
23  RLB, correct?  Because you discussed it with him.
24    A.  Yeah.  As a minimum -- as a bottom dollar,
25  yeah.

46 (Pages 181 to 184)

Oral Deposition of Stephen P. Swiber

Page 193

1  Kerrilyn, and we were talking about your company working
2  at the Stolt project for Harbor before mobilizing to the
3  Brady Island project.  Do you recall that?
4       A.  Yes.
5       Q.  Now, you know that the Tug Kerrilyn also
6  worked on the Stolt project, don't you?
7       A.  Yes.
8       Q.  And you know that part of the invoice that you
9  were trying to claim that Harbor somehow agreed to split
10 half or RLB somehow agreed to split half was really for
11 work on this other Stolt project.
12      **A.  I don't know if that ended up in the REA.**
13      Q.  You don't?
14      **A.  I don't.**
15      Q.  Well --
16      **A.  Because Roland put those into our part of the**
17 **REA and sent it back to me.**
18      Q.  All right, sir.
19         MR. GUTHRIE:  I don't have this premarked but
20 I'm just going to put a sticky thing on it and we can
21 deal with the marking later, if that's okay.
22      Q.  (By Mr. Guthrie)  But I'm going to hand you
23 what has been marked as Exhibit 23 to your deposition.
24 And I'll represent to you that Exhibit 23 is a
25 compilation of some of the tug logs that you produced --

Page 194

1  or your company produced via your counsel in this case.
2         MR. GUTHRIE:  And for the record, those are
3  Bates labeled Diamond 1991 through 19- -- I'm sorry,
4  Diamond 1990 through 1998 and then 2041 and 2060 and
5  2073 and 2086.
6       Q.  (By Mr. Guthrie)  Do you see that?
7       A.  Yes.
8       Q.  And this report date on the first page of
9  Exhibit 23, Bates labeled 1990, is dated May 16, 2020.
10 Do you see that?
11      A.  Yes.
12      Q.  And this Stolt doc refers to the Stolts
13 project that's listed on here, correct?
14      A.  Yes.
15      Q.  And what is the Diamond Annie referenced on
16 the last line of the description and comments?
17      **A.  I've never heard of the Diamond Annie.  We do**
18 **not have a vessel named the Diamond Annie.**
19      Q.  So you have no idea what that means?
20      **A.  I don't.**
21      Q.  And it's referred to at least twice on the
22 next page, 1991?
23      **A.  It is.**
24      Q.  Diamond Annie.
25      **A.  Yes.**

Page 195

1       Q.  All right.  Now, both the Kerrilyn as well as
2  the Lady Lafon worked at the same time on the Stolts
3  project, correct?
4       A.  Yes.
5       Q.  And so for some reason on this little project
6  that involved, as you described it, excavating a dock
7  area, you had to have two tugs, right?
8       A.  Yes.
9       Q.  And this was not out in the middle of the ship
10 channel, was it, the Stolts project?
11      **A.  I believe that was adjacent to the ship channel.**
12      Q.  Well --
13      **A.  But not in the middle.**
14      Q.  But not out in the navigation channel,
15 correct?
16      **A.  Correct.**
17      Q.  It was on the side, right?
18      **A.  Right.**
19      Q.  But you still needed two tugs to do the
20 dredging work on this project, correct?
21      **A.  Correct.**
22      Q.  Well, explain to us why it was such a surprise
23 that you had to have a second tug on the Brady Island
24 project when you had just had one on a project that
25 wasn't even out in the middle of the ship channel.

Page 196

1       **A.  Well, because when we bid the job, the person**
2  **who brought it to us informed us it could be done with**
3  **one tug.**
4       Q.  You're talking about the Brady Island?
5       **A.  Yes.**
6       Q.  And the same person that brought you the
7  Stolts project, correct?
8       **A.  Correct.**
9          MR. GUTHRIE:  That's all I have.  I pass the
10 witness.
11         MR. SOLOP:  I don't have anything further.
12         MS. DAILEY:  Travelers doesn't have any
13 questions.
14         MR. MORSE:  We'll read and sign, please.
15         MR. SOLOP:  Harry, do you have some?
16         MR. GUTHRIE:  No.  He's done.  Thank you all.
17         MR. SOLOP:  All right.  Thank you.  Appreciate
18 it.
19         THE WITNESS:  Thank you all.
20             (DEPOSITION CONCLUDED)

Oral Deposition of Stephen P. Swiber

Page 197

```
 1       CORRECTIONS/CHANGES
      ORAL DEPOSITION OF STEPHEN P. SWIBER
 2            AUGUST 10, 2022
 3   PAGE/LINE    CHANGE      REASON
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

Page 198

```
 1       I, STEPHEN P. SWIBER, have read the foregoing
     deposition and hereby affix my signature that same is
 2   true and correct, except as noted above.
 3
             _____
 4              STEPHEN P. SWIBER
 5
     THE STATE OF TEXAS )
 6   COUNTY OF _____ )
 7       Before me _____ on this day personally
     appeared STEPHEN P. SWIBER, known to me (or proved to me
 8   under oath or through _____)(description of
     identity card or other document)) to be the person whose
 9   name is subscribed to the foregoing instrument and
     acknowledged to me that they executed the same for the
10   purposes and consideration therein expressed.
11       Given under my hand and seal of office this _____
     day of _____, 2022.
12
13
             _____
14             NOTARY PUBLIC IN AND FOR
               THE STATE OF _____
15
16
17
18
19
20
21
22
23
24
25
```

Page 199

```
 1      IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF TEXAS
 2              GALVESTON DIVISION
 3                              )
     Diamond Services           )
 4   Corporation,               )
        Plaintiff,              )
 5                              ) Civil Action
     VS.                        ) No. 3:21-cv-00253
 6                              )
     RLB CONTRACTING, INC.,     )
 7   HARBOR DREDGING, INC., and )
     TRAVELERS CASUALTY AND     )
 8   SURETY COMPANY OF AMERICA, )
         Defendants.
 9
10
11         REPORTER'S CERTIFICATION
         DEPOSITION OF STEPHEN P. SWIBER
12            AUGUST 10, 2022
13       I, LESLEY A. WERNER, Certified Shorthand Reporter in and
     for the State of Texas, hereby certify to the following:
14
15   That the witness, STEPHEN P. SWIBER, was duly sworn by
     the officer and that the transcript of the oral
16   deposition is a true record of the testimony given by
     the witness;
17
18   That pursuant to information given to the deposition
     officer at the time said testimony was taken, the
19   following includes all parties of record:
20   Mr. Harry E. Morse, Attorney for Plaintiff Diamond Services
     Corporation;
21   Mr. Mark C. Guthrie, Mr. John Wooldridge, Jr., and Mr. Cody
     Schneider, Attorneys for Defendant RLB Contracting, Inc.;
22   Mr. Christopher Solop, Attorney for Defendant Harbor
     Dredging, Inc.;
23   Ms. J. Megan Daily, Attorney for Defendant Travelers
     Casualty and Surety Company of America;
24
     I further certify that I am neither counsel for, related
25   to, nor employed by any of the parties in the action in
```

Page 200

```
 1   which this proceeding was taken, and further that I am
     not financially or otherwise interested in the outcome
 2   of the action.
 3
     Certified to by me this 22nd day of August, 2022.
 4
 5
 6       _____
         Lesley A. Werner, Texas CSR 4044
 7       Expiration Date: 07-31-23
         Liberty Litigation Support
 8       Firm Registration No. 708
         7171 Highway 6 North, Suite 250
 9       Houston, Texas 77095
         Phone: (832) 427-5460
10       Fax: (713) 533-8997
```