# EXHIBIT 3

### Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF TEXAS
 3                 GALVESTON DIVISION
 4
 5 DIAMOND SERVICES      *  CIVIL ACTION
   CORPORATION,          *  NO.:  3:21-cv-00253
 6         Plaintiff     *
                         *
 7 VERSUS                *
                         *
 8 RLB CONTRACTING, INC., *
   HARBOR DREDGING, INC., *
 9 and TRAVELERS CASUALTY *
   AND SURETY COMPANY OF *
10 AMERICA               *
       *  *  *  *  *  *  *
11
12
13       Video deposition of JAMES "JIM" FURLETTE,
14 taken at the office of Bohman | Morse, LLC, located
15 at 400 Poydras Street, Suite 2050, New Orleans,
16 Louisiana  70130, on Friday, the 29th day of
17 July, 2022 at 10:06 a.m.
18
19
20
21 REPORTED BY:
22       QUINCEE B. ROCCAFORTE, CCR, RPR
             CERTIFIED COURT REPORTER
23
24
25
```

### Page 2

```
 1 APPEARANCES:
 2       BOHMAN | MORSE, LLC
         (BY:  HARRY E. MORSE, ESQUIRE)
 3       400 Poydras Street
         Suite 2050
 4       New Orleans, Louisiana  70130
         504-930-4009
 5       harry@bohmanmorse.com
         (Counsel for Plaintiff
 6       Diamond Services Corporation)
 7
         BIGGS, PETTIS, INGRAM & SOLOP, PLLC
 8       (BY:  CHRISTOPHER SOLOP, ESQUIRE)
         111 Capitol Building
 9       111 East Capitol Street
         Suite 101
10       Jackson, Mississippi  39201
         601-713-1192
11       csolop@bpislaw.com
         (Counsel for Defendant Harbor Dredging, Inc.
12       and Roland Maturin)
13
         KREBS | FARLEY, PLLC
14       (BY:  MEGAN DAILY, ESQUIRE)
         400 Poydras Street
15       Suite 2500
         New Orleans, Louisiana  70130
16       504-299-3570
         mdaily@krebsfarley.com
17       (Counsel for Travelers Casualty and
         Surety Company of America)
18
19       WINSTEAD, PC
         (BY:  CODY N. SCHNEIDER, ESQUIRE)
20       600 Travis Street
         Suite 5200
21       Houston, Texas  77002
         713-650-8400
22       cschneider@winstead.com
         (Counsel for Defendant RLB Contracting, Inc.)
23
   THE VIDEOGRAPHER:
24       GILLEY DELORIMIER, DEPO-VUE, INC.
   ALSO PRESENT:
25       STEPHEN SWIBER AND ROLAND MATURIN
```

### Page 3

```
 1                        INDEX
 2
 3 EXAMINATION BY:
 4 MR. SOLOP.......................................  6
 5 MR. SCHNEIDER................................... 54
 6            *  *  *  *  *
 7                       EXHIBITS
 8 Exhibit No. 1 - Notice of Deposition...........  6
 9 Exhibit No. 2 - Coversheet for Project Manual.. 10
10 Exhibit No. 3 - 2/24/2020 Subcontract.......... 18
11 Exhibit No. 4 - Harbor Dredging Bill Payments
                     List......................... 29
12 Exhibit No. 5 - Diamond Services Job Cost Detail
                     Report....................... 30
13 Exhibit No. 6 - 10/26/2020 RLB Contracting
                     letter....................... 31
14 Exhibit No. 7 - 4/6/2021 RLB Contracting
                     letter....................... 32
15 Exhibit No. 8 - Certified Cost and Pricing
                     Data......................... 33
16 Exhibit No. 9 - Handwritten calculations....... 44
17 Exhibit No. 10 - A/R Aged Analysis Detail...... 45
18 Exhibit No. 11 - 10/29/2021 Harbor Dredging
                      letter...................... 50
19 Exhibit No. 12 - 8/21/2020 E-mail.............. 76
20 Exhibit No. 13 - 3/25/2021 E-mail with invoices
                      attached.................... 84
21 Exhibit No. 14 - Audio recording............... 97
22
23
24
25
```

### Page 4

```
 1
 2           S T I P U L A T I O N
 3
 4      It is stipulated and agreed by and between
 5 counsel for the parties hereto that the deposition
 6 of the aforementioned witness is hereby being taken
 7 under the Federal Code of Civil Procedure, for all
 8 purposes, in accordance with law;
 9      That the formalities of reading and signing
10 are specifically waived;
11      That the formalities of sealing,
12 certification, and filing are specifically waived;
13      That all objections, save those as to the
14 form of the question and the responsiveness of the
15 answer, are hereby reserved until such time as this
16 deposition, or any part thereof, may be used or
17 sought to be used in evidence.
18
19      QUINCEE B. ROCCAFORTE, Certified Court
20 Reporter in and for the State of Louisiana,
21 officiated in administering the oath to the
22 witness.
23
24
25
```

Page 5

1  THE VIDEOGRAPHER:
2       We are now on the record.  This is the
3  videotaped deposition of Jim Furlette.  This
4  deposition is being held today at 400 Poydras
5  Street in New Orleans, Louisiana on July
6  the 29th, 2022 at approximately 10:06 a.m.
7       Would counsel present please now
8  introduce themselves and the party they
9  represent?
10 MR. SOLOP:
11      Christopher Solop with the law firm of
12 Biggs, Pettis, Ingram & Solop out of Jackson,
13 Mississippi, representing Harbor Dredging,
14 Inc.
15 MR. SCHNEIDER:
16      Cody Schneider with Winstead, PC,
17 representing defendant, RLB Contracting.
