# EXHIBIT 4

Randy Boyd                                                                    8/11/2022

### Page 1

```
 1            UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
 2
   UNITED STATES OF AMERICA
 3 For the use and benefit of       CIVIL ACTION NO:
   DIAMOND SERVICES CORPORATION        3:21-cv-00253
 4
     VERSUS                          DISTRICT JUDGE
 5                                HON. JEFFREY BROWN
   RLB CONTRACTING, INC.,
 6 HARBOR DREDGING, INC., and      MAGISTRATE JUDGE
   TRAVELERS CASUALTY & SURETY   HON. ANDREW M. EDISON
 7 COMPANY OF AMERICA

 8

 9              ORAL DEPOSITION

10                    OF

11               RANDY BOYD

12

13         Taken at Winstead, PC
         600 Travis Street, Suite 5200
14              Houston, Texas

15
   August 11, 2022                       10:19 a.m.
16
```

### Page 2

```
 1 APPEARANCES:
 2 FOR DIAMOND SERVICES:
 3             BOHMAN | MORSE, LLC
               400 Poydras Street
 4             Suite 2050
               New Orleans, Louisiana  70130
 5        By:  Harry Morse
               Harry@bohmanmorse.com
 6
   FOR TRAVELERS:
 7
               KREBS | FARLEY, PLLC
 8             400 Poydras Street
               Suite 2500
 9             New Orleans, Louisiana  70130
          By:  Mdaily@krebsfarley.com
10
11 FOR HARBOR DREDGING:
12             BIGGS, PETTIS, INGRAM & SOLOP, PLLC
               111 Capitol Building
13             111 East Capitol Street
               Suite 101
14             Jackson, Mississippi  39201
          By:  Christopher Solop
15             Csolop@bpislaw.com
16
   FOR RLB:
17
               WINSTEAD, PC
18             600 Travis Street
               Suite 5200
19             Houston, Texas  77002
          By:  Mark Guthrie
20             MGuthrie@Winstead.com
21 REPORTED BY:  Sarah B. Townsley, CCR, CSR, CRR
22 ALSO PRESENT:  Stephen Swiber
23
24
25
```

### Page 3

```
 1                 STIPULATIONS
 2    IT IS HEREBY STIPULATED BY AND BETWEEN COUNSEL FOR
 3 THE PARTIES HEREIN THAT THE ORAL DEPOSITION OF RANDY
 4 BOYD WAS TAKEN BEFORE SARAH B. TOWNSLEY, CRR, CCR, CSR,
 5 RPR, CERTIFIED REALTIME REPORTER IN AND FOR THE STATES
 6 OF TEXAS AND LOUISIANA, PURSUANT TO NOTICE AND IN
 7 ACCORDANCE WITH THE FEDERAL RULES OF CIVIL PROCEDURE AS
 8 PROVIDED BY LAW, ON AUGUST 11, 2022;
 9    THE PARTIES HEREBY WAIVE ALL FORMALITIES IN
10 CONNECTION WITH THE TAKING OF THE DEPOSITION, WITH THE
11 EXCEPTION OF THE SWEARING OF THE WITNESS AND THE
12 REDUCTION OF THE QUESTIONS AND ANSWERS TO TYPEWRITING;
13    THE RIGHT OF THE WITNESS TO READ AND SIGN A COMPLETED
14 TRANSCRIPT OF TESTIMONY IS SPECIFICALLY RESERVED;
15    COUNSEL FOR ALL PARTIES RESERVE ALL OBJECTIONS EXCEPT
16 AS TO THE FORM OF THE QUESTION AND RESPONSIVENESS OF THE
17 ANSWER AT THE TIME OF TAKING OF SAID DEPOSITION, AND
18 THEY ALSO RESERVE THE RIGHT TO MAKE OBJECTIONS AT THE
19 TIME THAT TAKING OF SAID DEPOSITION OF ANY PART THEREOF
20 MAY BE OFFERED INTO EVIDENCE, WITH THE SAME RIGHTS AS IF
21 THE TESTIMONY HAD BEEN GIVEN IN OPEN COURT;
22    SARAH B. TOWNSLEY, CCR, CSR, RPR, OFFICIATED IN
23 ADMINISTERING THE OATH TO THE WITNESS.
24
25
```

### Page 4

```
 1                     INDEX
 2 EXAMINATION BY                          PAGE NO.
 3 Mr. Morse                                   5
 4
 5                    EXHIBITS
 6 NO.     DESCRIPTION                     PAGE NO.
 7 1       2/24/2020 subcontract               29
 8 2       subcontract                         29
 9 3       10/26/2020 REA                      59
10 4       letter                              90
11 5       Harbor certified costs              96
12 6       second REA                         101
13 7       revision                           111
```

