# EXHIBIT 5

Roland Maturin 7/29/2022

## Page 1

```
 1       IN THE UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF TEXAS
 3              GALVESTON DIVISION
 4
 5 DIAMOND SERVICES      *  CIVIL ACTION
   CORPORATION,          *  NO.:  3:21-cv-00253
 6          Plaintiff    *
                         *
 7 VERSUS                *
                         *
 8 RLB CONTRACTING, INC.,*
   HARBOR DREDGING, INC.,*
 9 and TRAVELERS CASUALTY*
   AND SURETY COMPANY OF *
10 AMERICA               *
     *  *  *  *  *  *  *
11
12
13       Deposition of ROLAND MATURIN, taken at the
14 office of Bohman | Morse, LLC, located at 400
15 Poydras Street, Suite 2050, New Orleans, Louisiana
16 70130, on Friday, the 29th day of July, 2022 at
17 12:30 p.m.
18
19
20
21 REPORTED BY:
22      QUINCEE B. ROCCAFORTE, CCR, RPR
            CERTIFIED COURT REPORTER
23
24
25
```

## Page 2

```
 1 APPEARANCES:
 2      BOHMAN | MORSE, LLC
        (BY:  HARRY E. MORSE, ESQUIRE)
 3      400 Poydras Street
        Suite 2050
 4      New Orleans, Louisiana  70130
        504-930-4009
 5      harry@bohmanmorse.com
        (Counsel for Plaintiff
 6      Diamond Services Corporation)
 7
        BIGGS, PETTIS, INGRAM & SOLOP, PLLC
 8      (BY:  CHRISTOPHER SOLOP, ESQUIRE)
        111 Capitol Building
 9      111 East Capitol Street
        Suite 101
10      Jackson, Mississippi  39201
        601-713-1192
11      csolop@bpislaw.com
        (Counsel for Defendant Harbor Dredging, Inc.
12      and Roland Maturin)
13
        KREBS | FARLEY, PLLC
14      (BY:  MEGAN DAILY, ESQUIRE)
        400 Poydras Street
15      Suite 2500
        New Orleans, Louisiana  70130
16      504-299-3570
        mdaily@krebsfarley.com
17      (Counsel for Travelers Casualty and
        Surety Company of America)
18
19      WINSTEAD, PC
        (BY:  CODY N. SCHNEIDER, ESQUIRE)
20      600 Travis Street
        Suite 5200
21      Houston, Texas  77002
        713-650-8400
22      cschneider@winstead.com
        (Counsel for Defendant RLB Contracting, Inc.)
23
   ALSO PRESENT:
24      STEPHEN SWIBER
25
```

## Page 3

```
 1                       INDEX
 2
 3 EXAMINATION BY:
 4 MR. MORSE.....................................   5
 5 MR. SCHNEIDER................................. 172
 6 RE-EXAMINATION BY:
 7 MR. MORSE..................................... 190
 8            *  *  *  *  *
 9                     EXHIBITS
10 Exhibit No. 15 - 2/24/2020 Subcontract........  15
11 Exhibit No. 16 - 2/24/2020 Subcontract........  16
12 Exhibit No. 17 - Text Message.................  71
13 Exhibit No. 18 - 10/26/2020 RLB Contracting
                    letter.......................  84
14 Exhibit No. 19 - 3/25/2021 E-mail.............  96
15 Exhibit No. 20 - 3/16/2021 E-mail............. 100
16 Exhibit No. 21 - 3/30/2021 Harbor Dredging
                    letter....................... 106
17 Exhibit No. 22 - 10/29/2021 Harbor Dredging
                    letter....................... 159
18
19
20
21
22
23
24
25
```