18 MS. DAILY:
19      Megan Daily of Krebs Farley and Dry
20 representing Travelers Casualty and Surety
21 Company of America.
22 MR. MORSE:
23      Harry Morse on behalf of Diamond
24 Services Corporation.
25          JAMES "JIM" FURLETTE,

Page 6

1  after having been first duly sworn by the
2  above-mentioned Certified Court Reporter was
3  examined and testified as follows:
4  EXAMINATION BY MR. SOLOP:
5       Q.   Mr. Furlette, my name, as you heard, is
6  Chris Solop.  I'm representing Harbor Dredging,
7  Inc., and before we get started, would you please
8  state your full name for the record, your resident
9  address, and your cell phone number, please?
10      A.   My full name is James Furlette.  You
11 want my middle name?
12      Q.   Yes, please.
13      A.   James Lawrence Furlette.  And my
14 address is 4307 Cantrell Drive in Berwick,
15 Louisiana 70342.  Cell phone is 985-518-4393.
16      Q.   All right.  And before we get too far
17 along, let me tell you, if you can speak up just a
18 little bit to assist the court reporter in
19 recording what you have to say because she's going
20 to be taking down everything you say today, okay?
21      A.   Sure.
22      (Exhibit No. 1 was marked for
23      identification.)
24 BY MR. SOLOP:
25      Q.   All right.  You're here pursuant to a

Page 7

1  deposition notice I marked as Exhibit No. 1; is
2  that correct?
3       A.   Yes.
4       Q.   Okay.  And just wanted to make sure
5  that we have a little bit of background.  And ask
6  you if you've ever given your deposition before?
7       A.   Sure.
8       Q.   Okay.  So, you understand the ground
9  rules.  If you need to take a break, just let me
10 know, we'll stop, you can take a break.  I'm going
11 to ask questions.  You know, if you don't
12 understand, or it's not clear, ask me to rephrase
13 it, and I will rephrase it or clarify it.  And then
14 if you answer, I'll assume that you understood my
15 question and that your answer is responsive to that
16 question; is that fair?
17      A.   Okay.
18      Q.   Uh-huh.  Let me get a little background
19 on you.
20      What is your educational background, as
21 far as high school and advanced education?
22      A.   I graduated as a mining engineer in
23 1981 from Michigan Technological University.
24      Q.   You said 1981?
25      A.   Correct.

Page 8

1       Q.   Okay.  What -- just -- I don't know
2  anything about mining engineering.  What kind of
3  curriculum is that?  I mean, it's --
4       A.   It's an engineering curriculum.
5       Q.   Is it geological related or anything?
6       A.   Some.
7       Q.   Some.  Okay.
8       After you graduated in 1981, what did
9  you do professionally, from a work standpoint?
10      A.   Came to work at Diamond Services
11 Corporation.
12      Q.   Okay.  And so, you been working for
13 Diamond Services since 1981; is that correct?
14      A.   Yes, it is.
15      Q.   What kind of work does Diamond Services
16 do?
17      A.   We're offshore pipe laying and
18 construction company.
19      Q.   Uh-huh.
20      A.   And we also have a transportation
21 division that handles crew boats.
22      Q.   What about dredging?  How much dredging
23 does Diamond do?
24      A.   They -- I mean, compared to what?
25      Q.   Well, I mean, do they do a lot of

Page 21

1    Q.    Okay.  And there was $125,000
2  mobilization and $125,000 demobilization line item
3  for a total of 250,000; is that correct?
4    A.    Yes.
5    Q.    Okay.  What is -- what does the
6  mobilization cost of 125,000 generally encompass?
7    A.    Getting the equipment from where it is
8  to the location.
9    Q.    All right.  Where was the equipment
10 originally?
11   A.    At our yard.
12   Q.    Where's your yard located?
13   A.    Oh, I'm sorry.  Diamond Services in
14 Morgan City, Louisiana.
15   Q.    Now, the other item I want to focus in
16 on is the dredging, Section 16 item, it's $6.50 a
17 cubic yard, correct?
18   A.    Okay.
19   Q.    Is that correct?
20   A.    That's --
21   Q.    Just yes or no.
22   A.    It's --
23   Q.    I'm sorry.  I don't mean to be short
24 with you, but I need you to answer "yes" or "no"
25 and --

Page 22

1    A.    Yes.
2    Q.    Okay.  Thank you.
3          The estimated quantities, where did
4  that come from in the subcontract, do you know?
5    A.    No.
6    Q.    Okay.  Let me ask you a little bit
7  about that $6.50 and what it comprises of.  The
8  labor, material, equipment; is that right?
9    A.    Yes.
10   Q.    All right.  How do you break it down?
11   A.    Hourly.
12   Q.    Okay.  How is the labor broken down?
13 What percentage of that amount is labor?
14   A.    I don't -- we don't have a percentage
15 that's dedicated to that.
16   Q.    Where do you get that -- you just -- is
17 that a swag, or is it a historical number?  How did
18 you come up with the 6.50, I guess, is what I'm
19 asking?
20   A.    We -- we estimated the number of cubic
21 yards that we figured we could do in a day.
22   Q.    Uh-huh.
23   A.    And we divided by the yardage.  Divided
24 it by the cost per day.  I didn't mean by the
25 yardage.  But you figure out what it's going to

Page 23

1  cost you a day and, you divide it by the yardage,
2  and you get cost per yard.
3    Q.    Okay.  And does that number include
4  overhead and profit?