Randy Boyd 8/11/2022

Page 5

1 PROCEEDINGS:
2                    RANDY BOYD,
3 having been first duly sworn by the court reporter,
4 testified on oath as follows:
5           COURT REPORTER:   We're on the record at
6 10:09 a.m.  Can all parties please state your
7 appearances for the record?
8           MR. GUTHRIE:      Mark Guthrie, RLB
9 Contracting.
10          MR. MORSE:        Harry Morse on behalf of
11 Diamond Services, Incorporated.
12          MR. SOLOP:        Christopher Solop
13 representing Harbor Dredging.
14          MR. DAILY:        Megan Daily, representing
15 Travelers Casualty & Surety Company of America.
16                [Witness was sworn.]
17 EXAMINATION BY MR. MORSE:
18   Q.   Mr. Boyd, my name is Harry Morse.  I represent
19 Diamond Services Corporation.  Have you ever given a
20 deposition before?
21   A.   Yes.
22   Q.   So you know the ground rules.  I'm going to go
23 over a couple with you, nonetheless, all right?
24   A.   Yes.
25   Q.   The first is, you're already doing a great job

Page 6

1 of waiting till I finish my question before you start
2 talking.  It's good if we don't talk over one another;
3 fair deal?
4   A.   Yes.
5   Q.   The second is this:  At some point today, I'm
6 going to talk too fast, or I'm going to say something
7 stupid or confusing.  When I do that, if you don't
8 understand the question, I want you to stop me, and I
9 want you to tell me you don't understand the question.
10 Fair deal?
11  A.   Yes, sir.
12  Q.   If you answer a question, I'm going to assume
13 you understood it, and if I ask you the same question
14 again when you're on the stand, I'm going to expect the
15 same answer; fair deal?
16  A.   I understand.
17  Q.   This is not a memory test.  If "I don't know" is
18 the answer, that's fine for me, all right?
19  A.   Yes, sir.
20  Q.   You're here in your personal capacity.  You're
21 not here on behalf of RLB; understood?
22  A.   Yes, sir.
23  Q.   If you need a break at any time, you're more
24 than free to take a break.  The one rule that I'm going
25 to enforce is this:  If I ask you a question, you've

Page 7

1 got to answer the question before you take a break, all
2 right?
3   A.   Yes, sir.
4   Q.   Back to this not being a memory test, if there's
5 a document that you think would help you answer a
6 question or you'd like to refer to, by all means, do
7 that, all right?
8   A.   Yes.
9   Q.   I may not have them all in front of me, but I'm
10 sure that we can get them if you need to look at them,
11 all right?
12  A.   Yes.
13  Q.   You understand you're under oath, right?
14  A.   Yes, sir.
15  Q.   No different than if a judge were standing right
16 here, right?
17  A.   Yes, sir.
18  Q.   All right.  I'm going to start at the beginning,
19 and, like I said, if you need me to back up and tell
20 you where I'm coming from, I'm happy to do that, all
21 right?
22  A.   Yes.
23  Q.   What I'd like to do -- and I've had the chance
24 to review your CV which your counsel sent to me, but
25 I'd like a brief sketch of your educational and work

Page 8

1 background.  You graduated from which high school?
2   A.   Calhoun High School.
3   Q.   And you have some certifications past that?
4   A.   Yes, sir.
5   Q.   Your work experience is all in dredging, right?
6   A.   Yes, sir.  Much -- most of it.
7   Q.   Fair.  Give me -- let's work backwards in time.
8 RLB was created when?
9   A.   RLB was incorporated May 15th of 2000.
10  Q.   So that makes it a little bit over 22 years old
11 now, right?
12  A.   Yes, sir.
13  Q.   Who owns RLB?
14  A.   Our shareholders are my wife, myself, and our
15 children.
16  Q.   Understood.  What is your role in the company?
17  A.   I am the president of the company.
18  Q.   Who are the other executives of RLB?
19  A.   My wife is the secretary/treasurer/CEO.
20  Q.   Understood.  Are there any other executives
21 beyond the two of you?
22  A.   No.
23  Q.   RLB does dredging work?
24  A.   Yes, sir.
25  Q.   Is there any other work that RLB does?

Randy Boyd                                                              8/11/2022

Page 57

1  Q.  After the measured mile analysis, how often was
2  the off-loader barge waiting on --
3  A.  I don't recall.
4  Q.  Is there --
5  A.  It varied.
6  Q.  Understood.  In your mind, before the measured
7  mile analysis, was it a problem that the off-loader
8  barges was waiting -- excuse me -- barge was waiting on
9  full hopper barges with dredge spoil?
10  A.  Yes.
11  Q.  Did you bring that to anybody's attention?
12  A.  I brought it to Roland Maturin's attention.
13  Q.  What did you say?
14  A.  I told Roland that we needed to get the barges
15  there.
16  Q.  And what did he say?
17  A.  I don't recall.
18  Q.  Did you have that conversation once?  Twice?
19  A.  I don't recall.
20  Q.  Do you know when you had that conversation?
21  A.  No, sir, I do not, no.  Not over the --
22  Q.  I apologize.  I spoke over you.
23  A.  Not over the duration of the job.
24  Q.  Do you know whether you had that conversation in
25  person or over the phone?