## Page 4

```
 1            S T I P U L A T I O N
 2
 3       It is stipulated and agreed by and between
 4 counsel for the parties hereto that the deposition
 5 of the aforementioned witness is hereby being taken
 6 under the Federal Code of Civil Procedure, for all
 7 purposes, in accordance with law;
 8       That the formalities of reading and signing
 9 are specifically waived;
10       That the formalities of sealing,
11 certification, and filing are specifically waived;
12       That all objections, save those as to the
13 form of the question and the responsiveness of the
14 answer, are hereby reserved until such time as this
15 deposition, or any part thereof, may be used or
16 sought to be used in evidence.
17
18       QUINCEE B. ROCCAFORTE, Certified Court
19 Reporter in and for the State of Louisiana,
20 officiated in administering the oath to the
21 witness.
22
23
24
25
```

Roland Maturin                                                                7/29/2022

Page 5

1          ROLAND MATURIN,
2 after having been first duly sworn by the
3 above-mentioned Certified Court Reporter was
4 examined and testified as follows:
5 EXAMINATION BY MR. MORSE:
6      Q.    Mr. Maturin, my name is Harry Morse.  I
7 represent Diamond Services Corporation, all right?
8      A.    Yes, sir.
9      Q.    I'm going to ask you a bunch of
10 questions today.  Have you ever given testimony?
11     A.    Yes.
12     Q.    I'm going to go through some of the
13 ground rules.  The most important one is this:  At
14 some point today I'm going to say something stupid,
15 or confusing or just you don't know where I'm
16 coming from, all right?
17     A.    Yes, sir.
18     Q.    When I do that, what I want you to do
19 is stop me and I want you to be sure that you know
20 what I'm asking before you answer.
21     A.    Yes, sir.
22     Q.    The reason is because if I ask you the
23 same question again when you're on the stand, I
24 want the same answer, all right?
25     A.    Yes.

Page 6

1      Q.    I'm going to ask you not to guess, all
2 right?
3      A.    Yes.
4      Q.    You might say "I don't know", sir,
5 there's nothing wrong with I don't know if that's
6 the answer, all right?
7      A.    Yes, sir.
8      Q.    If I ask you to guess, I'm going to
9 tell you.  You can say I don't know, I'm going to
10 say, Mr. Maturin, can you guess and that's a
11 different ball of wax, all right?
12     A.    All right.
13     Q.    You're under oath here today just as if
14 the judge were sitting here.  Understood?
15     A.    Yes.
16     Q.    I normally tell people there are two
17 parts of a deposition.  The first is background and
18 the second is everything else.  This is not really
19 like that, the background is going to be real
20 brief, all right?
21     A.    Yes, sir.
22     Q.    If you ever want me to back up and tell
23 you where I'm coming from, if you want to look at a
24 document, then by all means tell me you want to
25 look at that document to refresh your recollection,

Page 7

1 because this is not a memory test, all right?
2      A.    Yes.
3      Q.    Very good.
4            Mr. Maturin, you are the principal of
5 Harbor Dredging, right?
6      A.    Yes.
7      Q.    How long have you been in that role?
8      A.    Three years.
9      Q.    Are there any other principals of
10 Harbor Dredging?
11     A.    Yes.
12     Q.    How many?
13     A.    One.
14     Q.    Who's that?
15     A.    Keith Marks.
16     Q.    What is his role in Harbor Dredging?
17     A.    He's the vice president.
18     Q.    Are there any employees of Harbor
19 Dredging?
20     A.    Yes.
21     Q.    How many?
22     A.    It varies.
23     Q.    Fair.
24            At the time of this job -- if I say
25 "this job", you know I'm talking about the Brady