5    A.    It does.
6    Q.    Okay.  And what is Diamond's overhead
7  and profit rate; do you know?
8    A.    I have no idea.
9    Q.    Who would know that?
10   A.    Somebody else.
11   Q.    Okay.  Well, what about the -- the
12 profit, you don't know what the profit rate is?
13   A.    No.  I don't.  It's not my business.
14   Q.    But there is overhead and profit in
15 that number, correct?
16   A.    Sure.
17   Q.    Tell me a little bit about the
18 requirement under the pricing.  Just take a minute
19 and read that paragraph that begins with,
20 "subcontractor will only be paid for volumes
21 dredged."  Do you see that paragraph?
22   A.    Yeah.
23   Q.    Would you take a minute and read that?
24 I'm going to ask you a few questions about it.
25   A.    (Complies.)  All right.

Page 24

1    Q.    Okay.  You understand in this document
2  that's been marked as Exhibit 3, titled
3  Subcontract, that it referenced subcontractor,
4  correct?
5    A.    Correct.
6    Q.    Okay.  And the subcontractor is
7  Diamond; is that correct?
8    A.    That's correct.
9    Q.    That's your understanding?
10   A.    Yes, it is.
11   Q.    ==Okay.  And in this paragraph that I==
12 ==asked you to read, it says, "the subcontractor will==
13 ==be responsible for traversing the hopper barges==
14 ==from the excavation site to the unloading site."==
15          ==What's your understanding of what that==
16 ==requirement entailed?==
17   A.    ==For us to take the hopper barges to an==
18 ==unloading site.==
19   Q.    ==How do you -- how would you traverse==
20 ==from the hopper barges loading site to the==
21 ==unloading site?==
22   A.    ==By tugboat.==
23   Q.    ==So that was part of Diamond's scope of==
24 ==work?==
25   A.    ==Yes.==

```
                                                  Page 41
 1  Diamond, involved in negotiating a settlement
 2  amount with Harbor on the REA submitted to the
 3  Corps of Engineers for the differing site
 4  condition?
 5       A.    I -- yes.
 6       Q.    Okay.  Tell me about that.  What was
 7  your involvement?
 8       A.    Well, I mean, he -- he'd call me and
 9  say that I'm going to submit this claim.  What's
10  your bottom line, you know, how much do you
11  actually need?  And you know, I'm going to the
12  Corps, and we're going to try to get this money for
13  us.  And, you know, where would your bottom line
14  be?
15       Q.    Did you tell him what your bottom line
16  was --
17       A.    Yeah.
18       Q.    -- or Diamond's bottom line?
19       A.    Yeah, I think we did.
20       Q.    And did you discuss that bottom line
21  with anyone other than yourself?
22       A.    Yeah, I probably did.  I probably
23  discussed it with Stephen.  I don't mean to
24  interrupt you again.
25       Q.    No.  No.
```

```
                                                  Page 42
 1       A.    I got a bad habit of that.  I'm sorry.
 2       Q.    That's fine.  That's fine.
 3             So, you talked to Stephen Swiber?
 4       A.    Swiber.
 5       Q.    Swiber.  Excuse me, Swiber.  About the
 6  bottom line that Diamond was willing to take on the
 7  claim, correct?
 8       A.    Correct.
 9       Q.    And what number did you guys decide was
10  the bottom line that Diamond needed to settle the
11  claim?
12       A.    About 950.
13       Q.    Uh-huh.  And you told that to Roland
14  Maturin?
15       A.    Yes, I did.
16       Q.    Uh-huh.  And was -- are you aware that
17  the $950,000 was paid to Diamond?
18       A.    I am.
19       Q.    And was it your understanding that that
20  $950,000 was full and final payment for that REA
21  that was submitted to the Corps?
22       MR. MORSE:
23             Object to form.
24       THE WITNESS:
25             No.  I -- I was under the understanding
```

```
                                                  Page 43
 1  that -- that what claim that they were going
 2  into the Corps with for Diamond's portion of
 3  it would be paid to us.
 4  BY MR. SOLOP:
 5       Q.    Okay.  And that was the $950,000?
 6       A.    I don't know what the -- what the Corps
 7  paid for Diamond's portion.
 8       Q.    Okay.
 9       A.    Before.
10       Q.    But your testimony is that Diamond
11  agreed that the bottom line was they had to have
12  $950,000 to resolve the claim; is that correct?
13       A.    If that was all the Corps was going to
14  give them, that's correct.
15       Q.    And you didn't have another number that
16  you wanted in case -- well, you knew -- let me back
17  up.
18             You knew the amount of the claim that
19  RLB had submitted to the Corps was around
20  $8 million, correct?
21       A.    No, I didn't.
22       Q.    You didn't?
23       A.    No.
24       Q.    You didn't have any idea?
25       A.    No.
```

```
                                                  Page 44
 1       Q.    All right.  So, I guess I have a
 2  question.  How did you come up with the $950,000 as
 3  far as the amount that Diamond would accept for the
 4  REA?
 5       A.    I can't say.  I don't have any earthly
 6  idea.
 7       Q.    Okay.
 8       A.    Maybe we figured out how many hours or
 9  days or our lost time or what have you.  But that
10  was just a...
11             (Exhibit No. 9 was marked for
12             identification.)
13  BY MR. SOLOP:
14       Q.    Okay.  I'm handing you a document we've
15  marked as Exhibit No. 9.  Those are some
16  handwritten notes.
17             Do you recognize that handwriting?
18       A.    Yeah.
19       Q.    Are those your handwritten notes?
20       A.    It is.
21       Q.    Is that -- what do these three pages
22  relate to?  Is that your bid work?