Page 58

1  A.  I don't recall.
2  Q.  Did you commit anything to writing about that?
3  A.  We could have.
4  Q.  You're not sure one way or the other?
5  A.  No, sir, I'm not sure.
6  Q.  All right.  Did you and Mr. Maturin text back
7  forth?
8  A.  We could have.
9  Q.  You're not sure one way or the other?
10  A.  We have before.
11  Q.  All right, but about this, you don't know?
12  A.  I don't recall.
13  Q.  After the measured mile analysis, did you have
14  any communications with Mr. Maturin about:  Hey, what's
15  up, Mr. Maturin?  We're waiting on these barges.
16  A.  I don't recall.
17  Q.  Did you commit any of that to writing?
18  A.  I don't recall.
19  Q.  All right.  If -- you told me, I think, that, to
20  the best of your recollection, during the measured mile
21  analysis, that ten days, 8-1/2 percent of the delay was
22  waiting on full hopper barges, right?
23  A.  The pump-off barge was down 8-1/2 percent of the
24  time that it could have been off-loading in that 240
25  hours when it did not have barges to unload.

Page 59

1  Q.  Understood.  I'm going to hand you what I'll
2  mark as Exhibit 3.
3           [Exhibit 3 was marked.]
4  BY MR. MORSE:
5  Q.  Exhibit 3 is -- would it be fair for me to call
6  it the first REA?
7  A.  First attempted REA.
8  Q.  Sure.  Ends up coming to nothing, right?
9  A.  I don't understand what you mean.
10  Q.  That's fair.  That's sort of vague on my part.
11  The Army Corps of Engineers never acted on the first
12  attempted REA, correct?
13  A.  There was never any settlement based on this REA
14  as submitted.
15  Q.  Sure.  RLB never got money as a result of
16  Exhibit 3, the October 26, 2020, REA, right?
17  A.  State your question again.
18  Q.  That's fair.  I'm not trying to confuse you,
19  here, Mr. Boyd.  Everything -- RLB submitted an October
20  26, 2020, REA, right?
21  A.  Yes, sir, we submitted an REA.
22  Q.  What happened with it?
23  A.  That REA was subsequently withdrawn.
24  Q.  And then a new REA was submitted, right?
25  A.  Correct.

Page 60

1  Q.  Why was it withdrawn?
2  A.  Because it had some errors and because, when we
3  discussed negotiations, the Corps wished for us to
4  waive all other claims, and this only encompassed a
5  piece of the job; not the entire job.
6  Q.  So is my understanding correct, then, that you
7  only effectively got to do the REA once, right?
8  A.  Yes, sir.
9  Q.  So if you did this one, you couldn't do one
10  later?
11  A.  We were trying to get the Corps to allow us to
12  do multiple REAs.
13  Q.  I understand.
14  A.  We were under the understanding the Corps was
15  going to allow multiple REAs so that RLB could get cash
16  flow, because this is a substantial amount of damage
17  that's going on.
18  Q.  Sure.
19  A.  When we got to a point where the Corps told us:
20  No, this is a one-time deal, then RLB backed out and
21  said:  No, sir, we can't have it as a one-time deal.  It
22  doesn't cover everything.
23  Q.  Sure.  In October of 2020, was the differing
24  site conditions still something that RLB was wrestling
25  with?

Randy Boyd                                                                8/11/2022

Page 93

1 logs, do you?
2           MR. GUTHRIE:    Object to the form.
3    A.   I don't know.  I haven't reviewed them.
4    Q.   You'd have to look at them to say whether you
5 could dispute them or not, fair?
6    A.   Yes.
7    Q.   So, by December 14th of 2020, the job is done?
8    A.   Possibly.
9    Q.   The dredging is definitely done?
10          MR. GUTHRIE:    Object to the form.
11   A.   Yes, to the best of my knowledge, it is.
12   Q.   All right.  When did RLB start working on its
13 second REA?
14   A.   I would believe that we started immediately
15 after the first REA was withdrawn.
16   Q.   Which is, to the best of anybody's
17 recollection -- or, at least, the best of your
18 recollection, which is all you can testify to -- plus or
19 minus December of 2020?
20   A.   Yes, sir.
21   Q.   To submit the second REA, RLB needed certified
22 costs from its contractor, right?
23   A.   RLB was requested, from the Corps of Engineers,
24 to have certified costs from our first-tier
25 subcontractor, Harbor Dredging, and they requested that