Page 8

1 Island job, right?
2      A.    Yes.
3      Q.    How many employees of Harbor Dredging
4 were there?
5      A.    About 15.
6      Q.    How many were working on this job?
7      A.    One.
8      Q.    Being?
9      A.    Sir?
10     Q.    Who was working on this job?
11     A.    Tyler Marks.
12     Q.    Tyler Marks is related to Mr. Marks --
13     A.    Yes.
14     Q.    -- the officer?
15           How related?
16     A.    Son.
17     Q.    Understood.
18           What was his title with the company
19 during this time period?  Tyler Marks.
20     A.    Tyler Marks, he was an
21 operator/leverman.
22     Q.    All right.  Harbor Dredging started
23 three years ago?
24     A.    Yeah, 2019.
25     Q.    Fair.

```
                                    Page 133                                          Page 135
 1      THE WITNESS:                                1           Objection; form.
 2          That would be correct.                  2      THE WITNESS:
 3  BY MR. MORSE:                                   3           I would assume that whatever their cost
 4      Q.  I asked a stupid question.  Let me back 4      was.
 5  up.                                             5      MR. MORSE:
 6          You would disagree with that if RLB     6           Sure.  Sure.
 7  said this was all of RLB's money, right?        7  BY MR. MORSE:
 8      A.  If they said it's all their money?      8      Q.  Harbor is not saying that Harbor gets
 9      Q.  (Nods head.)                            9  $3.179 million, right?
10      A.  Yes.                                   10      A.  Not at all.
11      Q.  Now, I want you to assume with me that 11      Q.  Right.
12  the Corps paid RLB $6 million?                 12          So adding those together, that gets us
13      A.  Okay.                                  13  to 816,825, right?
14      Q.  All right.                             14      MR. SCHNEIDER:
15          You don't know whether that's true or  15          Objection; form.
16  not, do you?                                   16      THE WITNESS:
17      A.  No, I don't.                           17          Whatever the math is.
18      Q.  Is that important information for you  18      MR. MORSE:
19  to know?                                       19          Sure.  Whatever the math is it is,
20      MR. SCHNEIDER:                             20      right.
21          Objection; form.                       21  BY MR. MORSE:
22      THE WITNESS:                               22      Q.  If I told you $500,000 divided by
23          Not really.                            23  816,825 is 61 percent; does that sound about right
24  BY MR. MORSE:                                  24  to you?
25      Q.  Why not?                               25      MR. SCHNEIDER:

                                    Page 134                                          Page 136
 1      A.  I submitted my costs and whatever what  1           Objection; form.
 2  my cost was, that's what I want.                2      THE WITNESS:
 3      Q.  And we can figure out -- you got        3           Whatever the math is.
 4  $500,000 out of the REA, right?                 4      MR. MORSE:
 5      A.  That's correct.                         5           Sure.
 6      Q.  Now, we can figure out what percentage  6  BY MR. MORSE:
 7  of the REA that is, right?                      7      Q.  So if I told you Harbor got paid 61
 8      A.  That's correct.                         8  percent of its claim, does that sound right to you?
 9      MR. SOLOP:                                  9      A.  Whatever the math is.
10          Object to form.                        10      MR. SCHNEIDER:
11      MR. SCHNEIDER:                             11          Objection; form.
12          Objection; form.                       12      MR. MORSE:
13  BY MR. MORSE:                                  13          Sure.
14      Q.  So Harbor's money here is the 64,371,  14  BY MR. MORSE:
15  right, plus the 489,954?                       15      Q.  You had a conversation with Jim
16      A.  Uh-huh.                                16  Furlette asking about Diamond's bottom line,
17      Q.  In overhead, right?                    17  correct?
18      A.  Correct.                               18      A.  That's correct.
19      Q.  Plus the 262,500 in profit, right?     19      Q.  Tell me what was said in that
20      A.  Correct.                               20  conversation.
21      Q.  Everything else is owed to Diamond,    21      A.  I told him what do we need to settle
22  right?                                         22  this claim and put it behind us.
23      MR. SOLOP:                                 23      Q.  And he said?
24          Object to the form.                    24      A.  He said I'll check with Steve, I'll get
25      MR. SCHNEIDER:                             25  back to you, and he gave me the 950.  Actually, he
```