23       A.    Well, it's actually two pages, because
24  one is a copy of the other one.
25       Q.    Okay.  Are those your handwritten
```

Page 49

```
 1  really didn't have a lot of experience in that type
 2  of channel dredging?
 3       A.   Not using ship channel, no, sir.  Not
 4  at all.
 5       Q.   All right.  But you're not sure what
 6  that $500,000 extra work is for?
 7       A.   I don't know.  I can't say.
 8       Q.   And it could be for the differing site
 9  condition?
10       A.   Yeah, sure.
11       Q.   Okay.
12       MR. SOLOP:
13            Can we take a -- just a few minutes?
14       MR. MORSE:
15            Of course.
16       THE VIDEOGRAPHER:
17            We're now off the record.  The time is
18  11:03.
19       (Off the record.)
20       THE VIDEOGRAPHER:
21            Returning to the record, it is 11:12.
22  BY MR. SOLOP:
23       Q.   All right.  Mr. Furlette, I want you to
24  look back at Exhibit No. 9, please.
25       A.   (Complies.)
```

Page 50

```
 1       Q.   And I wasn't -- I think it's clear, but
 2  I just want to make sure that I understand that
 3  those handwritten notes identified as Exhibit 9
 4  relate to the Brady -- Bradley [sic], excuse me,
 5  project?
 6       A.   Yes, sir.
 7       (Exhibit No. 11 was marked for
 8       identification.)
 9  BY MR. SOLOP:
10       Q.   Okay.  Now, I want to show you a
11  document that we've marked as Exhibit No. 11 and
12  ask you to take a look at that and see -- and tell
13  me if you've ever seen that document before?
14       A.   (Views document.)  I've never seen it,
15  no.
16       Q.   Can you flip a few pages?  There's some
17  other documents behind the letter.  See if you've
18  seen any of those other documents before?
19       A.   No, I've not seen any of this.  No,
20  I've never seen any of this.
21       Q.   All right.  Is it your understanding
22  that Diamond received a check for $950,000 for the
23  REA?
24       A.   I'm sorry.  I was reading something.
25       Q.   That's fine.
```

Page 51

```
 1            Is it your understanding that Diamond
 2  ultimately received a check for $950,000 for the
 3  REA from RLB and Harbor?
 4       A.   I know that they got a $950,000 check,
 5  yes.
 6       Q.   Okay.  And it was your understanding
 7  that that was the amount that you had told Roland
 8  would be accepted based on your conversations with
 9  Mr. Swiber?
10       A.   If that's what the Corps gave them.
11       Q.   Uh-huh.
12            All right.  Now, when Diamond received
13  the check for $950,000, did you and Mr. Swiber have
14  any --
15       A.   Swiber.
16       Q.   I'm sorry.  That's just --
17       A.   That's all right.
18       Q.   Swiber -- have any conversations about
19  the amount or how much more or less they -- Diamond
20  should have gotten?
21       A.   No.
22       Q.   Uh-huh.
23       A.   Not that I know of.
24       Q.   Uh-huh.
25            So, since the check for $950,000 came
```

Page 52

```
 1  in to Diamond, you haven't discussed this REA with
 2  Mr. Swiber -- Swiber?
 3       A.   I don't recall ever discussing the REA
 4  with Mr. Swiber.
 5       Q.   Other than the amount that Diamond
 6  would accept, the $950,000, correct?
 7       A.   Yes.
 8       Q.   Is this the first -- this REA that was
 9  submitted by Diamond to Harbor through RLB to the
10  Corps, is this the first Corps-related request for
11  equitable adjustment that Diamond has submitted?
12       A.   We didn't submit an REA.  We, you know,
13  agreed to an amount of money if that's all the
14  Corps was going to give us.
15       Q.   Okay.
16       A.   And the -- you know, as far as us
17  submitting something to Harbor Dredging,
18  we -- there was nothing beside what Stephen had
19  written up, as far as the extra work rates and from
20  what I understand, the extra work rates were taken
21  to -- given to Roland and Roland calculated what
22  would be put on the REA.
23       Q.   My question --
24       A.   Okay.
25       Q.   -- though, is, had Diamond ever
```

Page 69

1  Project?
2      A.   It was information that was mostly the
3  requirement for the Corps in order for our
4  equipment to work on the job.
5      Q.   Okay.  Switching gears a little bit.
6           How many -- I might be overly broad
7  here.  How many ships does Diamond have in its
8  fleet, whether it be barges, whether it be
9  tugboats, can you say approximately?
10     A.   Man, let's see.  20.  25 -- no, not
11 including the boats.  We got 12 boats.  30.  20 to
12 30, I guess.
13     Q.   20 to 30 boats?
14     A.   No.  Not boats, just, you know,
15 dredges, boats, crane barges, crew boats, which are
16 different than tugboats.
17     Q.   How many tugboats does Diamond have in
18 its fleet?
19     A.   Three.  Four.  Sorry.
20     Q.   Four.  Did Diamond have four tugboats
21 in its fleet at the time of the Brady Island
22 Project?
23     A.   Yeah, I think so.
24     Q.   Which tugboats were used on the Brady
25 Island Project that Diamond owned as part of its

Page 70

1  fleet?