Page 94

1 Harbor Dredging have certified costs from their
2 first-tier or second-tier subcontractor, Diamond
3 Services.
4    Q.   Let me pause you right here.  We've gone, in
5 brief, through the job from February.  Now we're in
6 December, right?
7    A.   Yes, sir.
8    Q.   One of RLB's responsibilities was supervision of
9 the job, right?
10   A.   Yes, sir.
11   Q.   You said, I think, earlier that you don't
12 remember precisely when you became aware of Diamond
13 being out there; is that fair?
14   A.   I would say yes.
15   Q.   Now, I want to talk about in December of 2020.
16 Over the course of the job, did RLB learn what Diamond's
17 role was?
18   A.   We learned that Diamond had equipment on the
19 job.
20   Q.   All right.  Did you know which equipment was
21 Diamond's and which was Harbor's?
22   A.   I don't recall.
23   Q.   Do you know whether any of the equipment was
24 Harbor's?
25   A.   I don't recall.

Page 95

1    Q.   Do you know which of the personnel were
2 Diamond's and which were Harbor's?
3    A.   I knew that Harbor had one person out there
4 under their direct employment and had a subcontractor
5 under their direct -- direction.
6    Q.   Understood.  At this point, now, in December of
7 2020, had you seen the contract between Diamond and
8 Harbor?
9    A.   No, sir.
10   Q.   Did you know who owned the dredge?
11   A.   No, sir.
12   Q.   Did you know who owned the barges?
13   A.   No, sir.
14   Q.   Did you know who owned the tug?
15   A.   No, sir.
16   Q.   Do you recall, at this point in December of
17 2020, anything about the tug Carolyn?
18   A.   I don't recall.
19   Q.   You don't recall any discussions with Roland
20 Maturin about a second tug, do you?
21   A.   I don't recall.
22   Q.   All right.  The Corps told you that you needed
23 certified costs from Harbor, and Harbor needed
24 certified costs from Diamond; is that right?
25   A.   Yes, sir.

Page 96

1    Q.   Did you communicate that with Harbor?
2    A.   Yes, sir.
3    Q.   What did you do?  How did you say it?  Who did
4 you talk to?
5    A.   I don't recall how it was communicated.  Hillary
6 probably communicated with them.
7    Q.   Now, safe to say, then, you don't know what was
8 communicated?
9    A.   Yes, sir.  I wasn't involved in the
10 communication, I don't believe.
11   Q.   Sure, sure.  You received from Harbor a
12 certified claim, right?
13   A.   No, sir.
14   Q.   You didn't receive a certified -- certified
15 costs from Harbor?
16   A.   You said a certified claim.
17   Q.   I misspoke.  My apologies.  You received
18 certified costs from Harbor, right?
19   A.   Yes, sir.
20   Q.   I'm handing those, which I'll mark as Exhibit
21 No. 5, to you.
22          [Exhibit 5 was marked.]
23 BY MR. MORSE:
24   Q.   You received this from Harbor on or about March
25 30, 2021, right?

Randy Boyd                                                                    8/11/2022

Page 97

1   A.   RLB did, yes, sir.
2   Q.   Right.  Do you know to whom it was sent?
3   A.   It may have came to my attention.  May have came
4 to Hillary.
5   Q.   It says "Randy Boyd" at the top, but whether it
6 actually came to you or Hillary, you can't say, right?
7   A.   Yes, sir.
8   Q.   What did RLB do when it received Harbor's
9 certified costs?
10  A.   We utilized the certified costs within the REA
11 that we were preparing.
12  Q.   Understood.  Utilized how?
13  A.   To show the cost of Harbor Dredging.
14  Q.   RLB also included Diamond's certified costs,
15 too, right?
16  A.   Yes, in the claim outlay, we included it because
17 the Corps had asked for it to be certified and done in
18 that manner.
19  Q.   Sure.  You were following the Corps' instruction
20 there, right?
21  A.   Well, there's two different things you have to
22 understand.
23  Q.   Please.
24  A.   Harbor's certified cost from their
25 subcontractor, diamond, realistically, to RLB, should

Page 98

1 be 6.50 a yard, because that's what Harbor was paying.
2 Diamond, being a second-tier subcontractor or
3 first-tier to Harbor, allows Diamond to take their
4 costs with their overheads and their profits on it, to
5 give that cost to declare what their cost is for the
6 job, for this duration.
7   Q.   I appreciate that explanation, but I apologize.
8 I don't understand it.  Can you unpack that little bit
9 for me, please?
10  A.   You're dealing with a cost from a point in time
11 to a point in time.  Harbor Dredging is my
12 subcontractor, RLB Contracting's subcontractor.  For
13 RLB to ask Harbor for their certified costs, their
14 certified costs, the costs that they paid to Diamond,
15 is 6.50 a yard, so that would be their cost.  To
16 include Diamond as a second-tier subcontractor, which
17 is what they were, a subcontractor, and that's what the
18 Corps recognized.  They were Harbor's subcontractor,
19 then Diamond was allowed the ability to take their
20 costs, multiply it by their overheads and their profits
21 and come up with this 2-million-362.  If they hadn't
22 done this and the Corps had not allowed that
23 second-tier subcontractor to certify his costs, and
24 only allowed RLB to certify what Harbor was giving
25 them, Harbor would have taken the 317 thousand yards