Page 137

1  gave me the 900.
2     Q.   All right.  And you did what with that
3  information?
4     A.   Then I took that information, related
5  to that Mr. Boyd.
6     Q.   When did you have that conversation or
7  those two conversations with Mr. Furlette?
8     A.   Well, I don't remember the exact dates
9  before.
10    Q.   Roughly?
11    A.   I'd have to look back.  Probably some
12 time in March.
13    Q.   So if this is submitted March 30th,
14 it's probably --
15    A.   Somewhere in that time.  I don't
16 remember the exact days.
17    Q.   Before or after the REA was submitted?
18    A.   After.
19    Q.   Before or after you knew what you were
20 going to get out of the REA?
21    MR. SCHNEIDER:
22         Objection; form.
23    THE WITNESS:
24         I didn't know what I was going to get,
25    to tell you the truth.

Page 138

1  BY MR. MORSE:
2     Q.   At some point you learned?
3     A.   Some point I learned, yes.
4     Q.   What I'm trying to figure out,
5  Mr. Maturin, is this:  You know what?  Let me back
6  up.
7          You knew Mr. Furlette's role at Diamond
8  as Vice President, right?
9     A.   That's correct.
10    Q.   You had a bunch of e-mails that we
11 looked at from Stephen Swiber, right?
12    A.   I wouldn't say a bunch.
13    Q.   Couple?
14    A.   Couple.
15    Q.   Text messages with Mr. Swiber, right?
16    A.   Yes.
17    Q.   Why didn't you call Mr. Swiber?
18    MR. SCHNEIDER:
19         Objection; form.
20    THE WITNESS:
21         Because I interacted with Jim.
22 BY MR. MORSE:
23    Q.   And with Stephen?
24    A.   Very little with Stephen.
25    Q.   You mostly interacted with Jim?

Page 139

1     A.   That's correct.
2     Q.   Did you ever commit this thing about
3  900 or $950,000 to writing?
4     A.   No.
5     Q.   Why not?
6     MR. SCHNEIDER:
7          Objection; form.
8     THE WITNESS:
9          Because they were in the middle of
10    negotiations, so I just spoke to Jim.
11    MR. MORSE:
12         Sure.
13 BY MR. MORSE:
14    Q.   What did you tell Jim or what did you
15 ask him?
16    A.   I asked him about what their bottom
17 line number was --
18    Q.   All right.
19    A.   -- to settle this.
20    Q.   And he told you?
21    A.   To put it behind us.
22    Q.   And he told you?
23    A.   He actually told me 900.
24    Q.   Uh-huh.
25         How did you get to 950?

Page 140

1     A.   We were able to get more money.  I went
2  up in the hopes that in case we had to go down, we
3  could.
4     Q.   "We were able to get more money"?
5     A.   Yeah, the Corps accepted.
6     Q.   You just told me you didn't know what
7  the Corps gave to RLB, so how do you know that you
8  were able to get more money?
9     A.   What do you mean?
10    MR. SCHNEIDER:
11         Objection; form.
12 BY MR. MORSE:
13    Q.   You just told me repeatedly you don't
14 know how much money --
15    A.   That's right.
16    Q.   How do you know -- what does "we were
17 able to get more money" mean?
18    A.   Because RLB said we can get -- we got
19 another 50,000 for them.
20    Q.   All right.
21    A.   Okay?
22    Q.   For Diamond?
23    A.   Yes.
24    Q.   RLB got another $50,000 for Diamond?
25    A.   That's correct.