2      A.   One tugboat, a 900 horsepower Lady
3  Lafon.
4      Q.   Lady Lafon?
5      A.   Lady Lafon, L-A-F-O-N.
6      Q.   Okay.  And Lady Lafon wasn't the only
7  tugboat that was used on the Brady Island
8  Project --
9      A.   That's correct.
10     Q.   -- by Diamond?
11     A.   That's correct.
12     Q.   Okay.  What other tugboats were used by
13 Diamond on the Brady Island Project?
14     A.   There was a third-party tug from
15 Central Boats.
16     Q.   Central Boats.
17          Do you remember the name of that tug?
18     A.   I think they had two of them over
19 there.  But no, I don't remember the name.
20     Q.   Okay.  I know you talked about Diamond
21 not previously working for Harbor before the Brady
22 Island Project, right?
23     A.   Correct.
24     Q.   Had Diamond ever done any work with RLB
25 before the Brady Island Project?

Page 71

1      A.   No.
2      Q.   Has Diamond done any work with RLB
3  since the Brady Island Project?
4      A.   No.
5      Q.   Has Diamond done any work with Harbor
6  since the Brady Island Project?
7      A.   No.
8      Q.   Okay.  With respect to the Brady Island
9  Project itself, when did Diamond start its work on
10 the Brady Island Project?
11     A.   I'd have to go look at some notes.  I
12 don't know the date.
13     Q.   Sure.  Let's look -- if you wouldn't
14 mind flipping back to the subcontract, I think it
15 was Exhibit No. 3 in front of you.  I'd help you to
16 look, but I'd just get in the way.
17          THE WITNESS:
18              Thank you.
19          MR. SCHNEIDER:
20              Thank you, Mr. Solop.  Did I pronounce
21     that right?
22          MR. SOLOP:
23              Yes.
24 BY MR. SCHNEIDER:
25     Q.   All right.  And you have Exhibit 3 in

Page 72

1  front of you?
2      A.   Yes, I do.
3      Q.   ==All right, Mr. Furlette.  And again,==
4  ==Exhibit 3 is the subcontract between Harbor and==
5  ==Diamond, right?==
6      A.   ==That's correct.==
7      Q.   Okay.  And if you look and go to
8  Article 3 on page 2 of the subcontract -- let me
9  know when you're there.
10     A.   Okay.
11     Q.   You see Article 3?
12     A.   Yes.
13     Q.   It says schedule of work?
14     A.   Yes.
15     Q.   It states, "time is of the essence.
16 Subcontractor" -- meaning Diamond -- shall begin
17 work on or about March 10th, 2020.
18          Did I read that correctly?
19     A.   I guess, yes.  Yes, sir.  You did.
20     Q.   Now that you've seen that excerpt from
21 the subcontract between Harbor and Diamond, does
22 that refresh your recollection of when Diamond
23 began its work on the Brady Island Project?
24     A.   The exact date, no.  But it --
25     Q.   Generally, though?

James 'Jim' Furlette                                                                                      7/29/2022

Page 81
1  payment"?
2      A.    Right.
3      Q.    Let me know when you see that on
4  Article 1.
5      A.    I got it.
6      Q.    Okay.  And it notes under that Article
7  1 under contract payment that contractor, meaning
8  Harbor, agrees to pay subcontractor, meaning
9  Diamond, $2,294,110, right?
10     A.    It says that, yes.
11     Q.    Okay.  But if you go to Article 2,
12 you'll look at the grand total there, under that
13 kind of section, it has a different number, right?
14     A.    It does.
15     Q.    It has $2,428,150, right?
16     A.    Okay.  Yes, sir.
17     Q.    Do you know why there's a difference in
18 that number?
19     A.    No idea.
20     Q.    Okay.  And again, this Exhibit 3 is the
21 subcontract between only Harbor and Diamond, right?
22     MR. MORSE:
23           Object to form.  Go ahead.
24     THE WITNESS:
25           Yes.

Page 82
1  BY MR. SCHNEIDER:
2      Q.    Oh, I wanted to ask you -- on the last
3  page of Exhibit 3, if you wouldn't mind turning to
4  that for me.  Let me know when you're there.
5      A.    All right.
6      Q.    That -- it lists for the signature
7  lines Diamond and Harbor, right?
8      A.    It does.
9      Q.    Okay.  And it looks like to be Roland
10 Maturin's signature for Harbor, from what you can
11 tell?
12     A.    It does.
13     Q.    And whose signature is under Diamond's?
14     A.    Stephen Swiber.
15     Q.    Okay.  Is there a signature line for
16 RLB on this contract?
17     A.    There is not.
18     Q.    Okay.  I want to go back to Exhibit 4
19 now, if you wouldn't mind.  It's going to be the
20 checks that were provided.
21     A.    All right.
22     Q.    There we go.  All right.  If you
23 wouldn't mind turning to the second page for me.
24     A.    (Complies.)
25     Q.    Yeah.  Perfect.

Page 83
1      Q.    If you wouldn't mind looking at that
2  check on the second page for me, I'd appreciate it.
3      A.    Okay.
4      Q.    All right.  Take a gander at it.  Who
5  is that check from?
6      A.    Harbor Dredging.
7      Q.    And who is that check to?
8      A.    Diamond Service.
9      Q.    Okay.  If you wouldn't mind just
10 perusing through all of these checks --
11     A.    It all says the same --
12     Q.    Just real quick --
13     A.    Okay.
14     Q.    -- just to double-check for me.
15     A.    (Complies.)  (Views document.)
16     Q.    Done?
17     A.    Done.
18     Q.    Okay.  Were all the checks you just
19 reviewed checks from Harbor to Diamond?
20     A.    It was.
21     Q.    And all of those checks were for the
22 Brady Island Project?
23     A.    I didn't look at that, but I assume it
24 was, yeah.