Page 99

1 plus the change, multiplied it by 6.50 a yard, and said:
2 This is my cost, to their subcontractor, which would
3 have been a lesser cost than what this is.
4   Q.   I believe that I follow you, but I'm going to
5 ask some follow-ups to make sure, all right?  As I
6 understand your testimony, Diamond's contract gives
7 diamond 6.50 per yard, right?
8   A.   To -- from Harbor Dredging.
9   Q.   Sure.  Harbor owes Diamond 6.50 per yard,
10 dredged by Diamond, right?
11  A.   Diamond is Harbor Dredging's subcontractor.
12  Q.   Right.
13  A.   I have nothing to do with how they're paying or
14 what their contract is, or anything else.
15  Q.   Sure.
16  A.   So Diamond's cost -- I'm sorry, Harbor's cost
17 for the performance of dredging of that dredging work
18 is 6.50 a yard, and if Harbor was going to certify
19 their cost, their cost is 6.50 a yard, so by the Corps
20 allowing you to go to the second-tier subcontract and
21 asking for that, they're allowing Diamond to recover
22 their overheads and profits in their cost to Harbor,
23 which is now relayed to RLB.
24  Q.   I understand.  Should the Corps not have done
25 that?

Page 100

1   A.   No, sir.  That is the proper way for it to be
2 done.
3   Q.   Okay.  So this is a Corps contract, right?
4   A.   Yes, sir.
5   Q.   What the Corps says goes, right?
6   A.   Yes, sir.
7   Q.   So the Corps allowed Diamond to submit its
8 certified cost to Harbor, and Harbor to submit its
9 certified costs to RLB, right?
10  A.   Yes, sir.
11  Q.   And, in fact, RLB took those certified costs and
12 submitted to the Corps, right?
13  A.   We took those certified costs, utilized them
14 inside of a measured mile to show the
15 non-productiveness to calculate what additional cost
16 should be put on this.  In actuality, Diamond has
17 certified 2,362 thousand and some change of costs to do
18 their performance of dredging.  Under the contract,
19 they were paid over 2 million.  The maximum amount of
20 their damage right there is three hundred thousand.  If
21 they get everything they're asking for, the maximum
22 amount of their damage is 3 hundred thousand.
23  Q.   The REA is in addition to the contract, right?
24       MR. GUTHRIE:   Object to the form.
25  A.   Yes.  The REA is in addition to the contract,

Randy Boyd                                                                8/11/2022

Page 113

1 revise their cost.
2  Q.  Did you speak with Harbor before you did that?
3  A.  I don't recall.
4  Q.  Did you speak with Diamond before you did that?
5  A.  I don't recall.
6  Q.  You knew that Diamond had expressly asked to be
7 included in this process, didn't you?
8  A.  Again, I don't recall.
9  Q.  You got a letter from me in which Diamond asked,
10 in no uncertain terms, to be included in this process,
11 right?
12  A.  Yes, sir.
13  Q.  Did you include Diamond in the process?
14  A.  I don't recall.
15  Q.  Do you have any writing going to Diamond saying:
16 You know, here's what we're doing?
17  A.  Sir, I don't recall.
18  Q.  Did you have any conversation with Stephen
19 Swiber about, hey, Mr. Swiber, Stephen, here's what
20 we're doing?
21  A.  I don't recall.
22  Q.  Did you have any conversation with Mr. Maturin
23 about, hey, Mr. Maturin, here's what we're doing?
24  A.  I may have.  I don't recall.
25  Q.  Just can't say one way or the other?

Page 114

1  A.  I can't say one way or the other.
2  Q.  The gross effect of the revision was to bring
3 the total claim from 8.8 million to 6.6 million, right?
4  A.  Yes, sir.
5  Q.  And then, in fact, RLB got 6 million dollars
6 from the Corps?
7  A.  RLB negotiated this and accepted a 6 million
8 dollar value after -- prior to that negotiation, RLB, I
9 personally spoke to Roland Maturin and said:  What will
10 you take for your portion?  I would recommend that you
11 go to Diamond, get what they'll take for their portion
12 of this settlement.  Your damage, according to the
13 revised REA, is a-million-670.  That's your total
14 damage for Harbor.  That includes Diamond's damages in
15 it.  We know we probably won't get the 6.6 million, so
16 I need to know what y'all's bottom-line number is so I
17 can make a decision on what our bottom-line number is.
18 And I depended on that during that negotiation.
19  Q.  And Mr. Maturin told you what?
20  A.  Mr. Maturin came back to me and told me that it
21 was 1 million 450 thousand and, of that, five hundred
22 thousand was for them, and that 950 thousand was for
23 Diamond.
24  Q.  Now, let me pause you there.  We talked about
25 the contract rate of 12 dollars per yard, right?