Page 181

1  A.  Yes, sir.
2  Q.  Okay.  You then took Diamond's
3 certified cost and prepared Harbor Dredging's
4 certified cost, correct?
5  A.  Correct.
6  Q.  If you put that exhibit to the side and
7 pull out what is marked as Exhibit 21.
8  A.  Okay.
9  Q.  Let me know when you have it in front
10 of you, Mr. Maturin.
11  A.  Sorry it took me so long.
12  Q.  No, you're fine.  Take as much time as
13 you need.
14      Do you have Exhibit No. 21 in front of
15 you, Mr. Maturin?
16  A.  Yes, sir.
17  Q.  All right.  What is Exhibit 21,
18 Mr. Maturin?
19  A.  It is the submission of total certified
20 costs for Harbor.
21  Q.  For Harbor.  Does Exhibit 21 include
22 Diamond's certified costs?
23  A.  Yes.
24  Q.  What was your intention of preparing
25 Exhibit 21 -- what is represented in Exhibit 21 as

Page 182

1 Harbor's certified costs, why did you create this
2 document?
3  A.  That was the submission for the REA.
4  Q.  And you were to submit the Harbor
5 certified costs for the submission of the REA to
6 RLB Contracting?
7  A.  Correct.
8  Q.  Did you submit the certified costs
9 represented in Exhibit 21 to RLB Contracting?
10  A.  Yes.
11  Q.  Okay.  You can put that to the side.
12      And the certified costs that we just
13 went over that were dated March 30th, 2021, all of
14 those were submitted before the Army Corps of
15 Engineers made a determination on the request for
16 equitable adjustment, right?
17  A.  Yes.
18  Q.  Okay.  But before the Army Corps of
19 Engineers had made the decision on the amount for
20 the request for equitable adjustment, you had had
21 conversations with Mr. Furlette of Diamond about
22 what --
23  A.  Yes.
24  Q.  -- Diamond -- sorry?
25  A.  Yes.

Page 183

1  Q.  The conversations with Mr. Furlette
2 were on what Diamond was willing to accept as its
3 bottom line settlement number as part of the
4 request for equitable adjustment?
5  A.  Yes.
6  Q.  And that number that you testified
7 earlier that Mr. Furlette told you Diamond would
8 accept was $900,000?
9  A.  That's correct.
10  Q.  And, in fact, more money was provided
11 to Diamond, Diamond was actually paid $950,000 as
12 part of the request for equitable adjustment?
13  A.  Correct.
14  Q.  If you can pull out what's been
15 previously marked as Exhibit 11.  Let me know when
16 you have Exhibit 11.
17  A.  Yes, sir.
18  Q.  Do you recognize what's been marked as
19 Exhibit 11?
20  A.  Yes, sir.
21  Q.  And I believe if you can pull out
22 Exhibit 22.  If you look at the first page of
23 Exhibit 11 and Exhibit 22.  Do these appear to be
24 the same letter?
25  A.  Yes.

Page 184

1  Q.  The only distinction between Exhibit 22
2 and Exhibit 11 is that Exhibit 11 contains the
3 enclosures or attachments with this October 29th,
4 2021 letter, correct?
5  A.  Yes.
6  Q.  Okay.  In the second paragraph of this
7 letter, I want to go back just a step.
8      This letter dated October 29, 2021, was
9 from you, right?
10  A.  Yes.
11  Q.  And it was addressed to Mr. Furlette
12 with Diamond?
13  A.  Correct.
14  Q.  And did you send this letter to
15 Mr. Furlette at Diamond at the address shown in
16 Exhibit 11?
17  A.  Yes.
18  Q.  Okay.  In Exhibit 11, the second full
19 paragraph, it states "As you recall, in preparation
20 for RLB's negotiation of the different site
21 condition claim with the government, I asked you on
22 several occasions for the amount Diamond would
23 accept for the settlement of claim"; did I read
24 that correctly?
25  A.  Yes.