25     Q.    Okay.  And from your understanding,

Page 84
1  Harbor was the only company that paid Diamond
2  Services for the Brady Island Project outside that
3  one $950,000 check that was a joint check from RLB
4  to Diamond?
5      A.    Yes.
6      Q.    Okay.  Do you know how much in total
7  Harbor paid Diamond?
8      A.    No, I don't.
9      Q.    All right.  Give me just a moment.
10 Forgive me for the thickness of this one.  This is
11 going to be Exhibit 13.
12           If you wouldn't mind marking that one
13 for me.
14     A.    (Views document.)
15           (Exhibit No. 13 was marked for
16           identification.)
17 BY MR. SCHNEIDER:
18     Q.    All right.  With respect to this first
19 e-mail, page 1 of Exhibit 13, do you see that first
20 page right there?
21     A.    Yeah.
22     Q.    This is An e-mail from Diamond's
23 Mrs. Tardo to Mr. Roland Maturin, right?
24     A.    Yes.
25     Q.    Okay.  Is RLB or anybody with RLB

Page 85

1 copied on this e-mail?
2    A.   No.
3    Q.   But you're copied on this e-mail,
4 correct?
5    A.   Yes.
6    Q.   If you wouldn't mind just perusing
7 through the attachments with this e-mail and kind
8 of let me know what they are.
9         Don't worry, I don't need you to go
10 into any detail, but if you feel it's necessary,
11 don't let me stop you.
12   A.   This is the -- this is the invoices for
13 the tugboat and the fuel for the tugboat.
14   Q.   Okay.  And these are invoices from
15 Diamond to Harbor in instances?
16   A.   They are.
17   Q.   And there are no invoices from Diamond
18 to RLB contained within this packet?
19   A.   That's correct.
20   Q.   And Diamond never issued any invoices
21 to RLB for the Brady Island Project, right?
22   A.   Not to my knowledge.
23   Q.   And there's also, like you mentioned,
24 other invoices from Central Boat Rentals to Diamond
25 and there are invoices from O'Rourke to Diamond,

Page 86

1 right?
2    A.   Invoices from Central Boat to Diamond
3 and what?
4    Q.   And invoices from O'Rourke Marine
5 Services to Diamond?
6    A.   Oh, that was a fuel dock, yes.
7    Q.   And these, again, are invoices for the
8 Brady Island Project?
9    A.   Yes.
10   Q.   And essentially these invoices are
11 invoices to Diamond notifying Diamond that O'Rourke
12 and Central Boat Rentals was looking to Diamond to
13 pay these invoices, right?
14   A.   Correct.
15   Q.   Central Boat and O'Rourke weren't going
16 to look to Harbor to pay these invoices, right?
17   A.   No.
18   Q.   And that's because they were invoiced
19 to Diamond not to Harbor?
20   A.   That's correct.
21   Q.   Okay.  You can go ahead and put that to
22 the side.
23        From your understanding during the
24 project -- during the Brady Island Project, Diamond
25 directed all of its communications to employees of

Page 87

1 Harbor, right?
2    A.   Yep.
3    Q.   Okay.  And when you needed to talk
4 about the Brady Island Project, you talked to
5 people with Harbor?
6    A.   Correct.
7    Q.   You didn't talk to people with RLB?
8    A.   Did not.
9    Q.   Okay.  And with respect to your
10 understanding, you don't recall anybody with
11 Diamond ever talking, during the project itself,
12 with someone at RLB?
13   A.   Oh, yeah.
14   Q.   Oh, yeah, you do recall, or you
15 don't --
16   A.   I recall talking to Randy.
17   Q.   When do you recall talking to Randy?
18   A.   When our crane broke down --
19   Q.   Okay.
20   A.   -- and I had found some parts to fix
21 the crane, and Randy called and said here's who you
22 need to buy the parts from.  And they have them in
23 stock.  You don't have to wait a week.  You
24 can -- I can get them hauled out of Pennsylvania
25 and get them down here a lot quicker than what

Page 88

1 you're talking about your man getting parts for the
2 crane.
3    Q.   And when you're referring to Randy,
4 you're referring to Randy Boyd with RLB?
5    A.   I am.
6    Q.   Other than this one crane incident, if
7 I can call it an incident or matter -- outside of
8 that one crane matter, you directed the vast
9 majority of your communications about the Brady
10 Island Project to Harbor, not RLB?
11   A.   The vast majority, yes.
12   Q.   Okay.  And when you provided the bid
13 for the Brady Island Project, you provided that bid
14 to Harbor, not RLB?
15   A.   That's correct.
16   Q.   Okay.  And when you received
17 information for the Brady Island Project to bid on
18 it, you received that information from Harbor, not
19 RLB?
20   A.   Correct.
21   Q.   You, personally, on behalf of Diamond
22 never requested any payment from RLB for the Brady
23 Island Project, right?
24   A.   Correct.
25   Q.   Do you recall a meeting

Page 89

 1  in approximately September 6th, 2020, at Diamond's
 2  offices between Diamond, Harbor and RLB?
 3       A.   I do.
 4       Q.   Okay.  Who was in attendance at that
 5  meeting?
 6       A.   Myself, Randy Boyd, Roland and Stephen
 7  Swiber.
 8       Q.   Was anybody else in attendance?
 9       A.   No.
10       Q.   Okay.  What was discussed in that
11  September 6th, 2020, meeting?
12       A.   It was about another project that he
13  was looking at doing in the Houston area.
14       Q.   And when you refer to "he," are you
15  talking about Mr. Swiber, or Mr. Boyd?