Page 115

1  A.  Yes, sir.
2  Q.  Now, you're aware, sitting here today, although
3 you probably were not at the time, that, of the 7
4 dollars per yard under the contract price that went to
5 Harbor, 6.50 went to Diamond, right?
6  A.  Sir, this damage and this REA has nothing to do
7 with the contract price.
8  Q.  I'd like for you to answer the question that I
9 asked you, please, sir.
10  A.  I'm trying to answer.
11  Q.  Go ahead.
12  A.  The REA has nothing to do with the contract
13 price.  It has to do with the increased costs on top of
14 the 7 dollars Harbor was getting, on top of the five
15 dollars RLB was getting.
16  Q.  I understand.
17  A.  And who that cost went to, and who, again, has
18 claim to that money, and that's what the REA documents.
19  Q.  What are the increased costs to RLB because of
20 the differing site condition?
21       MR. GUTHRIE:    Object to the form.
22  A.  A little less than five million dollars.
23  Q.  How was that calculated?
24  A.  Again, when you take the total value of the
25 claim at 6-million-636, and you take away the

Page 116

1 subcontractor cost, the subcontractor's damage partial
2 is one-million-six.  That leaves five million and some
3 change.
4  Q.  I appreciate that answer.  I might have asked an
5 unclear question.  How did RLB incur approximately five
6 million dollars in additional expense as a consequence
7 of the differing site condition?
8  A.  Labor, equipment, and all of our costs that went
9 on.
10  Q.  Sure.  Which of those did Diamond not incur?
11  A.  Many.  Diamond has certified their cost at what
12 their cost is.
13  Q.  Of the five million dollars that RLB got, how
14 much of that went to RLB for RLB's direct cost versus
15 RLB's overhead?
16       MR. GUTHRIE:    Object to the form.
17  A.  I didn't divide it out.
18  Q.  You put it in the REA, though, right?
19       MR. GUTHRIE:    Object to the form.
20  A.  Again, the REA is showing the cost in accordance
21 with FAR.
22  Q.  That includes RLB's overhead?
23  A.  Yes, sir.
24  Q.  That includes RLB's overhead on Harbor's claim?
25  A.  That includes RLB's overhead as allowable to be

Randy Boyd 8/11/2022

Page 117

1 charged under this REA.
2  Q. Which includes RLB's overhead of Harbor's?
3  A. It includes RLB's overhead on everything.
4  Q. Sure. Including Harbor's claim?
5  A. That is part of everything, I would believe.
6  Q. Sure. Including RLB's profit on Harbor's claim?
7  A. I don't understand what you're trying to say,
8 here.
9  Q. The same thing with regard to overhead as
10 regards profit, right? RLB added 9 percent profit to
11 Harbor's claim in submitting the REA to the Corps,
12 right?
13  A. RLB used a 9-percent profit factor.
14  Q. Sure. Of the five million dollars-ish, that RLB
15 got for RLB from the Corps, how much of that is
16 overhead?
17      MR. GUTHRIE:   Object to the form.
18  A. Again, when this is negotiated down, I did not
19 go out and redistribute moneys. We received
20 approximately whatever the number would be,
21 four-million-550, so we didn't receive everything that
22 we asked for in here.
23  Q. Sure. Did you break do you know how much of the
24 money you got goes to what category?
25      MR. GUTHRIE:   Object to the form.

Page 118

1  A. No, sir. What do you mean by "what category", I
2 guess.
3  Q. Sure. You have what I'm going to call hard
4 costs, right? You had to pay people more because that
5 you were out there for longer than you expected them to
6 be because of the differing site condition, right?
7  A. Yes, sir.
8  Q. You had equipment out there for longer, and that
9 has a value, too, right?
10  A. Yes, sir.
11  Q. I'm going to call those hard costs. Are we on
12 the same page?
13  A. That's fine.
14  Q. All right. If we wanted to figure out what
15 those hard costs are, we can look at the spreadsheets
16 in the REA to figure that out, right?
17  A. You can look at the REA and the spreadsheets to
18 figure out what the costs are that were developed
19 utilizing the EP-1110.
20  Q. Right, but you didn't go down and break out,
21 when you got a check from the Corps, how much of this is
22 for these hard costs, versus how much is overhead,
23 versus how much is profit?
24      MR. SOLOP:   Object to the form.
25      MR. GUTHRIE:   Same objection.