Roland Maturin                                                                                    7/29/2022

|  | Page 193 |
|---|---|

1  RE-EXAMINATION BY MR. SCHNEIDER:
2       Q.   You testified earlier, Mr. Maturin,
3  that you had believed that Diamond had sent tug
4  invoices directly to RLB; is that correct?
5       A.   I don't know that for sure.  Did I say
6  that?  I don't know that.
7       Q.   Let me ask you this:  Do you think that
8  Diamond sent tug invoices directly to RLB for the
9  Brady Island Project?
10      A.   I don't know.
11      Q.   You don't know one way or the other?
12      A.   That's correct.  I don't know.
13  MR. SCHNEIDER:
14           I promise those are all the questions I
15      have for you.
16           Pass the witness.
17  MR. MORSE:
18           Mr. Maturin, thank you very much.
19      (At this time, 3:32 p.m., testimony was
20      concluded and the record was closed.)
21
22
23
24
25

|  | Page 194 |
|---|---|

1                 ERRATA SHEET
2  WITNESS:     ROLAND MATURIN
3  DATE TAKEN:  Friday, July 29, 2022
4
5            Page#___  Line#___
6  Reason:_____
7            Now
8  Reads:_____
9            Change
10 To:_____
11           Page#___  Line#___
12 Reason:_____
13           Now
14 Reads:_____
15           Change
16 To:_____
17           Page#___  Line#___
18 Reason:_____
19           Now
20 Reads:_____
21           Change
22 To:_____
23           Page#___  Line#___
24 Reason:_____
25           Now

|  | Page 195 |
|---|---|

1  Reads:_____
2            Change
3  To:_____
4            Page#___  Line#___
5  Reason:_____
6            Now
7  Reads:_____
8            Change
9  To:_____
10           Page#___  Line#___
11 Reason:_____
12           Now
13 Reads:_____
14           Change
15 To:_____
16           Page#___  Line#___
17 Reason:_____
18           Now
19 Reads:_____
20           Change
21 To:_____
22
23
24
25

|  | Page 196 |
|---|---|

1
2                WITNESS' CERTIFICATE
3
4      I, ROLAND MATURIN, deponent in the foregoing
5  deposition, do hereby certify that the same was
6  submitted to me for examination; that I have read
7  the deposition and find it to be a true and correct
8  transcription of the testimony as given by me
9  before Quincee B. Roccaforte, RPR, CCR, with the
10 exception of any corrections noted on the attached
11 Errata Sheet(s).
12
13
14           [ ] Without Corrections
15           [ ] With Corrections, as reflected
               on the Errata Sheet(s)
16         prepared by me and attached
           hereto, consisting of
17           ___ pages
18
19
20
21
       _____  _____
22       Date              Deponent's Signature
23
24
25

Roland Maturin                                                              7/29/2022

```
                                                      Page 197
 1              REPORTER'S CERTIFICATE
 2
         I, QUINCEE B. ROCCAFORTE, Certified Court
 3  Reporter in and for the State of Louisiana,
    Certificate No. 21016, as the officer before whom
 4  this testimony was taken, do hereby certify that
    ROLAND MATURIN, after having been duly sworn by me
 5  on July 29, 2022, upon authority of R.S. 37:2554,
    did testify as hereinbefore set forth in the
 6  foregoing 196 pages;
         That this testimony was reported by me in the
 7  stenotype reporting method, was prepared and
    transcribed by me or under my personal direction
 8  and supervision, and is a true and correct
    transcript to the best of my ability and
 9  understanding;
         That the transcript has been prepared in
10  compliance with transcript format guidelines
    required by statute or by rules of the board, and
11  that I am informed about the complete arrangement,
    financial or otherwise, with the person or entity
12  making arrangements for deposition services;
         That I have acted in compliance with the
13  prohibition on contractual relationships, as
    defined by Louisiana Code of Civil Procedure
14  Article 1434 and in rules and advisory opinions of
    the board;
15       That I have no actual knowledge of any
    prohibited employment or contractual relationship,
16  direct or indirect between a court reporting firm
    and any party litigant in this matter or is that
17  any such relationship between myself and a party
    litigant in this matter.
18       I am not related to counsel or to the parties
    herein, nor am I otherwise interested in the
19  outcome of this matter.
20
         Dated this 8th day of August, 2022.
21
22
23
                    _____
24                  QUINCEE B. ROCCAFORTE, CCR, RPR
                    Certificate No. 21016
25
```