16       A.   No, I'm sorry.
17       Q.   Okay.
18       A.   It was Randy Boyd had brought another
19  project and he wanted us to look at.
20       Q.   Okay.  Outside of that other project
21  that Mr. Boyd with RLB provided or presented to
22  Diamond, what else was discussed during that
23  meeting from what you recall?
24       A.   I don't remember the details of that,
25  no.

Page 90

 1       Q.   And, generally, not in details, do you
 2  remember what was discussed outside of this other
 3  project?
 4       A.   No.
 5       Q.   Okay.  So, you don't recall from this
 6  meeting Mr. Boyd on behalf of RLB committing to
 7  paying Diamond any money in connection with the
 8  Brady Island Project?
 9       A.   No, I don't.
10       Q.   Okay.  I know you kind of talked about
11  this generally earlier, but I just want to cover my
12  bases.
13            With respect to the request for
14  equitable adjustment that was made to the Corps,
15  what was your involvement with that request for
16  equitable adjustment that was made to the Corps?
17       A.   As I said, Roland gave me the website
18  that I gave to Stephen to -- in order to work up an
19  hourly rate for an extra claim.
20       Q.   Okay.  So, no one from RLB presented a
21  website or any other information or request to you
22  as part of the request for equitable adjustment?
23       A.   That's correct.
24       Q.   All of your communications in
25  connection with this request for equitable

Page 91

 1  adjustment were made with Harbor or someone with
 2  Harbor?
 3       A.   That's correct.
 4       Q.   Okay.  And you do recall that there was
 5  several amended or variations of this request for
 6  equitable adjustment made to the Corps, right?  For
 7  example, there wasn't just one request made and
 8  bam, the Corps paid it, right?
 9       A.   That's correct.
10       Q.   Okay.  I want to go back to that
11  Exhibit 10.  It's that March 5th, 2020, e-mail --
12  2021 e-mail.  I'm sorry.  It's the one from you to
13  Mr. Maturin.
14       A.   That's it right there.  Just got to --
15       Q.   That's it.  There you go.
16            Do you have the Exhibit 10 in front of
17  you?
18       A.   I do.
19       Q.   Okay.  And again, on page 1, that's an
20  e-mail from you to Mr. Maturin with Harbor?
21       A.   Right.
22       Q.   And it's dated March 5th, 2021?
23       A.   Right.
24       Q.   And the subject line is "account for
25  RLB"?

Page 92

 1       A.   Okay.
 2       Q.   And it states in this e-mail, "this is
 3  where we are at," right?
 4       A.   Yeah.
 5       Q.   And then the attachment that you
 6  provided is this A/R aged analysis detail, right?
 7       A.   Yeah.
 8       Q.   Okay.  Did you prepare this A/R aged
 9  analysis detail?
10       A.   I did not.
11       Q.   Okay.  But it's your handwriting on
12  portions of this A/R aged analysis detail?
13       A.   Correct.
14       Q.   And, again, we talked about it earlier,
15  it's your handwritten notes that say $500,000 for
16  extra work?
17       A.   Correct.
18       Q.   Now that you've had time to think about
19  it and looking at this again, do you recall what
20  that note about $500,000 for extra work was about?
21       A.   No, I do not.
22       Q.   Sitting here today, what do you think
23  that $500,000 for extra work was about?
24       A.   I -- I have -- extra work for the job
25  at Harbor Dredging -- I mean at Brady Island.

Page 93
1  Q. Okay. So, it could have entailed the
2 entirety of the extra work performed by Diamond for
3 the Brady Island Project?
4  A. Could have.
5  Q. Okay. I want to bring out -- what was
6 exhibit -- give me just a moment. Now I got to
7 play the same fiddle you had been. It is the
8 Exhibit 11 for me. It's a letter dated
9 October 29th, 2021, from Harbor Dredging to Diamond
10 Services.
11     Let me know when you have it in front
12 of you.
13  A. (Views document.) I got it in front of
14 me.
15  Q. Okay. And if you look at the attention
16 line, the attention line in Exhibit 11 is directed
17 towards you, Jim Furlette, VP of operations, right?
18  A. Yes, it is.
19  Q. And if you look at the address line for
20 Diamond Services Corporation, is that the correct
21 address for Diamond?
22  A. No.
23  Q. That's not the correct address?
24  A. Not the mailing address.
25  Q. Not the mailing address. If something

Page 94
1 was sent to that address, would Diamond have
2 received it?
3  A. No.
4  Q. No.
5     So, you don't recall ever seeing what's
6 been marked as Exhibit 11?
7  A. That's correct.
8  Q. Do you recall ever talking to anybody
9 about the information contained in Exhibit 11, for
10 example, the reconciliation --
11  A. Sure.
12  Q. -- of the amount of yards on the
13 project?
14  A. Yes.
15  Q. Do you remember talking to Mr. Maturin
16 about that?
17  A. Correct.
18  Q. And with respect -- it mentions also
19 that $950,000 payment that we've been talking about
20 previously, right?
21  A. It does.
22  Q. And you recall talking to Mr. Maturin
23 about that $950,000 payment, right?
24  A. Yes.
25  Q. And I think you referred to it earlier,

Page 95
1 you had conveyed to Mr. Maturin after speaking with
2 Mr. Swiber that the $950,000 payment was the bottom
3 line for Diamond?
4     MR. MORSE:
5         Object to form.
6     THE WITNESS:
7         If that was all the Corps was going to
8     give, correct.