Page 119

1  A. When we got paid from the Corps, we paid our
2 bills, sir.
3  Q. I need you to answer the question I asked.
4  A. I don't understand your question.
5  Q. Did you break down the check you got from the
6 Corps and figure out what percent was allotted to hard
7 costs, versus what percent was not allotted to hard
8 costs?
9  A. No.
10      MR. SOLOP:   Object to the form.
11      MR. GUTHRIE:   Same objection.
12 BY MR. MORSE:
13  Q. Did you discuss with Mr. Maturin the breakdown
14 between Harbor and Diamond?
15      MR. GUTHRIE:   Object to the form.
16      MR. SOLOP:   Object to the form.
17  A. Mr. Maturin told me what the breakdown was from
18 Harbor to Diamond. My only concern was that they were
19 clear on that, and I asked him to be sure that was
20 clear because I didn't want any issues. When I go to
21 negotiate this, I'm going to get one chance to
22 negotiate it, and Mr. Maturin assured me that Diamond
23 would accept 950 thousand as full and final payment,
24 and that he would accept his five hundred thousand as
25 full and final payment, and that RLB's total cost from

Page 120

1 Harbor would be 1,450,000 for this REA.
2  Q. Did you reach out to Diamond to confirm?
3  A. No, sir, I didn't. I don't have a contract with
4 Diamond.
5  Q. Why didn't you reach out to Diamond?
6  A. I don't have a contract with them, sir.
7  Q. Mr. Boyd, I'm going to take a brief break. I'm
8 going to have some more questions, but we're approaching
9 the end, okay?
10      MR. GUTHRIE:   How long do you want to
11 take?
12      MR. MORSE:   Ten minutes.
13      COURT REPORTER:   Back on the record, 1:23.
14      THE WITNESS:   I need to clarify
15 something.
16 BY MR. MORSE:
17  Q. Yes, sir.
18  A. I thought we've been talking about a May to an
19 October time frame.
20  Q. Yes, sir.
21  A. This claim is from May 17th to February 19th.
22  Q. Right.
23  A. Everything we've been talking about is that
24 duration.
25  Q. I understand. I understand.

Page 125

1  A.  Yes, sir.
2  Q.  And invoices that are associated with the tug
3 Carolyn.  I think it's about 666 thousand dollars,
4 right?
5  A.  Yes.
6  Q.  Did you get paid for that?
7  A.  They were included in the cost and flow through
8 as the costs are supposed to within that.
9  Q.  You're going to have to explain that to me.
10  A.  They flow through the cost of the spreadsheet
11 for the REA to the 6.6 million.
12  Q.  Of the 6 million dollars that you got, how much
13 is attributable to the Carolyn?
14  A.  I couldn't break that out.
15  Q.  Some of it?
16  A.  I don't know, sir.  I didn't break it out.
17  Q.  You said that you relied on Mr. Maturin's
18 conversation with you that Diamond and Harbor would be
19 completely satisfied by, I think that's, what, 1.45
20 million?
21  A.  That's what I was told, yes, sir.
22  Q.  At that point, did you discuss with him what RLB
23 anticipated receiving?
24  A.  No, sir.
25  Q.  Why not?

Page 126

1  A.  Because I didn't have a clue of what that number
2 would be.
3  Q.  When you spoke with the Corps and you gained an
4 idea of what RLB anticipated recovering, did you then
5 go back to Mr. Maturin and say:  Here's where we are?
6  A.  No, sir.
7  Q.  Why not?
8  A.  Because Mr. Maturin had told me what they would
9 accept, and I was going to have to make a business
10 decision on what would the Corps offer and would we
11 accept the delta.
12  Q.  You already said you didn't go to Diamond to
13 confirm that 950 number, right?
14  A.  I had no discussions with Diamond, that I
15 recall.
16  Q.  Sure.  Diamond had asked you to have that
17 discussion, right?
18  A.  I don't recall.
19  Q.  I mean, you looked at a letter where Diamond
20 asked you to have that discussion, right?
21  A.  Again, I -- I received a letter from Diamond.
22 Again, Diamond gave me their certified costs.  I
23 applied their certified costs according to FAR.
24  Q.  Mr. Boyd, that's all the questions I have for
25 you right now.  I'm sure some of the other lawyers will

Page 127

1 have a couple questions, and I may have a little bit
2 more after that, all right?
3  A.  Okay.
4      MR. SOLOP:      I don't have any questions
5 at this time.  I'll tender the witness.
6      MS. DAILY:      I also don't have any
7 questions at this time.
8      MR. GUTHRIE:    Nor do I.
9      MR. MORSE:      Mr. Boyd, you're free to
10 go.  You have the right to read and sign your
11 deposition.
12      MR. GUTHRIE:    He will.
13      COURT REPORTER:  Copies, anybody?
14      MR. GUTHRIE:    Yes.
15      [Deposition was concluded 1:32 p.m.]