9 BY MR. SCHNEIDER:
10  Q. Okay. So when you say "if that's all
11 the Corps was going to give," your agreement on
12 behalf of Diamond with Harbor was that Diamond
13 would accept $950,000 as the final payment if
14 that's all the Corps was going to give?
15  A. Correct.
16     MR. MORSE:
17         Object to form.
18     THE WITNESS:
19         Correct.
20 BY MR. SCHNEIDER:
21  Q. And was it your understanding that
22 Mr. Maturin with Harbor was going to convey that
23 information to Mr. Boyd with RLB?
24  A. Yes, sir.
25  Q. And as we sit here today, do you

Page 96
1 understand that Mr. Maturin did convey to Mr. Boyd
2 that Diamond would accept $950,000 as its final
3 payment for the Brady Island Project if that's all
4 the Corps would give?
5  A. I can't say that.
6  Q. Okay.
7     MR. SCHNEIDER:
8         Can we go off the record for just a
9     moment just to look at a couple things.
10     MR. MORSE:
11         Of course.
12     THE VIDEOGRAPHER:
13         Off the record. The time is 12:01.
14     (Off the record.)
15     THE VIDEOGRAPHER:
16         Returning to the record, it's 12:06.
17 BY MR. SCHNEIDER:
18  Q. All right. Mr. Furlette, we're back on
19 the record. You understand you're still under
20 oath, right?
21  A. Correct.
22  Q. And after we've taken a short break and
23 you had a moment to think about any of the answers
24 that you've given to the questions provided today,
25 do you have any clarifications that you want to

Page 97

1  provide or can we rely on what answers you provided
2  thus far in the deposition?
3       A.   I didn't even think about it.
4       Q.   So, for the best you recall, we can
5  rely on your answers?
6       A.   Absolutely.
7       Q.   Okay.
8       MR. SCHNEIDER:
9            I'm going to try to play an audio
10       recording as Exhibit -- I think it's going to
11       be 14.
12           I may look like I should be tech savvy.
13       I'm not.  So forgive me here as I'm going to
14       try to bring this up.  I'm going to turn it
15       up a little if I can.
16           And I will provide a copy to the court
17       reporter afterwards.  So I'm going to try to
18       start this.
19       (Exhibit No. 14 was marked for
20       identification.)
21       (Audio recording playing.)
22  BY MR. SCHNEIDER:
23      Q.   So far, can you hear it just fine,
24  Mr. Furlette?
25      A.   I can.

Page 98

1       Q.   I'm just going to play the whole audio
2  recording and then ask you some questions at the
3  end, okay?
4       A.   Sure.
5       (Audio recording playing.)
6  BY MR. SCHNEIDER:
7       Q.   All right.  That's the end of the
8  recording, Mr. Furlette.  Just to confirm, that's
9  your voice on that recording, correct?
10      A.   Uh-huh.
11      Q.   I'm sorry, what was that?
12      A.   Oh, yeah.
13      Q.   Is that a "yes," that is your voice?
14      A.   Yes, that is my voice.
15      Q.   And that was a conversation between you
16  and Harbor's Mr. Maturin, correct?
17      A.   Yeah.  Yes.
18      Q.   That's a "yes"?
19      A.   Yes, that's correct.
20      Q.   And you were discussing the Brady
21  Island Project on that call, right?
22      A.   Yes, we were.
23      MR. SCHNEIDER:
24           That's all the questions that I have
25      for you today, Mr. Furlette.  There may be

Page 99

1       further questioning in the future per an
2       agreement with your counsel for Diamond, but
3       as of right now, I pass the witness.
4       MS. DAILY:
5            No questions for Travelers.
6       MR. MORSE:
7            No questions.
8       MR. SOLOP:
9            Thank you, and you're excused.
10      MR. SCHNEIDER:
11           Thank you very much, Mr. Furlette.
12      THE VIDEOGRAPHER:
13           This concludes the deposition.  We're
14      now off the record.  The time is 12:13.
15  (At this time, 12:13 p.m., testimony was
16  concluded and the record was closed.)

Page 100

1            REPORTER'S CERTIFICATE
2
3       I, QUINCEE B. ROCCAFORTE, Certified Court
   Reporter in and for the State of Louisiana,
   Certificate No. 21016, as the officer before whom
4  this testimony was taken, do hereby certify that
   JAMES "JIM" FURLETTE, after having been duly sworn
5  by me on July 29, 2022, upon authority of R.S.
   37:2554, did testify as hereinbefore set forth in
6  the foregoing 99 pages;
        That this testimony was reported by me in the
7  stenotype reporting method, was prepared and
   transcribed by me or under my personal direction
8  and supervision, and is a true and correct
   transcript to the best of my ability and
9  understanding;
        That the transcript has been prepared in
10 compliance with transcript format guidelines
   required by statute or by rules of the board, and
11 that I am informed about the complete arrangement,
   financial or otherwise, with the person or entity
12 making arrangements for deposition services;
        That I have acted in compliance with the
13 prohibition on contractual relationships, as
   defined by Louisiana Code of Civil Procedure
14 Article 1434 and in rules and advisory opinions of
   the board;
15      That I have no actual knowledge of any
   prohibited employment or contractual relationship,
16 direct or indirect between a court reporting firm
   and any party litigant in this matter or is that
17 any such relationship between myself and a party
   litigant in this matter.
18      I am not related to counsel or to the parties
   herein, nor am I otherwise interested in the
19 outcome of this matter.
20
        Dated this 8th day of August, 2022.
21
22
23      _____
24          QUINCEE B. ROCCAFORTE, CCR, RPR
            Certificate No. 21016
25