Page 128

1          REPORTER CERTIFICATION
2   ORAL DEPOSITION of RANDY BOYD, taken on August 11,
3 2022.
4   I, Sarah B. Townsley, CCR, RPR, CSR, hereby certify
5 to the following:
6   That the witness, RANDY BOYD, was duly sworn by me,
7 and that the transcript of the deposition is a true
8 record of the testimony given by the witness;
9   That examination and signature of the witness to the
10 deposition transcript was reserved by the witness at the
11 time of the deposition;
12   I further certify that I am neither counsel for,
13 related to, nor employed by any of the parties in the
14 action in which this proceeding was taken, and, further,
15 that I am not financially or otherwise interested in the
16 outcome of this action.
17   Certified by me on this 30th day of August, 2022.
18
19      _____
20      Sarah B. Townsley CRR CCR CSR RPR
21      Certified Realtime Reporter
22      TX CSR #5746; LA CCR #92016; RPR 814558

Randy Boyd  8/11/2022

```
                                              Page 129
 1                    ERRATA SHEET
 2 WITNESS NAME: Randy Boyd      DEPOSITION DATE:8/11/22
 3 REPORTED BY:  Sarah B. Townsley CRR, CSR, RPR, CCR
 4 Page No. _____   Line No. ____ Change to: _____
 5 _____
 6 Reason for Change: _____
 7 Page No. _____   Line No. ____ Change to: _____
 8 _____
 9 Reason for Change: _____
10 Page No. _____   Line No. ____ Change to: _____
11 _____
12 Reason for Change: _____
13 Page No. _____   Line No. ____ Change to: _____
14 _____
15 Reason for Change: _____
16 Page No. _____   Line No. ____ Change to: _____
17 _____
18 Reason for Change: _____
19 Page No. _____   Line No. ____ Change to: _____
20 _____
21 Reason for Change: _____
22 Page No. _____   Line No. ____ Change to: _____
23 _____
24 Reason for Change: _____
25
```

```
                                              Page 130
 1    I, RANDY BOYD, have read the foregoing deposition and
 2 hereby affix my signature that same is true and correct,
 3 except as noted above.
 4
 5                      _____
 6                      Randy Boyd
 7 STATE OF _____
 8 COUNTY OF _____
 9    BEFORE ME, _____, on this day
10 personally appeared Randy Boyd, either known to me or
11 proved to me under oath through _____
12 (description of identity card or other document to be
13 the person whose name is acknowledged to me that they
14 executed the same for purposes and consideration
15 therein expressed;
16    Given under my hand and seal of office this ____ day
17 of _____, 2022.
18
19                      _____
20                      NOTARY PUBLIC IN AND FOR
21                      THE STATE OF _____
22
23
24
25
```

```
 1                        ERRATA SHEET
 2   WITNESS NAME: Randy Boyd        DEPOSITION DATE: 8/11/22
 3   REPORTED BY:  Sarah B. Townsley CRR, CSR, RPR, CCR
 4   Page No. 56   Line No. 1   Change to: ~~Barges~~
 5   Waiting on Barges
 6   Reason for Change: Wrong Word
 7   Page No. 72   Line No. 11  Change to:
 8   for To FAR
 9   Reason for Change: Definition
10   Page No. 100  Line No. 17  Change to:
11   Change of Cost for Dredging To Do
12   Reason for Change: Clarify
13   Page No. 105  Line No. 5   Change to:
14   That's what we did.
15   Reason for Change: Wrong Word.
16   Page No. _____ Line No. _____ Change to: _____
17   _____
18   Reason for Change: _____
19   Page No. _____ Line No. _____ Change to: _____
20   _____
21   Reason for Change: _____
22   Page No. _____ Line No. _____ Change to: _____
23   _____
24   Reason for Change: _____
25
```

1  I, RANDY BOYD, have read the foregoing deposition and
2  hereby affix my signature that same is true and correct,
3  except as noted above.

4
5  _____
6  Randy Boyd

7  STATE OF Texas
8  COUNTY OF Calhoun
9  BEFORE ME, Pamela Lundin, on this day
10 personally appeared Randy Boyd, either known to me or
11 proved to me under oath through Texas Drivers License
12 (description of identity card or other document to be
13 the person whose name is acknowledged to me that they
14 executed the same for purposes and consideration
15 therein expressed;
16  Given under my hand and seal of office this 6th day
17 of September, 2022.

18
19  PAMELA LUNDIN
    Notary ID #129446447
    My Commission Expires
20  June 24, 2025          Pamela Lundin
                           NOTARY PUBLIC IN AND FOR
21                         THE STATE OF Texas